**238**

In re JAPANESE ELECTRONIC PROD-
UCTS ANTITRUST LITIGATION
(D.C. MDL No. 189).

ZENITH RADIO CORPORATION,
Appellant,

v.

MATSUSHITA ELECTRIC INDUSTRI-
AL CO., LTD., et al. (D.C.Civ.
No. 74–2451).

In re JAPANESE ELECTRONIC PROD-
UCTS ANTITRUST LITIGATION
(D.C. MDL No. 189).

NATIONAL UNION ELECTRIC
CORPORATION, Appellant,

v.

MATSUSHITA ELECTRIC INDUSTRI-
AL CO., LTD., et al. (D.C.Civ.
No. 74–3247).

In re JAPANESE ELECTRONIC PROD-
UCTS ANTITRUST LITIGATION
(D.C. MDL No. 189).

ZENITH RADIO CORPORATION

v.

MATSUSHITA ELECTRIC INDUSTRI-
AL CO., LTD., et al. (D.C.Civ.
No. 74–2451).

NATIONAL UNION ELECTRIC
CORPORATION

v.

MATSUSHITA ELECTRIC INDUSTRIAL
CO., LTD., et al. (D.C.Civ. No. 74–3247)
Mitsubishi Electric Corporation ("MEL-
CO"), Appellant.

Nos. 81–2331 to 81–2333.

United States Court of Appeals,
Third Circuit.

Argued Oct. 21 and 22, 1982.

Decided Dec. 5, 1983.

See also D.C., 505 F.Supp. 1190, 494
F.Supp. 1190, 494 F.Supp. 1263.

Edwin P. Rome (argued), Morris L. Weisberg, William H. Roberts, Arnold I. Kalman, Kathleen Herzog Larkin, Norman E. Greenspan, Margaret B. Dardess, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., for appellants, Zenith Radio Corp. and Nat. Union Elec. Corp.; Philip J. Curtis, John Borst, Jr., Zenith Radio Corp., Glenview, Ill., of counsel.

Asa D. Sokolow (argued), Renee J. Roberts, Brian G. Lustbader, Rosenman, Colin, Freund, Lewis & Cohen, Joshua F. Greenberg, Randolph S. Sherman, Kaye, Scholer, Fierman, Hays & Handler, New York City, Franklin Poul, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for appellees, Sony Corp. and Sony Corp. of America.

Louis A. Lehr, Jr. (argued), Stanley M. Lipnick, John L. Ropiequet, Carol R. Kanter, Arnstein, Gluck & Lehr, Chicago, Ill., Harry A. Short, Jr., Liebert, Short, Fitzpatrick & Lavin, Philadelphia, Pa., for appellee, Sears, Roebuck and Co.; Philip M. Knox, Jr., Charles A. Tausche, Ann M. Coons, Law Dept., Sears, Roebuck and Co., Chicago, Ill., of counsel.

Thomas P. Coffey (argued), E. Houston Harsha, Karl F. Nygren, Chicago, Ill., for appellee, Motorola, Inc.; Kirkland & Ellis, Chicago, Ill., of counsel.

Henry T. Reath (argued), Terry R. Broderick, Duane, Morris & Heckscher, Philadelphia, Pa., Hoken S. Seki, Seki, Jarvis & Lynch, Chicago, Ill., John T. Dolan, Arnold B. Calmann, Crummy, Del Deo, Dolan & Purcell, Newark, N.J., for appellee, Mitsubishi Elec. Corp.

Charles F. Schirmeister (argued), Charles Z. Krueger, Reid & Priest, New York City, Thomas N. O'Neill, Jr., Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., for appellees, Mitsubishi Corp. and Mitsubishi Intern. Corp.

Donald J. Zoeller (argued), Mudge, Rose, Guthrie & Alexander, New York City, Drinker, Biddle & Reath, Philadelphia, Pa., Liaison Counsel for appellees and for Toshiba defendants.

Whitman & Ransom, New York City, Hunt, Kerr, Bloom, Hitchner, O'Brien & Conrad, Philadelphia, Pa., for Sanyo appellees.

Kirkland & Ellis, Chicago, Ill., Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, Pa., for Motorola appellee.

Wender, Murase & White, New York City, Dechert, Price & Rhoads, Philadelphia, Pa., for the Sharp appellees.

Morgan, Lewis & Bockius, Philadelphia, Pa., Ira M. Millstein (argued), A. Paul Victor, Joel B. Harris (argued), Weil, Gotshal & Manges, New York City, for Matsushita appellees.

William H. Barrett, Carl W. Schwarz, Metzger, Shadyac & Schwarz, Washington, D.C., for Hitachi, Ltd., Hitachi Kaden Hanbai Kabushiki Kaisha and Hitachi Sales Corp. of America.

H. William Tanaka, Lawrence R. Walders and B. Jenkins Middleton, Tanaka, Walders & Ritger, Washington, D.C., for Hitachi, Ltd., et al.

### INDEX

I. The Parties and the Charges — 251

II. Proceedings to Date — 252
 A. Preliminary Substantive Rulings — 252
 B. Preliminary Procedural and Evidentiary Rulings — 255
 C. The Summary Judgment Ruling — 256

III. Scope of Review — 257

IV. The Trial Court Did Not Err in Considering the Summary Judgment Motions on This Record — 257

V. Evidence Issues — 259
 A. The Propriety of *in Limine* Rulings — 260
 B. Standards for Admission of Coconspirator Statements · — 260
 C. Rule 803(8)(C) Materials — 263
 1. The Court's General Approach to Rule 803(8)(C) — 264
 2. Reports Prepared by the United States Treasury Department Under the 1921 Antidumping Act — 266
 3. Findings Under the Trade Expansion Act of 1962 and the Trade Act of 1974 — 271
 4. Records and Findings of the Japanese Fair Trade Commission — 271
 5. Judge Hibbinbotham's Findings of Fact — 275
 D. Rule 702 Expert Opinion Evidence — 275
 1. The DePodwin Report — 279
 a. Parts IV and V — 280
 b. Part VI — 280
 c. Part VII — 282
 2. The Yamamura Report — 282

3. The Nehmer Report ............... 283
4. The Saxonhouse Report .......... 283
5. The Haley Report ................. 284
E. Rule 803(6) Materials ................ 284
 1. Authentication .................... 284
 2. Admissibility ...................... 287
 a. The Diaries .................... 289
 (1) The Yajima Diaries ...... 289
 (2) The Yamada, Tokizane and
 Kozukue Diaries .......... 291
 (3) The Yamamoto Diary ..... 292
 (4) The Okuma Diary ......... 292
 b. Internal Memoranda ......... 293
 c. Minutes of Trade Group Meet-
 ings ........................... 296
F. Rule 804(b) Materials ............... 298
G. Rule 801(d)(2) Materials ............ 300
H. Rules 803(24), 804(b)(5) and 803(1) 301
I. Other Contentions .................. 303
J. Other Evidence ..................... 303

VI. Liability Issues ....................... 303
 A. Conspiracy .......................... 303
 1. The Legal Standard for Sufficiency
 of Evidence of Conspiracy ...... 303
 2. The NUE-Zenith Theory of the
 Case ............................. 305
 3. Evidence Supporting the NUE-
 Zenith Conspiracy Theory ...... 306
 a. Evidence Relating to Japanese
 Home Market .................. 306
 b. Evidence Relating to Exports to
 U.S. ........................... 310
 (1) Motorola, Inc. ............ 311
 (2) Sears, Roebuck & Co. .... 312
 (3) Sony Corporation ......... 313
 (4) MELCO, Mitsubishi Corpo-
 ration and Mitsubishi Inter-
 national Corporation ...... 314
 (5) The Remaining Defendants 314
 4. Proof of Injury Arising From Viola-
 tion of the Antitrust Laws ..... 315
 5. The Defense of Sovereign Compul-
 sion ............................. 315
 6. The *Illinois Brick* Defense ..... 315
 7. Conclusion as to the Conspiracy 316
 B. The Attempt to Monopolize ........ 316
 C. The Robinson-Patman Claims ...... 316
 1. Discrimination Between Japanese
 and American Customers ....... 316
 2. Discrimination Among American
 Customers ...................... 317
 D. Zenith's Clayton Act Section 7 Claim 317
 E. Clayton Act Injunctive Relief ..... 318

VII. Conclusion ........................... 319

* Hon. Thomas J. Meskill, United States Circuit Judge for the Second Circuit, sitting by designation.

1. *In re Japanese Elec. Prod. Antitrust Litig.,* 388 F.Supp. 565 (Jud.Pan.Mult.Lit.1975). Both of the New Jersey judges to whom the NUE case was assigned died before any substantial progress was made toward its disposition. In Pretrial Order No. 182 the transfer was made permanent, and the cases were consolidated for

Before SEITZ, Chief Judge, GIBBONS and MESKILL *, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

The plaintiffs, National Union Electric Corporation (NUE) and Zenith Radio Corporation (Zenith), appeal from an order of the District Court for the Eastern District of Pennsylvania granting summary judgment in favor of all twenty-four defendants on their respective complaints. The NUE complaint, filed in the District of New Jersey in December 1970, as amended, names as defendants seven Japanese television manufacturers, eight of their subsidiaries, and one Japanese trading company and its United States subsidiary. The Zenith complaint, filed in the Eastern District of Pennsylvania in September 1974, names as defendants all of those named in the NUE complaint, a few additional subsidiaries, and two American companies: Motorola, Inc., a manufacturer of consumer electronic products, and Sears Roebuck & Co., a retailer. On January 10, 1975, the Judicial Panel on Multidistrict Litigation transferred the NUE case to the Eastern District of Pennsylvania, pursuant to 28 U.S.C. § 1407 (1976 & Supp. V 1981), for coordinated or consolidated pre-trial proceedings with the Zenith case.[1] The defendants and the charges made against them are described more particularly hereafter. Although counterclaims filed by several of the defendants are pending unresolved in the district court, we have jurisdiction over the grant of summary judgment on the NUE and Zenith claims because that court, pursuant to Fed.R. Civ.P. 54(b), directed the entry of a final judgment as to fewer than all claims.[2] We

trial in the Eastern District. *See Zenith Radio Corp. v. Matsushita Elec. Indus. Co.,* 513 F.Supp. 1100, 1119 (E.D.Pa.1981).

2. That direction resulted in a final order dismissing charges based on the Sherman Act, sections 1 and 2, the Wilson Tariff Act, the Robinson-Patman Act and the Clayton Act, section 7, and the Antidumping Act of 1916. There is also pending in this court at No. 80–2080, an appeal pursuant to 28 U.S.C.

conclude that as to most of the defendants the record discloses material issues of disputed fact which made the entry of summary judgment improper. Thus we reverse, except as hereafter noted.

## I. The Parties and the Charges

NUE is the corporate successor to Emerson Radio Co., a manufacturer of radio and television receivers, which ceased production of television receivers in February 1970 when it could no longer conduct that activity profitably. NUE claims that it was forced from the market by the unlawful activities of the defendants. Zenith is still a major manufacturer of television receivers. It claims that it has incurred operating losses and lost profits because of the unlawful activities of the defendants.

Both plaintiffs allege a conspiracy to drive all American manufacturers of television receivers out of business by a "scheme to raise, fix and maintain artificially *high* prices for television receivers sold by defendants in Japan and, at the same time, to fix and maintain *low* prices for television receivers exported to and sold in the United States." Preliminary Pretrial Memorandum, App., vol. 3, at 712. Both plaintiffs charge that such activity violates sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1982), and section 73 of the Wilson Tariff Act, 15 U.S.C. § 8 (1982). Both complaints also charge that the pricing activity complained of violates the Antidumping Act of 1916, 15 U.S.C. § 72 (1982). Zenith's complaint alleges sales at depressed prices not only of television receivers, but of radios, phonographs, tape and audio equipment, and electronic components. Zenith also alleges price discrimination among purchasers in violation of section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a) (1982), and as to two Japanese defendants, a violation of section 7 of the Clayton Act, 15 U.S.C. § 18 (1982), by acquiring interests in American manufacturers of consumer electronic products formerly owned by Motorola, Inc. and Sears, Roebuck & Co. Both NUE and Zenith seek treble damages and injunctive relief.

Of the twenty-four defendants, seventeen and named in both suits; seven are named in the Zenith action only. Among the principal Japanese defendants, Mitsubishi Corporation is a trading company, Matsushita Electric Industrial Co., Ltd. (MEI), Toshiba Corporation, Hitachi, Ltd., Sharp Corporation, Sanyo Electric Co., Ltd., Sony Corporation[3] and Mitsubishi Electric Corporation (MELCO) are manufacturers of television receivers and other consumer electronic products. Many of the subsidiaries of these Japanese corporations are also joined as defendants.[4] The section 7 Clayton Act charge addresses two transactions engaged in by Sears Roebuck & Co. and Motorola, Inc., respectively, with individual Japanese defendants. Sears Roebuck & Co., one of this country's largest retailers of consumer electronic products, at one time was a twenty-five percent owner of Warwick Electronics, Inc., a manufacturer of television receivers for private label retail customers. Warwick, in 1976, was acquired by a Sanyo Electric Co. subsidiary in which Sears retained a twenty-five percent interest. Motorola, Inc., a manufacturer of consumer electronic products, sold

§ 1292(b) (1976), from an order granting partial summary judgment for the defendants on charges that they violated the Antidumping Act of 1916. *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.,* 494 F.Supp. 1190 (E.D.Pa. 1980). The opinion of the court deciding plaintiffs' appeals from the dismissal of all their claims under the Antidumping Act of 1916 will be filed simultaneously with this opinion.

**3.** Sony Corporation and its sales subsidiary, Sony Corporation of America, were originally named in both suits, but settled with Zenith in 1977.

**4.** The subsidiaries include Mitsubishi International Corp., Matsushita Electronics Corp. of America, Matsushita Electric Corp., Matsushita Electric Trading Co., Quasar Electronics Corp., Toshiba America, Inc., Hitachi Sales Corp. of Japan, Hitachi Sales Corp. of America, Sharp Electronics Corp., Sanyo Electric, Inc., Sanyo Electric Trading Co., Sanyo Electric Manufacturing Co., Sony Corp. of America, and Melco Sales, Inc.

its television manufacturing business and its trademark "Quasar" to MEI in 1974.

. We deal in this opinion with charges based on the Sherman Act, section 1, and the Wilson Tariff Act, both of which are directed at combinations or conspiracies, and which, in granting summary judgment, the district court treated as co-equal in scope.[5] We also deal with the charges that the defendants monopolized and attempted to monopolize in violation of section 2 of the Sherman Act. We deal as well with the charges that some defendants violated the Robinson-Patman Act by giving or receiving price discriminations. Finally, we deal with the charge that the Warwick and Motorola transactions violated section 7 of the Clayton Act. Only the section 1 Sherman Act and the Wilson Tariff Act charges require proof of a combination or conspiracy. Evidence bearing on those conspiracy charges, however, is relevant to the non-conspiracy charges in many instances. As described in the plaintiffs' Preliminary Pretrial Memorandum and noted above, "the conspiracy involved an unlawful, concerted scheme to raise, fix and maintain artificially *high* prices for television receivers sold by defendants in Japan and, at the same time, to fix and maintain *low* prices for television receivers exported to and sold in the United States." App., vol. 3, at 712.

## II. Proceedings to Date

The summary judgment which we review was entered only after a series of prelimi- nary rulings, some of which serve as the predicates for that judgment. Others rejected certain defenses which are now tendered as alternative grounds for affirmance. Thus a complete understanding of the proceedings to date is necessary for the disposition of this appeal.

### A. *Preliminary Substantive Rulings*

In 1975, shortly after the NUE case was transferred to the Eastern District of Pennsylvania, Judge Higginbotham granted motions by the defendants to dismiss Count V of the NUE complaint and Count IV of the Zenith complaint. Both counts charged that by selling electronic consumer products of like grade and quality in Japan at prices higher than those charged to customers in the United States the Japanese manufacturers violated section 2(a) of the Robinson-Patman Act.[6] Judge Higginbotham held that these counts failed to state a claim on which relief could be granted because the Robinson-Patman Act required that both of the discriminatory sales take place in the United States.[7] In the order appealed from, Judge Becker, to whom the case was assigned when Judge Higginbotham was appointed to this court, directed that the dismissal of the Robinson-Patman claim be made final.[8] The NUE notices of appeal are from the entire order, and thus Judge Higginbotham's Robinson-Patman Act ruling is before us.[9]

Judge Higginbotham next addressed the defendants' motions to dismiss Count I of

---

**5.** *See Zenith Radio Corp. v. Matsushita Elec. Indus. Co.,* 513 F.Supp. 1100, 1162–64 (E.D.Pa. 1981).

**6.** Section 2(a) provides in pertinent part:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, . . . to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States . . . and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly

receives the benefit of such discrimination, or with the customers of either of them . . . .
15 U.S.C. § 13(a) (1982)

**7.** *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.,* 402 F.Supp. 244 (E.D.Pa.1975).

**8.** In so ruling he also disposed of Zenith's alternative claim that there were price discriminations among American purchasers. *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.,* 513 F.Supp. at 1323–29.

**9.** Perhaps because of the limitations on brief size imposed by this court in proceedings under Fed.R.App.P. 33, the NUE-Zenith brief does not address the Robinson-Patman Act claim. At oral argument, however, counsel for NUE and Zenith represented that he was abandoning none of their claims.

the NUE and Count VII of the Zenith complaint, which charged violations of the Antidumping Act of 1916. The motions were predicated on the theory that the statute was void for vagueness. The court denied those motions.[10] At a later stage in the proceedings Judge Becker granted summary judgment on those counts.[11] Judge Higginbotham's ruling on the vagueness challenge is before us in appeal No. 80–2080 from that ruling. *See* note 2 *supra*.

In May of 1975 Judge Higginbotham addressed a series of motions by various defendants to dismiss for lack of personal jurisdiction, improper venue, and insufficient service of process. These rulings were made on affidavits and exhibits after extensive discovery on jurisdictional and venue issues. The court held that venue was proper under section 12 of the Clayton Act, 15 U.S.C. § 22 (1982), in the districts in which each action was originally filed, and that there was pendent venue over the Antidumping Act claim even if section 12 did not apply. Judge Higginbotham also held that there were sufficient defendant contacts with those districts to support personal jurisdiction, and that each defendant had been properly served.[12]

Discovery and other pretrial proceedings in the case went forward under the supervision first of Judge Higginbotham and later of Judge Becker. When discovery was substantially complete, Judge Becker, in June of 1979, considered the motion by certain defendants to strike the NUE and Zenith demands for jury trial. Those motions were denied, but the court certified, pursuant to 28 U.S.C. § 1292(b), that the order denying them presented a controlling question of law as to which there was substantial ground for difference of opinion, the pre-trial resolution of which would materially advance the litigation. The district court held that a jury trial could not be denied on the ground that the issues in the case were too complex for juror comprehension.[13] This court granted the petition for leave to appeal, and held, one judge dissenting, that the seventh amendment guarantee of the right to jury trial does not prevent the striking of a jury demand when the lawsuit is so complex that the jury would be unable to perform the task of rational decision-making with a reasonable understanding of the factual and legal issues. We remanded for reconsideration of the jury trial demand.[14] Without reconsidering the jury trial issue, the trial court eventually granted the summary judgment from which this appeal was taken. While the section 1292(b) appeal on the jury trial issue was under consideration by this court, the district court went forward with the consideration of other motions and with other pre-trial proceedings.

In April of 1980 the trial court considered the motion by MELCO to dismiss the antitrust claims against it on the ground that as a matter of international law it lacked subject matter jurisdiction to impose antitrust liability on a Japanese corporation for activities taking place entirely in Japan. The court denied that motion, holding that as a matter of law those activities would, if proved, support antitrust liability for conduct intended to affect interstate or foreign commerce of the United States.[15] MELCO argues here that the district court erred, and that its subject matter jurisdiction contention, based on international law, is an alternative ground for affirmance. Thus we must address it.

---

10. *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 402 F.Supp. 251 (E.D.Pa.1975), *petition denied*, 521 F.2d 1399 (3d Cir.1975).

11. *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 494 F.Supp. 1190 (E.D.Pa.1980) (granting partial summary judgment); *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 513 F.Supp. 1100, 1316 n. 372 (E.D.Pa.1981) (granting summary judgment on Zenith's remaining claims under 1916 Act).

12. *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 402 F.Supp. 262 (E.D.Pa.1975).

13. *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 478 F.Supp. 889 (E.D.Pa.1979).

14. *In re Japanese Elec. Prod. Antitrust Litig.*, 631 F.2d 1069 (3d Cir.1980).

15. *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 494 F.Supp. 1161 (E.D.Pa.1980).

Also in April of 1980 the court considered defendants' motions for summary judgment on the NUE and Zenith claims under the Antidumping Act of 1916. Holding that because of technical differences the products sold in Japan and the United States were not sufficiently similar to support liability under that Act, the court granted partial summary judgment dismissing all of NUE's claims under the 1916 Act and most of Zenith's. It certified, however, that its interpretation of the Act was a controlling question of law as to which there is a substantial ground for a difference of opinion and that an interlocutory appeal might materially advance the ultimate disposition of the litigation.[16] We granted leave to appeal, but before that appeal was decided summary judgment was granted on the balance of the plaintiffs' case. Thus that interlocutory appeal was held for disposition by the same panel to which the instant appeal is assigned. As noted above, that appeal and the dismissal of Zenith's remaining 1916 Act claims are being decided simultaneously.

In May of 1980 the trial court considered the motion by certain defendants for summary judgment against Zenith on the ground that Zenith could not recover damages under section 4 of the Clayton Act because it was only indirectly injured, since all its sales were made through wholesalers, with whom the defendants competed. That motion was predicated on *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), and *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). The court denied it, holding that in the circumstances of this case the administrative difficulty of proving a pass-on defense was not a ground for dismissing the complaint.[17]

In June of 1980 the trial court denied the motion of defendant Sharp Electronics Corporation for summary judgment on plaintiffs' claim based on the Antidumping Act of 1916. Sharp urged that Zenith's claim against it is barred by Article XVI(1) of the Treaty of Friendship, Commerce and Navigation between the United States and Japan, 4 U.S.T. 2063, T.I.A.S. No. 2863 (1953). The court held that the treaty did not bar plaintiffs' claims under the Antidumping Act.[18] Sharp urges that the court erred, and relies on the Treaty as an alternative ground for affirming the dismissal of plaintiffs' 1916 Act claims. The opinion addressing those claims disposes of Sharp's contention.

In June of 1980 the trial court also considered the motion by the defendants for summary judgment on NUE's complaint because in 1974 all of NUE's stock was acquired by Aktiebolaget Electrolux (Electrolux), a Swedish corporation. Relying on *Bangor Punta Operations, Inc. v. Bangor & Aroostook Railroad Co.,* 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974), the defendants contended that the complaint should be dismissed because Electrolux, the real party in interest, having suffered no injury from defendants' conduct, lacked standing to sue. The court suggested that the *Bangor Punta* rule was inapplicable as a matter of law, but held that if it was applicable there were genuine fact issues with respect to such application which would in any event bar summary judgment.[19] Defendants do not on appeal contend that the denial of summary judgment on the *Bangor Punta* ground was an error which, if considered by us, would be an alternative ground for affirmance of the summary judgment.

On June 30, 1980 the trial court, without opinion, denied the motion of Sears, Roebuck & Co. for summary judgment on statute of limitations issues, holding that there were genuine issues of material fact on questions of fraudulent concealment and

**16.** *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.,* 494 F.Supp. 1190, 1243 (E.D.Pa.1980).

**17.** *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.,* 494 F.Supp. 1246 (E.D.Pa.1980).

**18.** *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.,* 494 F.Supp. 1263 (E.D.Pa.1980).

**19.** *National Union Elec. Corp. v. Matsushita Elec. Indus. Co.,* 498 F.Supp. 991 (E.D.Pa.1980).

due diligence.[20] Sears does not on appeal urge that any applicable statute of limitations affords an alternative ground for affirming the summary judgment.

### B. *Preliminary Procedural and Evidentiary Rulings*

Throughout this protracted case the parties were before the trial court on numerous occasions on discovery matters, a circumstance which resulted in many pretrial orders and at least one reported opinion.[21] The product of all of that discovery amounts to several hundred thousand documents, many of which were furnished by the defendants pursuant to Fed.R.Civ.P. 33(c) in lieu of specific answers to interrogatories.[22] Prior to the trial court's ruling denying defendants' motions to strike the NUE and Zenith jury trial demands, it also entered a case management order, Pretrial Order No. 154, governing the further progress of the litigation.[23] That order regulated completion of discovery and directed the preparation by each party of a final pretrial statement (FPS). Its key provision is that "[e]xcept for good cause shown, the parties are precluded from offering at trial any facts or evidence supporting such facts which have not been disclosed in the FPS." 478 F.Supp. at 949–50. Pretrial Order No. 154 required the inclusion in the FPS of lists of all public records, reports or data compilations of public officers or agencies, of all documents from private sources, of all depositions, of charts, graphs, models, and reports of experts which the parties intended to offer in evidence. It also dealt with translation of documents. The effect of Pretrial Order No. 154 was to require that each party make, before trial, with preclusive effect, a complete offer of proof on each issue it intended to prove. The order directed that NUE and Zenith file their FPS first, and fixed a schedule during which the defendants could make objections to the admissibility of any of the evidence referred to.

Pursuant to Pretrial Order No. 154, NUE and Zenith, on October 15, 1979, filed their FPS containing factual contentions with cross references to a large number of documents. Because so many documents were involved, the court in Pretrial Order No. 219 ordered the creation of a document depository in the courthouse in which the documents referred to in the NUE and Zenith FPS were to be deposited. The order also required deposit of all documents referred to by the defendants in any motions for summary judgment. By the spring of 1980 the deposit of documents was substantially completed. At that point the court ordered NUE and Zenith to submit a list of documents which constituted independent evidence of the existence of the alleged conspiracy, and which linked each defendant as a member. NUE and Zenith filed such a list, referring to some 250,000 documents in the document depository.

The defendants contended that none of the evidence relied on by NUE and Zenith to establish the existence of the alleged conspiracy, or to establish that they were members of it, was admissible. Objections were made on grounds of authenticity, hearsay, and relevancy. The trial court held an *in limine* hearing on these objections in order to determine what evidence should be considered on defendants' pending motions for summary judgment. This *in limine* hearing produced three opinions dealing with the admissibility of evidence. The first of them dealt with the admissibility of public records and reports from various governmental sources in the United States and Japan. The court held that almost all of them were inadmissible and thus would not be considered in opposition to

---

**20.** Pretrial Order No. 263.

**21.** *National Union Elec. Corp. v. Matsushita Elec. Indus. Co.,* 494 F.Supp. 1257 (E.D.Pa. 1980) (NUE must cause its computer experts to create a computer-readable tape containing data furnished by NUE in answers to interrogatories).

**22.** Rule 33(c) is discussed in Part V G, *infra.*

**23.** Pretrial Order No. 154 is reproduced in *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.,* 478 F.Supp. 889, 946–60 (E.D.Pa.1979).

defendants' summary judgment motions.[24] A second opinion dealt with a series of documents from non-governmental sources—mostly from defendants in response to discovery requests—which NUE and Zenith offered under various hearsay exceptions. The court held that a limited number of these documents were admissible, but that most, for one reason or another, did not qualify for admission.[25] Finally the court considered plaintiffs' proffered expert testimony, holding that most of it was inadmissible.[26]

## C. *The Summary Judgment Ruling*

Having in Pretrial Order No. 154 required that NUE and Zenith make a complete offer of proof with preclusive effect, and having in the *in limine* hearing on admissibility of evidence excluded a substantial part of the proof so offered, the court next turned to the defendants' summary judgment motions. On the section 1 Sherman Act and Wilson Tariff Act claims the court held that there was no admissible evidence raising an issue of fact as to the existence of the alleged conspiracy to raise, fix and maintain artificially high prices of consumer electric products in Japan while at the same time fixing and maintaining low prices for such products exported to the United States. Since the existence of concerted action is an essential element of those claims, summary judgment was granted on them in favor of the defendants.[27]

The court then addressed the NUE and Zenith section 2 Sherman Act claims. At the hearing on the motion for summary judgment counsel for NUE and Zenith made clear that this claim was not addressed to attempts by individual defendants to monopolize the American market in consumer electronics products but rather to the behavior of the defendants in the aggregate, a theory of monopolization for which NUE and Zenith claim support in *American Tobacco Co. v. United States,* 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). While expressing doubt that even in the aggregate the defendants' American market share was sufficient to support a monopolization claim, the court held that the aggregate-share theory required proof of concert of action. Since in disposing of the section 1 Sherman Act claim, the court found no admissible evidence from which concert of action could be found, summary judgment was entered on the section 2 claim as well.[28]

Next the court turned to Zenith's Robinson-Patman Act claim that the defendants discriminated in price not only between the Japanese and American markets, but also among American customers. The court read this charge to be inseparable from the conspiracy charge. Thus it, too, fell with the section 1 Sherman and Wilson Tariff Act claims. In addition the court held that Zenith had produced no evidence of injury to competition from the alleged price differential. Since injury to competition is an element of a Robinson-Patman Act violation, summary judgment was entered on this claim as well.[29]

Finally, the trial court addressed Zenith's charge that the Motorola sale of its Quasar division to MEI, and Sanyo's acquisition of a seventy-five percent interest in Warwick's television manufacturing business violated section 7 of the Clayton Act. Summary judgment was granted on this claim because Zenith had failed to show any injury traceable to those transactions.[30]

These four rulings disposed of all the NUE and Zenith claims not already disposed of in the substantive preliminary rul-

---

24. *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.,* 505 F.Supp. 1125 (E.D.Pa.1980).

25. *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.,* 505 F.Supp. 1190 (E.D.Pa.1980).

26. *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.,* 505 F.Supp. 1313 (E.D.Pa.1980).

27. *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.,* 513 F.Supp. 1100, 1180–1318 (E.D.Pa. 1981).

28. *Id.* at 1318–23.

29. *Id.* at 1323–29.

30. *Id.* at 1329–31.

ings described in Part II A. The court therefore directed the entry of a final judgment in favor of the defendants, deferring its consideration of their counterclaims pending the disposition of the anticipated appeal.

Our description of the proceedings to date is only a summary. The trial court's consideration both of the procedural and evidentiary issues, and of the substantive issues, was comprehensive and detailed. Indeed the reported opinions written by Judges Higginbotham and Becker in advancing the cases to their present posture total over 800 pages in the Federal Supplement. We will, to the extent possible considering the scope of our review, attempt to avoid duplication of their impressive efforts.

### III. Scope of Review

An appellate court reviewing the grant of a motion for summary judgment exercises plenary review. Our task is to determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and [whether] the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *E.g., Coastal States Gas Corp. v. Department of Energy,* 644 F.2d 969, 978–79 (3d Cir.1981). That task is complicated in this instance by the method by which the trial court determined what would be considered in ruling on defendants' summary judgment motions. Relying on the "preclusive effect" language in Pretrial Order No. 154 the court made its ruling without requiring the defendants to complete their own final pretrial statements and, in the case of most defendants, without the filing of detailed affidavits. NUE and Zenith contend that this procedure was improper, in that it imposed on them a higher burden than Rule 56 requires, or relieved the defendants of a burden which that rule imposes on the moving parties. As to this essentially procedural objection our review involves two aspects: whether the method of fixing the record to be considered on summary judgment by requiring a final pretrial statement with

preclusive effect is legally permissible, as to which our review is plenary; and whether, if it is permissible in this instance, it was proper, as to which we review for abuse of the trial court's discretion. A further complication arises from the fact that the trial court made *in limine* rulings on admissibility of evidence. Those must be reviewed in order to determine whether or not some evidence which was disregarded would raise a material fact issue. Scope of review over these rulings depends in each instance on the nature of the ruling. In some instances the trial court's ruling under Fed.R.Evid. 104 was essentially factual, and as to these our review is by the clearly erroneous standard. In other instances rulings on admissibility of evidence call for the application of a legally set standard, and as to these our review is plenary. Finally, some of the Federal Rules of Evidence, such as Rule 403, recognize that the trial court must exercise discretion in weighing competing considerations. These rulings are reviewed by an abuse of discretion standard. Because the trial court made a large number of evidence rulings it will be necessary to address the question of scope of review separately as to each.

Until we have satisfied ourselves about what evidence should be considered we cannot turn to our principal task, the plenary review of the record to determine whether or not summary judgment should have been granted. If, however, we were to accept the NUE and Zenith argument that the court in its basic approach misconstrued Rule 56 that alone would require a reversal. Thus we will first consider that question.

### IV. The Trial Court did Not Err in Considering the Summary Judgment Motions on This Record

NUE and Zenith urge that the trial court violated every principle of Rule 56 because it imposed on the respondents to the motions the initial burden of producing significant probative evidence of the existence of material fact issues, while relieving the moving defendants of the burden of showing initially the absence of such a genuine issue. As a corollary to this argument

they contend that the court, in relieving defendants of the obligation to file their FPS's, compounded its erroneous application of Rule 56. According to NUE and Zenith, either detailed affidavits in support of defendants' motions, or FPS's complying with Pretrial Order No. 154 were mandatory. Principal reliance in support of this argument is placed on language in *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970):

> Because respondent did not meet its initial burden of establishing the absence of a policeman in the store, petitioner here was not required to come forward with suitable opposing affidavits.... "[T]he party moving for summary judgment has the burden to show that he is entitled to judgment under established principles; and if he does not discharge that burden then he is not entitled to judgment. No defense to an insufficient showing is required."

*Id.* at 160–61, 90 S.Ct. at 1610 (footnote omitted) (quoting 6 J. Moore, Moore's Federal Practice ¶ 56.22[2], at 2824–25 (2d ed. 1966)). The entire NUE-Zenith argument in this respect, however, is built upon an unfortunate semantical confusion. It is true that the Supreme Court, and even the commentators, have sometimes referred to the "burden," under Rule 56, "of showing the absence of any genuine issue as to all the material facts ...." 6 J. Moore, W. Taggart & J. Wicker, Moore's Federal Practice ¶ 56.15[3], at 56–463 (2d ed. 1983) (footnote omitted). But the term "burden" is one that lends itself readily to confusion because it is used with different meanings in different contexts. In the Rule 56 context it does not refer to the quantum of evidence necessary to establish the existence or nonexistence of facts which as a matter of law are material. In the civil context that quantum is usually a preponderance of the evidence, and such preponderance cannot be resolved under Rule 56. Rather the Rule 56 inquiry is whether the admissible evidence, in the record in whatever form, from whatever source, considered in the light most favorable to the respondent to the motion, fails to establish

a prima facie case or defense. *E.g., Tomalewski v. State Farm Life Insurance Co.,* 494 F.2d 882, 884 (3d Cir.1974). Where, as here, the plaintiffs have produced a preclusive FPS, the ruling is closely analogous to that presented in a motion for a directed verdict at the end of a plaintiff's case. 6 J. Moore, W. Taggart & J. Wicker, Moore's Federal Practice ¶ 56.15[3], at 56–479 (2d ed. 1983). "If the state of the pretrial record would justify a directed verdict if nothing more were shown at trial, the Rule 56(c) test is satisfied." 2 P. Areeda & D. Turner, Antitrust Law ¶ 316, at 61 (1978). Moreover, in the Rule 56 context the reference to "burden" is not to which side has the duty to come forward with affidavits or evidence. The court may consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, *if any* ...." Fed.R.Civ.P. 56(c) (emphasis supplied). Rule 56(c) does not exclude the grant of summary judgment on the basis of materials originating entirely with the opponent of the motion. Such material alone may be sufficient to establish that on the basis of the undisputed facts no reasonable inference could be drawn in favor of the respondent with respect to the ultimate facts. Rule 56(b) is explicit on this point. "A party against whom a claim ... is asserted ... may, at any time, move with or without supporting affidavits for a summary judgment in his favor as to all or any part thereof." Fed.R. Civ.P. 56(b). The movant may choose not to submit any evidentiary materials supporting his summary judgment motion. *Hubicki v. ACF Industries, Inc.,* 484 F.2d 519, 522 (3d Cir.1973). If, however, there is any evidence in the record from any source from which a reasonable inference in the respondent's favor may be drawn, the moving party simply cannot obtain a summary judgment, no matter how many affidavits are filed. *E.g., Coastal States Gas Corp. v. Department of Energy,* 644 F.2d 969, 979 (3d Cir.1981). The "burden" then is insurmountable.

Properly understood, that is all the "burden" language in *Adickes v. S.H. Kress &*

*Co.* stands for. In that case a critical element of the plaintiff's cause of action was state action, which could be found only if the private defendant acted in concert with the local police to deny her service because she was at a lunch counter in the company of black students. In her complaint and at her deposition plaintiff alleged that a policeman walked through the store and subsequently arrested her on the street. There were contrary depositions and affidavits, but since plaintiff's deposition contradicted them she could rest on it, for "[i]f a policeman were present, we think it would be open to a jury, in light of the sequence that followed, to infer from the circumstances that the policeman and a Kress employee had a 'meeting of the minds' and thus reached an understanding that petitioner should be refused service." 398 U.S. at 158, 90 S.Ct. at 1609. Thus *Adickes v. S.H. Kress & Co.* actually supports the approach taken by the district court in this case, because it recognizes that a party—either party—can rely in a Rule 56 proceeding on the contents of the entire record.

A court may not, of course, by a premature resort to a Rule 56 order, deprive the party resisting it of a fair opportunity to present facts essential to justify his opposition. Fed.R.Civ.P. 56(f). One may conceive of situations in which requiring a pretrial statement with preclusive effect might do so even though such orders are expressly authorized by Fed.R.Civ.P. 16. This case, however, does not present that situation. Pretrial Order No. 154 was entered only after years of discovery. It gave NUE and Zenith ample time to outline their entire case, and adequate notice that, with limited exceptions, they must do so by the date specified or forever hold their peace. Paragraph X of the order expressly contemplated summary judgment motions. App., vol. 2, at 675. Thus for all practical purposes, except perhaps the opportunity to observe the credibility of witnesses, the trial court had before it the same record that it would have had at trial at the end of the plaintiffs' case. There was no violation of either the spirit or the letter of Rule 56(f). We explicitly approve, for protracted cases, the trial court's determination embodied in Pretrial Order No. 154 which required preparation of a FPS with preclusive effect, permitted *in limine* rulings on evidence issues, and created a record to which summary judgment motions might then be addressed. That action is entirely consistent with the provisions of Fed.R.Civ.P. 56(d) directing that the court "shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted" and "shall thereupon make an order specifying the facts that appear without substantial controversy . . . ."

Thus we reject the contentions advanced in Point I of the NUE-Zenith brief that the summary judgment should be reversed because the defendants' affidavits were insufficient to meet some affirmative burden imposed by Rule 56, or because the trial court ruled on the summary judgments before the defendants' FPS's were filed.

## V. Evidence Issues

We noted in Part III B above that the court filed three separate opinions making *in limine* rulings on evidence issues, dealing separately with public records and reports, with other hearsay exceptions, and with expert testimony. Most of those rulings dealt with evidence tendered in the FPS in support of the plaintiffs' conspiracy allegations. The alleged conspiracy had two aspects: concert of action to maintain high prices in Japan, and concert of action to sell at low prices in the United States to the detriment of American manufacturers of televisions and other consumer electronic products. The trial court identified thirteen categories of evidence, and as to each made a ruling on authenticity or admissibility under one or more of the Federal Evidence Rules, and on relevancy. *See* 505 F.Supp. at 1138–39. Some evidence was held to be admissible, and thus for purposes of summary judgment must be taken into account. That evidence will be referred to in our discussion of the merits of the summary judgment, *see* 505 F.Supp. at 1138–39, since none of the defendants has urged that

the rulings admitting evidence were error. In this Part V, therefore, we address only the evidence which was for one reason or another excluded.

### A. *The Propriety of In Limine Rulings*

■ Before turning to that task in detail, it is appropriate to note that although neither the Federal Rules of Civil or Criminal Procedure, nor the Federal Rules of Evidence, explicitly authorize pre-trial rulings on admissibility of evidence, we agree completely with those commentators who urge that *in limine* ruling on evidence issues is a procedure which should, in a trial court's discretion, be used in appropriate cases. *See* 21 C. Wright & K. Graham, Federal Practice and Procedure § 5037, at 193–95 (1977); Federal Judicial Center, Manual for Complex Litigation § 4.22 (1981) (*reprinted in* 1 Moore's Federal Practice (2d ed. 1982)); Rothblatt & Leroy, *The Motion in Limine in Criminal Trials: A Technique for the Pretrial Exclusion of Prejudicial Evidence,* 60 Ky.L.J. 611, 614 (1972). This was an appropriate case, not only because the court's *in limine* consideration was far more efficient than if the rulings were deferred until the trial, with consequent interruptions, but also because the *in limine* procedure permitted more thorough briefing and argument than would have been likely had the rulings been deferred. That was particularly so with respect to those rulings requiring district court fact findings under Rule 104.

■ We recognize that there are countervailing considerations, especially with respect to relevancy rulings under Rule 403 which may be made pre-trial without the benefit of the flavor of the record developed at trial. Nevertheless we hold that the trial court has discretion to make even relevancy rulings pre-trial, subject to review for abuse of such discretion. In this instance, because under the provisions of the FPS the plaintiffs' entire case was before the trial court, no conceivable prejudice occurred from making *in limine* rulings, and thus there was no abuse of discretion.

### B. *Standards for Admission of Coconspirator Statements*

Another preliminary matter which should be addressed before turning to the court's rulings on exclusion of evidence is the contention by NUE and Zenith that the trial court erred in ruling on the admissibility of statements by one coconspirator against the others. They advance three separate objections to the trial court's treatment of coconspirator statements.

The court held that in determining admissibility of such statements it could consider only independent evidence of the existence of and membership in a conspiracy. 513 F.Supp. at 1179. The first NUE-Zenith contention is that under Rules 801(d)(2)(E) and 104(a) it is not necessary, at least in civil cases, to produce independent evidence of the existence of and membership in the conspiracy before admitting statements made during the course of and in furtherance of it. NUE and Zenith concede that in *Glasser v. United States,* 315 U.S. 60, 74, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942), the Supreme Court held that declarations of one conspirator made to a third party in furtherance of the objects of the conspiracy are admissible against an alleged coconspirator, not present when they were made, "only if there is proof *aliunde* that he is connected with the conspiracy." They urge, however, that with the enactment of the Federal Rules of Evidence the *Glasser* rule no longer applies. In their view, the statements are no longer hearsay because a statement is not hearsay if "[t]he statement is offered against a party and is . . . (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E). *Glasser,* they contend, was predicated on the assumption that if such statements were admissible without proof *aliunde* then "hearsay would lift itself by its own bootstraps to the level of competent evidence." 315 U.S. at 75, 62 S.Ct. at 467. Since under Rule 801(d)(2)(E) the statements are not hearsay, they reason, the *Glasser* rule no longer has vitality. NUE and Zenith reinforce their interpretation of Rule

801(d)(2)(E) by reference to Rule 104(a), which provides that in making its determination on admissibility the court is not bound by the rules of evidence.

 We reject the contention that the trial court erred in this respect. Neither rule relied upon was intended to change the settled law that there must be independent proof *aliunde* of the existence of and membership in a conspiracy before coconspirator statements are admissible against a party. We recognize that *United States v. Martorano,* 561 F.2d 406, 408 (1st Cir.1977), *cert. denied,* 435 U.S. 922, 98 S.Ct. 1484, 55 L.Ed.2d 515 (1978), suggests in dicta that Rule 104(a) casts doubt on the *Glasser* rule and that the Court of Appeals for the Sixth Circuit has rejected *Glasser, see James R. Snyder Co. v. Associated General Contractors,* 677 F.2d 1111, 1117 (6th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 374, 74 L.Ed.2d 508 (1982). Since the Federal Rules of Evidence were adopted, however, all other courts of appeal have assumed that in deciding whether to admit coconspirator statements the judge may only consider evidence independent of them. 1 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 104[05], at 104–45–46 (1982). Since the effective date of the Evidence Rules, this court has continued to apply the *Glasser* rule. *United States v. Ammar,* 714 F.2d 238, 246 n. 3 (3d Cir.1983); *United States v. Continental Group, Inc.,* 603 F.2d 444, 457 (3d Cir.1979), *cert. denied,* 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980); *United States v. Trowery,* 542 F.2d 623, 627 (3d Cir.1976) (per curiam), *cert. denied,* 429 U.S. 1104, 97 S.Ct. 1132, 51 L.Ed.2d 555 (1977); *United States v. Trotter,* 529 F.2d 806, 811 (3d Cir.1976). Arguably these decisions do not bind this panel because they do not specifically address the question whether the Federal Evidence Rules overruled *Glasser.* But if the question is open, we believe

that neither the language of the rules relied upon nor sound policy supports the NUE-Zenith position.

Rule 801(d)(2)(E) says that a coconspirator statement is not hearsay, but says nothing about how coconspirator status is established. That status requires a preliminary factual inquiry, to which Rule 104(a) undoubtedly applies. But the fact that Rule 104(a) permits the trial court to resort to hearsay does not speak to the *Glasser* rule requirement of independent evidence. Granting that the court can rely on hearsay in making the determination of coconspirator status, the evidence relied on must still be independent of the statement. Otherwise all parties to a lawsuit, civil or criminal, may be exposed to the risk of admission against them of "idle chatter of criminal partners as well as inadvertently misreported and deliberately fabricated evidence." 4 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 801(d)(2)(E)[01], at 801–171 (1981) (footnote omitted).

 The trial court held that before it could admit coconspirator statements under Rule 801(d)(2)(E) it must find, by a preponderance of the independent evidence that the conspiracy relied upon for admissibility existed, and that each party against whom the statement is offered was a member of it. 513 F.Supp. at 1179. NUE and Zenith urge that the trial court erred in requiring that the independent evidence of coconspirator status satisfy him by a preponderance of the evidence. They concede that, at least in criminal cases, the law in this circuit is settled. In criminal cases we require that the trial court apply a preponderance of the evidence standard, *e.g., United States v. Ammar,* 714 F.2d at 249–51; *United States v. Trowery,* 542 F.2d at 627, although other courts require a different standard.[31] It is true that no opinion of

---

**31.** *See, e.g., United States v. Jackson,* 627 F.2d 1198, 1219 (D.C.Cir.1980) (substantial evidence test); *United States v. James,* 590 F.2d 575, 581 (5th Cir.1979) (substantial evidence test); *United States v. Dixon,* 562 F.2d 1138, 1141 (9th Cir.) (prima facie evidence of coconspirator status), *cert. denied,* 435 U.S. 927, 98 S.Ct. 1494,

55 L.Ed.2d 521 (1977). The First, Second, and Tenth Circuits apply the preponderance standard. *See United States v. Petersen,* 611 F.2d 1313, 1327 (10th Cir.1979), *cert. denied,* 447 U.S. 905, 100 S.Ct. 2986, 64 L.Ed.2d 854 (1980); *United States v. Stanchich,* 550 F.2d 1294, 1297–99 (2d Cir.1977); *United States v. Petroz-*

this court has expressly held that the preponderance of evidence test applies to determination of coconspirator status in civil cases, although the *Trowery* court seems to have assumed so. 542 F.2d at 626. We are not persuaded that a different standard of proof for this preliminary question in civil cases should be adopted. The preponderance of evidence standard is commonly used for preliminary evidence questions in civil cases. Saltzburg, *Standards of Proof and Preliminary Questions of Fact,* 27 Stan.L. Rev. 271, 273–74 (1975). While there may be merit in the position of those courts which have, in criminal cases, raised the threshold standard to substantial evidence, we see none in the position that for either civil or criminal cases the responsibility of the court in making the *Glasser* determination should be decreased.

NUE and Zenith urge that there is a valid distinction, for purposes of the coconspirator statement rule, between civil and criminal cases, because in the latter the jury must find guilt beyond a reasonable doubt and thus the court, finding the existence of an agreement by a preponderance of the evidence, is not usurping the function of the jury. In civil cases, on the other hand, if both the preliminary question and the ultimate question are to be decided by the preponderance of the evidence standard, the court may, to the disadvantage of the plaintiff, usurp the jury's function. One fallacy in that reasoning, however, is that the court's determination of the ultimate issue is not binding on the jury. Another fallacy is that the two questions are not the same. In order to admit the statement the court need only find that the speaker and the party against whom it is offered were engaged in a common undertaking for the advancement of which the statement was made. The jury, or court if the case is tried non-jury, must also find that the common undertaking was unlawful and can rely on the contents of the statement for that purpose.

We recognize that exclusion of statements by alleged coconspirators may have a severely damaging effect on a plaintiff's case in which concert of action is an essential element of the cause of action. Evidence rulings often have such an effect, however, and the admission against defendants, in proof of illegality, of statements of third parties without a proper foundation may be equally damaging. Thus we agree with the recent decision of the Court of Appeals for the Sixth Circuit rejecting the distinction between civil and criminal cases which NUE and Zenith urge. *James R. Snyder Co. v. Associated General Contractors,* 677 F.2d 1111, 1117 (6th Cir.), *cert. denied,* 459 U.S. 1015, 103 S.Ct. 374, 74 L.Ed.2d 508 (1982).

Finally, NUE and Zenith contend that in deciding on the admissibility of coconspirator statements the trial court erred in requiring a showing not only that there was a combination between the defendants, but also that the combination was unlawful. If the trial court had so ruled, that ruling would be error, for in order to admit coconspirator statements "it is necessary to show by independent evidence that there was a combination between them, . . . but it is not necessary to show by independent evidence that the combination was criminal or otherwise unlawful." *Hitchman Coal & Coke Co. v. Mitchell,* 245 U.S. 229, 249, 38 S.Ct. 65, 72, 62 L.Ed. 260 (1917); *see United States v. Trowery,* 542 F.2d at 626–27. Our examination of that portion of the trial court's opinion dealing with admissibility of coconspirator statements, however, convinces us that no such additional burden was imposed. The court said:

> [W]e simply make the factual finding that plaintiffs have not established by a preponderance of independent evidence that any of the defendants entered into an agreement . . . .

513 F.Supp. at 1298.

We conclude, therefore, that the trial court applied the correct rule: coconspirator statements can be admitted only if

---

ziello, 548 F.2d 20, 23 (1st Cir.1977). The Fourth Circuit is apparently equivocal. *See*

*United States v. Stroupe,* 538 F.2d 1063, 1065 (4th Cir.1976).

the court is convinced by a preponderance of evidence independent of the statements that there was a joint undertaking, that the statement was made to advance that undertaking, and that the party against which the statements are offered was a party to that undertaking. All of the independent record evidence must, of course, be considered.

The joint undertaking need not be identical to the conspiracy relied·upon as a basis for liability. Rule 402 affords adequate protection against admission of statements in furtherance of joint undertakings that are remote and unrelated to the conspiracy relied upon as a basis for liability. It is well established, for example, that there need not be a conspiracy count in the indictment before coconspirator statements may be admitted. 4 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 801(d)(2)(E)[01], at 801–166 (1981); *Kay v. United States,* 421 F.2d 1007, 1010 (9th Cir. 1970); *United States v. Cryan,* 490 F.Supp. 1234, 1240 (D.N.J.), *aff'd,* 636 F.2d 1211 (3d Cir.1980). Moreover, coconspirator statements admissible on conspiracy counts may be considered on substantive counts as well. *United States v. Cahalane,* 560 F.2d 601, 605 n. 4 (3d Cir.), *cert. denied,* 434 U.S. 1045, 98 S.Ct. 890, 54 L.Ed.2d 796 (1977). *See also, United States v. Mendoza,* 473 F.2d 692, 695 (5th Cir.1972) (coconspirator exception applicable to criminal prosecutions and not limited to prosecutions for conspiracy);

*United States v. Accardi,* 342 F.2d 697, 700 (2d Cir.), *cert. denied,* 382 U.S. 954, 86 S.Ct. 426, 15 L.Ed.2d 359 (1965). The reasoning of these cases suggests that if, for example, a price fixing conspiracy in Japan were to be found by a preponderance of independent evidence, the statements of any of its members made in furtherance of it would, if relevant, be admissible against all members of it for all purposes.[32]

The district court made a Rule 104(a) finding that NUE and Zenith had not established "by a preponderance of independent evidence that any of the defendants engaged in the 'unitary' conspiracy alleged by plaintiffs (or, for that matter, either the home market or export facets thereof)." 513 F.Supp. at 1299. We are unable to affirm the exclusion of coconspirator statements on the basis of this finding, however, because, as noted hereafter, much independent evidence bearing on the existence of joint undertakings by the defendants, particularly with respect to price fixing in Japan, was erroneously excluded. The admissibility of coconspirator statements must on remand be reconsidered by the trial court in light of all the independent evidence in the record.

### C. *Rule 803(8)(C) Materials*

Included in the FPS are a number of documents originating with public offices or agencies, which NUE and Zenith contend are properly admitted for the truth of the

---

**32.** Chief Judge Seitz reluctantly joins the majority opinion with respect to what may be proved by the admission of coconspirator statements. In *United States v. Trowery,* 542 F.2d 623 (3d Cir.1976) (per curiam), *cert. denied,* 429 U.S. 1104, 97 S.Ct. 1132, 51 L.Ed.2d 555 (1977), this court held that statements made in furtherance of an uncharged conspiracy may be admissible against coconspirators charged with other offenses. The logic of *Trowery* compels Chief Judge Seitz to accept the possibility that statements made in furtherance of a conspiracy to fix high prices in Japan may be used to establish the existence of a conspiracy to fix low prices in the United States, even though the conspiracy to fix low prices could not be established without the admission of coconspirator statements. Bound by precedent to reach this result, Chief Judge Seitz is troubled by a holding that seems to him to permit the boot-

strap expansion of a conspiracy in circumvention of the *Glasser* independence requirement. *Cf. Krulewitch v. United States,* 336 U.S. 440, 443, 69 S.Ct. 716, 718, 93 L.Ed. 790 (1948) (statements made in furtherance of an implicit conspiracy to conceal the conspiracy charged may not be used to prove the conspiracy charged); *United States v.·Cambindo Valencia,* 609 F.2d 603, 635–36 n. 25 (2d Cir.1979) (court would limit coconspirator exception to statements made in furtherance of the conspiracy charged or proved, not other conspiracies "found to exist in the factual pattern of the case"), *cert. denied sub nom. Prado v. United States,* 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980); *United States v. Layton,* 549 F.Supp. 903,·916–17 (N.D.Cal.1982) (coconspirator exception limited to statements made in furtherance of conspiracy charged or conspiracy underlying substantive charges).

matter asserted therein as hearsay exceptions under Rule 803(8)(C). That rule admits "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... (C) in civil actions ... factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." Fed.R.Evid. 803(8). Five categories of documents were tendered:

1. Six documents prepared in proceedings instituted by the United States Treasury Department under the 1921 Antidumping Act, 19 U.S.C. § 160 *et seq.* (repealed 1980);

2. Eighteen documents prepared in proceedings before the United States International·Trade Commission under the Trade Expansion Act of 1962, 19 U.S.C. § 1801 *et seq.* and its successor statute, the Trade Act of 1974, 19 U.S.C. § 2101 *et seq.;*

3. Two documents prepared in proceedings before the Japanese Fair Trade Commission under the Japanese Anti-Monopoly Law;

4. Findings of fact made by Judge Higginbotham in the instant case in ruling on motions to dismiss for lack of personal jurisdiction, improper venue, and improper service of process; and

5. Two documents, one of which was prepared for the Statistical Office of the United Nations, and the other a report of the Organization for Economic Cooperation and Development.

See 505 F.Supp. at 1138–39. Of these twenty-nine documents the trial court ruled inadmissible all but the two documents in the fifth category, identified as DSS # 46 and # 47. Many of the excluded documents were. also relied upon by plaintiffs' experts in reaching the opinions which they expressed, and thus received the court's attention a second time when it considered, pursuant to Rule 703, the admissibility of those opinions.[33]

### 1. *The Court's General Approach to Rule 803(8)(C)*

▇▇ Before ruling on specific public records and reports the trial court outlined a general approach toward the consideration of Rule 803(8)(C) materials. The court noted first that the rule permits only the admission of factual findings, including evaluative findings, but not legal conclusions, and not underlying exhibits and data.[34] Turning to the trustworthiness proviso in the rule, the court identified eleven factors which would be taken into consideration in determining trustworthiness, and hence admissibility. Four of these are the factors listed in the Notes of the Advisory Committee on Proposed Revisions to Rule 803(8)(C):

Factors which may be of assistance in passing upon the. admissibility of evaluative reports include: (1) the timeliness of the investigation ...; (2) the special skill or experience of the ·official ...; (3) whether a hearing was held and the level at which conducted ...; (4) possible motivational problems suggested by *Palmer v. Hoffman,* 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943).

(citations omitted). The Advisory Committee's reference to the motivational problems suggested by *Palmer v. Hoffman* is to the bias which may arise when a report is compiled for the purpose not of finding the facts in a neutral manner, but in anticipation of litigation. To the four factors mentioned by the Advisory Committee, the trial court added seven more:

(1) The finality of the agency findings, *i.e.,* the state of the proceedings at which the findings were made (whether they are subject to subsequent proceedings or *de novo* review), and the likelihood of modification or reversal of the findings.

(2) The extent to .which the agency findings are based upon or are the product of proceedings pervaded by receipt of substantial amounts of material which would not be admissible in evidence (*e.g.* hearsay, confidential communications, ex

---

**33.** *See* Part VI *infra.* ˎ

**34.** 505 F.Supp. at 1144–46.

parte evidence), and the extent to which such material is supplied by persons with an interest in the outcome of the proceeding.

(3) If the findings are products of hearings, the extent to which appropriate safeguards were used (Administrative Procedure Act, Due Process), and the extent to which the investigation complied with all applicable agency regulations and procedures.

(4) The extent to which there is an ascertainable record on which the findings are based.

(5) The extent to which the findings are a function of an executive, administrative, or legislative policy judgment (as opposed to a factual adjudication) or represent an implementation of policy.

(6) The extent to which the findings are based upon findings of another investigative body or tribunal which is itself vulnerable as a result of trustworthiness evaluation.

(7) Where the public report purports to offer·expert opinion, the extent to which the facts or data upon which the opinion is based are of a type reasonably relied upon by experts in the particular field.

505 F.Supp. at 1147. NUE and Zenith urge that by adding these seven factors in addition to those suggested by the Advisory Committee the court destroyed the utility of the public records and reports hearsay exception. Without at this point endorsing the seven specific criteria, we reject the contention that in ruling on the admission of findings by public agencies a trial court is restricted to the four factors listed by the Advisory Committee. The Committee's note to Rule 803(8)(C) observes that "[o]thers no doubt could be added." It continues:

The formulation of an approach which would give appropriate weight to all possible factors in every situation is an obvious impossibility. Hence the rule, as in Exception [803](6), assumes admissibility

in the first instance but with ample provision for escape if sufficient negative factors are present.

In considering whether an official report is sufficiently reliable to be admitted under Rule 803(8)(C), we start from the premise that such reports of investigations are presumed to be reliable. As this court has noted:

Official reports are admitted as an exception to the hearsay rule because they are presumed to be generally reliable. . . . . Before [untrustworthiness] objections may be recognized . . . the party challenging the validity of an official report admitted under 803(8)(C) must come forward with some evidence which would impugn its trustworthiness.

*Melville v. American Home Assurance Co.*, 584 F.2d 1306, 1316 (3d Cir.1978). *Cf. Moran v. Pittsburgh-Des Moines Steel Co.*, 183 F.2d 467, 472–73 (3d Cir.1950) (before the codification of the Federal Rules of Evidence, held that a trial court erred in rejecting a report of the Bureau of Mines which supported a plaintiff's contention·that negligent design of a gas tank had caused a disaster).

 The scope of our review of the trial court's trustworthiness determination depends on the basis for the ruling. When the trial court makes Rule 104(a) findings of historical fact about the manner in which a report containing findings was compiled we review by the clearly erroneous standard of Fed.R.Civ.P. 52. But a determination of untrustworthiness, if predicated on factors properly extraneous to such a determination, would be an error of law.[35] *See Lloyd v. American Export Lines, Inc.*, 580 F.2d 1179, 1183 (3d Cir.), *cert. denied*, 439 U.S. 969, 99 S.Ct. 461, 58 L.Ed.2d 428 (1978). There is no discretion to rely on improper factors. Such an error of law might, of course, in a given instance be harmless within the meaning of Fed.R.Civ.P. 61. In weighing factors which we consider proper,

---

**35.** Chief Judge Seitz believes that considering extraneous factors when making a trustworthiness determination under Rule 803(8) would be an abuse of discretion rather than an error of law. In his view, the abuse of discretion standard includes improper application of the factors which show trustworthiness under Rule 803(8).

the trial court exercises discretion and we review for abuse of discretion. Giving undue weight to trustworthiness factors of slight relevance while disregarding factors more significant, for example, might be an abuse of discretion. With that in mind, we turn to the task of reviewing the specific documents tendered as official reports.

2. *Reports Prepared by the United States Treasury Department Under the 1921 Antidumping Act*

The Antidumping Act of 1921, 19 U.S.C. §§ 160–173 (1976), provided [36] for the imposition of dumping duties on imported products under certain circumstances. The legislation was aimed at sales of foreign merchandise at less than fair value which injured or prevented the establishment of an American industry by the importation of such merchandise into the United States. The statutory remedy was the imposition of a special dumping duty. 19 U.S.C. § 161 (1976). Before a special duty could be imposed, both aspects of the statute—sales at less than fair value and injury to an actual or potential American industry—were to be satisfied. Procedures for the establishment of both aspects were set forth in title 19 of the Code of Federal Regulations, which is included in the FPS.App., vol. 11, at 4177–87. Suspected dumping could result in proceedings under the Act either because any district director of the Customs Service reported a suspicion of dumping to the Commissioner of Customs, *see* 19 C.F.R. § 53.25 (1969), or because a person outside the Customs Service communicated information about suspected dumping to the Commissioner. 19 C.F.R. § 53.26 (1969). A communication from a person outside the Customs Service had to include detailed information about the suspected merchandise, its source, the injured industry, and price information. 19 C.F.R. § 53.27 (1969). Upon receipt of such information, whether from within or outside the Customs Service, the Commissioner was to conduct a summary investigation. On the basis of that investi-

gation the Commissioner could for specified reasons close the case. 19 C.F.R. § 53.29 (1969). If he did not do so, the Commission was to publish in the Federal Register an Antidumping Proceeding Notice, including a summary of the information received and an identification of its source. 19 C.F.R. § 53.30 (1969).

■ On June 10, 1968 the Commissioner of Customs, having received information from an antidumping source outside the Customs Service and having conducted a summary investigation, published in compliance with 19 C.F.R. § 53.30 (1969), an antidumping proceeding notice, stating that "[t]he information received tends to indicate that the prices of the television sets for exportation to the United States are less than the prices for such or similar merchandise for home consumption in Japan." This notice is part of the FPS and identified as DSS #1. App., vol. 11, at 4188. It was held to be admissible as a report of activities of the ·Customs Service, under Fed.R.Evid. 803(8)(A), or of activities observed pursuant to a duty imposed by law, under Fed.R. Evid. 803(8)(B). 505 F.Supp. at 1155. The trial court held, however, and we agree, that it is not a factual finding resulting from an' investigation within the meaning of Rule 803(8)(C). The notice "finds" no more than reasonable cause to pursue a more thorough investigation.

■ Once the Antidumping Proceeding Notice was published, the Commissioner of Customs was required "by a full-scale investigation, or otherwise, to obtain such additional information, if any, as may be necessary to enable the [Treasury] Secretary to reach a [fair-value] determination as provided by § 53.32." 19 C.F.R. § 53.31(a) (1969). The Customs Service was to conduct the investigation through its own representatives, including Customs representatives in foreign countries. *Id.* On the basis of its report the Secretary of the Treasury was required to "proceed as promptly as

---

**36.** That Act has now been superseded by section 101 of the Trade Agreements Act of 1979,

19 U.S.C. §§ 1673–73i (1982).

possible to determine whether or not the merchandise in question is in fact being, or is likely to be, sold in the United States or elsewhere at less than its fair value." 19 C.F.R. § 53.32(a) (1969). Interested persons could make written submissions, which were to be given appropriate consideration, and the Secretary could invite any person to supply information orally. 19 C.F.R. § 53.-32(b) (1969).

Upon concluding that there were reasonable grounds to believe or suspect that merchandise was being sold at less than fair value and that there was evidence concerning actual or potential injury to an American industry, the Commissioner of Customs could publish in the Federal Register a Withholding of Appraisement Notice, setting forth the basis of his belief or suspicion. 19 C.F.R. § 53.34(a) (1969). The effect of this notice was to direct district directors of customs to withhold appraisements, and thus leave undetermined the liability for tariff duties of the importers of the goods in question. On August 28, 1970 the Commissioner of Customs published such a notice with respect to Japanese manufactured television sets. This notice is part of the FPS and denominated DSS #2. App., vol. 11, at 4189. Like the June 10, 1968 notice, it was held to be admissible under Rule 803(8)(A) and (B), but not under Rule 803(8)(C). 505 F.Supp. at 1155. This notice, like that of June 10, 1968, did not make findings, but only set forth reasonable grounds for belief or suspicion. It served merely to preserve the status quo pending further proceedings. It also triggered an opportunity for interested parties to appear, through counsel or in person, to make known their point of view and supply further information. 19 C.F.R. § 53.37 (1969). Thus the trial court's ruling that the August 28, 1968 notice is not admissible to establish the fact of sales at less than fair value or of injury to an American industry was not erroneous.

█ If on the basis of information before it the Treasury Secretary decided that a determination of sales at less than fair value was required, he was required to pub-lish a Federal Register Notice of the determination and advise the U.S. Tariff Commission. 19 C.F.R. §§ 53.36, 38 (1969). On December 4, 1970 an Assistant Secretary of the Treasury did so. That determination, DSS #3, provided in relevant part:

I hereby determine that for the reasons stated below, television receiving sets, monochrome and color, from Japan are being, or likely to be, sold at less than fair value within the meaning of section 201(a) of the Act.

*Statement of reasons on which this determination is based.* The information currently before the Bureau reveals that the appropriate basis of comparison is between purchase price or exporter's sales price and adjusted home market price.

Purchase price was calculated on the basis of f.o.b. or f.o.r. packed prices with deductions for freight, packing, and other charges applicable. The applicable Japanese commodity tax was added to this price.

Exporter's sales price was calculated by deducting from the resale prices of the related firms to distributors in the United States any applicable discounts to arrive at a net selling price. From the latter appropriate deductions were made for inland freight in Japan, ocean freight and insurance, U.S. duty, brokerage charges, U.S. freight, warranty costs, packing, and commissions and other selling expenses incurred in the United States. To this additions were made for any applicable Japanese commodity tax refunded or not paid on exportation of the merchandise.

Home market price was based on the delivered price to distributors in the home market. Appropriate deductions were made for discounts and rebates, granted for cash, quantities, and certain sales promotions. From the net price adjustments were made for commissions, warranty and installation costs, inland freight, inland insurance, patent fees, bad debts, where applicable, and packing. Adjustments were also made for differences in

the merchandise, and for difference in advertising and credit costs.

Purchase prices or exporter's sales prices were lower than home market prices by amounts that were more than minimal in relation to the total volume of sales.

35 Fed.Reg. 18549 (1970). The trial court held this less-than-fair-value finding to be inadmissible because it was untrustworthy, Fed.R.Evid. 803(8)(C), irrelevant, Fed.R. Evid. 402, and unduly prejudicial, Fed.R. Evid. 403.

The court found that the investigation was timely, that the investigating officials were professionally responsible for making the investigation, and that there were no motivational problems. 505 F.Supp. at 1155. Moreover, the court found that the investigation was conducted in compliance with the applicable Treasury Department regulations. *Id.* at 1156. Nevertheless the finding was held to be untrustworthy for eight reasons: (1) there was no evidentiary hearing; (2) the Assistant Secretary did not attend the hearings which were held but instead relied on staff reports; (3) the investigation included hearsay, confidential communications, and *ex parte* evidence; (4) the procedures, while permitting submissions and the opportunity to present argument by counsel, did not provide for cross-examination; (5) there was no ascertainable record; (6) the finding was made at a nascent stage of the investigation; (7) the finding was subject to some form of judicial review; and (8) the finding contained no statement of reasons for allowances or disallowances of particular adjustments. *Id.* Neither singly nor collectively do these reasons overcome the presumption of reliability.

Requiring that the government report of an investigation be based on an evidentiary hearing providing an opportunity for cross-examination would rob Rule 803(8)(C) of any practical utility. Most governmental investigations proceed without either evidentiary hearings or the opportunity for cross-examination. The indice of reliability for the governmental investigative report is

the fact that it is prepared pursuant to a duty imposed by law. The law sets forth the standards for conducting the investigation and those standards were complied with. An important governmental decision—whether to proceed with the costly and time-consuming procedure for determining the amount of dumping duties—was predicated on the outcome. We note, moreover, without suggesting that Rule 803(8)(C) so requires, that during the investigation the parties were represented by counsel and had an opportunity to make written submission and oral arguments. *Id.* at 1151–52, 1155. *See* 19 C.F.R. §§ 53.-32(b), 53.37 (1969). Under these circumstances reliability is highly likely. We reject as well the contention that the Assistant Secretary's absence from the hearings and his reliance on reports of others makes his findings unreliable in this instance. In the real world of governmental affairs, investigations into economic facts—such as whether or not sales are being made at less than fair value—will frequently require that the expert to whom the agency entrusts the task of making a finding rely on facts not directly observed by him. There is no suggestion in the record that the procedures specified in the Treasury Department's regulations for conducting a fair-market-value investigation are a professionally unreliable means for ascertainment of economic facts. The fact that the finding was made at a nascent stage of the proceedings is in our view of no significance in this instance. Under the statutory and regulatory scheme, the finding at that stage was a predicate for further proceedings leading to the determination of the amount of dumping duties. As noted above, the findings were sufficiently reliable for the Treasury Department to go forward with that costly and time-consuming proceeding. Furthermore, there is no requirement in Rule 803(8)(C) that an investigative report contain a statement of reasons for each adjustment or allowance. Finally, the fact that under the statute some form of judicial review of the imposition of dumping duties was available at some point does not support an inference that the investigation was

unreliable or the finding based upon it untrustworthy. In holding the finding in 39 Fed.Reg. 18549 (1970) to be untrustworthy, the trial court gave undue weight to considerations either legally irrelevant under Rule 803(8)(C) or of only slight relevance, and too little weight to the fact that the investigation was conducted by officials charged with a legal duty to conduct it, for an important governmental purpose, in full compliance with the governing law. This determination of untrustworthiness was, therefore, an abuse of discretion.

 The trial court also held the less-than-fair-value finding to be irrelevant for two reasons: (1) the finding resulted from a comparison of prices constructed from a formula, not of actual transactional prices, 505 F.Supp. at 1158–59; (2) the finding indiscriminately applied to all sales of Japanese television receivers. *Id.* at 1159.

Rule 402 requires the exclusion of irrelevant evidence. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. Judge Weinstein observes that "the test of relevancy is whether a reasonable man might believe the probability of the truth of the consequential fact to be different if he knew of the proffered evidence." 1 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 401[07], at 38 (1982). Our review of a Rule 402 relevancy ruling is plenary.[37] Especially in the context of review of a summary judgment or a directed verdict, we must determine to our own satisfaction whether the finding has any tendency to prove or disprove a consequential fact. A consequential fact in this action is the sale of television receivers by the defendants in the United States, in the time frame covered by

the report, at prices lower than similar receivers were being sold in Japan.

The less-than-fair-value finding could be relied upon to establish that there were significant price differences in the two markets. While some of the Treasury Department's adjustments may have been arguable, that objection goes, at best, to weight, not admissibility. *See Elwood v. New York,* 450 F.Supp. 846, 874 (S.D.N.Y.1978), *rev'd on other grounds sub nom. Badgley v. City of New York,* 606 F.2d 358 (2d Cir. 1979), *cert. denied,* 447 U.S. 906, 100 S.Ct. 2989, 64 L.Ed.2d 855 (1980) (appraisal of diminished land values resulting from diversion of river headwaters relevant to issue of damages despite claim that they lacked detailed adjustments for time and location). The Treasury Department's finding can be contested at trial just as an expert's opinion can be contested. It is, however, plainly relevant on the issue of price disparities in the two markets. Nor are we persuaded that the lack of specificity with respect to the defendants renders the industry-wide finding irrelevant. The defendants are a part of the industry, and the affidavits on file indicate that at least some of the defendants participated in the Treasury Department investigation. The finding has *some* tendency to establish that Japanese manufacturers, including the defendants, maintained the price differentials complained of. No more is required for relevancy under Rule 401. Thus we hold that the trial court erred in its relevancy ruling.

 Finally, the trial court held that even if the less-than-fair-value finding were trustworthy and relevant he would exclude it under Rule 403, which provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair preju-

---

**37.** Chief Judge Seitz does not agree that our review of relevancy rulings is plenary. Rather, he would review for abuse of discretion, citing *Hamling v. United States,* 418 U.S. 87, 124–25, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974); *Gagliardi v. Flint,* 564 F.2d 112, 116 (3d Cir. 1977), *cert. denied,* 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978). In addition to this case

law, Chief Judge Seitz relies on Rule 401, which defines relevancy in terms of evidence that has a "tendency" to make facts "more probable or less probable." Fed.R.Evid. 401. Chief Judge Seitz concludes that these terms admit of a latitude in the district court's relevancy determinations that is appropriately reviewed under the abuse of discretion standard.

dice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403. In contrast with the Rule 402 relevancy determination, we review this ruling by an abuse of discretion standard. *United States v. Long,* 574 F.2d 761, 767 (3d Cir.), *cert. denied,* 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978); *John McShain, Inc. v. Cessna Aircraft Co.,* 563 F.2d 632, 636 (3d Cir.1977). The trial court found potential prejudice in the fact that the less-than-fair-value finding carrying the imprimatur of the Treasury Department might sway the jurors and dissuade them from making an independent appraisal of the record evidence. 505 F.Supp. at 1160–61. The court also ruled that admission of the finding would lead to confusion of the issues and misleading of the jury. *Id.* at 1161. Reliance on these factors was premature, however, since it had not yet been determined that the case would actually be tried to a jury. The court also concluded that admission of the finding would cause undue delay and needless presentation of cumulative evidence. *Id.* Because two of the factors relied upon were plainly premature, and thus improper, we cannot affirm the court's exercise of discretion under Rule 403 on the basis of these factors, since we do not know precisely what weight was given to them. Moreover, we cannot disregard the fact that the court's Rule 403 ruling was colored by its erroneous rulings on trustworthiness and relevance. We do not hold that on remand a Rule 403 exclusion would necessarily be error. Rather, the trial court should reconsider that ruling in light of factors that are proper at the time of its ruling. We need not decide whether the less-than-fair-value finding is properly a part of the summary judgment record at this stage, because we conclude that it is not outcome determinative as to any defendant.

Following the determination that sales were being made at less than fair value the United States Tariff Commission, in accordance with 19 U.S.C. § 160(a) (1976), instituted an investigation to determine whether an industry in the United States was being injured by such sales. A notice of hearing was published in the Federal Register on December 10, 1970, 35 Fed.Reg. 18768 (1970). An evidentiary hearing was conducted before the Tariff Commission, and on March 4, 1971 it issued a Determination of Injury, which was published at 36 Fed.Reg. 4576 (1971) and which is included in the FPS as DSS # 4. App., vol. 11, at 4191–98. The Commission found that the United States industry for the production of television receivers was being injured. The Tariff Commission's report concluded:

> In the Commission's judgment, the imports of television receivers from Japan, sold at LTFV [less than fair value], have adversely affected the prices of comparable domestically produced receivers in the United States, and have caused substantial loss of sales by U.S. producers. Accordingly, we have unanimously determined that an industry in the United States is being injured by reason of such LTFV imports.

App., vol. 11, at 4198. The trial court held that the Tariff Commission finding of injury was untrustworthy, and thus inadmissible under Rule 803(8)(C), solely because it was predicated upon the Treasury Department's less-than-fair-value finding. 505 F.Supp. at 1157. Since we have concluded that the court erred in holding the latter untrustworthy and irrelevant, the ruling on the Tariff Commission injury finding is tainted by that error.

■ The defendants object that the finding of injury was predicated in part on confidential submissions to the Tariff Commission, not disclosed to counsel for the importers. The trial court rejected that objection to admissibility, noting that "the consideration of confidential sources of evidence does not in and of itself render the Commission's findings inadmissible." 505 F.Supp. at 1157. We agree with that ruling, essentially for the reasons set forth above with respect to the admissibility, under Rule 803(8)(C), of the less-than-fair-value finding. If the government, in conducting investigations pursuant to authority granted by law, is authorized to rely and

does rely on confidential submissions in making a finding, that fact does not so impugn the trustworthiness of the finding as to make it inadmissible. The indice of reliability remains the fact that it is prepared pursuant to a duty imposed by law. The injury finding qualifies for admission under Rule 803(8)(C).

█ The district court also excluded the finding of injury as irrelevant for two reasons. First, it held that the injury finding could be no more relevant than the less-than-fair-value determination on which it was based. 515 F.Supp. at 1160. Our rejection of the district court's analysis of the relevance of the less-than-fair-value determination prevents us from affirming on that ground. Second, the district court held that because the injury finding was countrywide, it was not relevant to whether Zenith or NUE had been injured. *Id.* Essentially for the reasons given in our discussion of the less-than-fair-value determination, we are convinced that the injury finding is plainly relevant on this issue. We therefore conclude that the district court erred in holding that the injury finding is irrelevant.

Finally, the district court excluded the injury finding under Rule 403. Our analysis of the admissibility of the less-than-fair-value finding under this rule is equally applicable here. Since the Rule 403 ruling was colored by erroneous rulings on trustworthiness and relevance, and was premature, we cannot approve the trial court's exercise of discretion. The Rule 403 issue remains for reconsideration on remand. Since it is not outcome determinative as to any defendant, we need not decide whether the injury finding is properly part of the summary judgment record.

When the Treasury Secretary found sales at less than fair value and the Tariff Commission found injury to an American industry, 19 U.S.C. § 160(a) (1976) mandated a public notice of those determinations, referred to elsewhere in the statute as a finding of dumping. That notice was published at 36 Fed.Reg. 4597 (1971) on March 10, 1971, and is included in the FPS as DSS # 5. App., vol. 11, at 4200. The court concluded that it was a mere ministerial act, adding no weight to the underlying fair-value and injury findings. 505 F.Supp. at 1160. We agree. However, since we have concluded that those findings are admissible under Rule 803(8)(C) and relevant, the finding of dumping is admissible and relevant as well. Admissibility under Rule 403 must likewise be reconsidered in the trial court on remand. Since it is not outcome determinative as to any defendant, we need not decide whether the finding of dumping is properly part of the summary judgment record.

3. *Findings Under the Trade Expansion Act of 1962 and the Trade Act of 1974*

The FPS includes a group of records and reports of proceedings under the Trade Expansion Act of 1962, Pub.L. No. 87–794, tit. I, 76 Stat. 872 (sections repealed 1975), and its successor statute, the Trade Act of 1974, 19 U.S.C. §§ 2101–2487 (1982). One group of proceedings sought relief on behalf of the domestic industry in the form of import quotas or increased duties. Another group involved trade and adjustment assistant proceedings. The trial court held these records and reports to be inadmissible under Rule 803(8)(C) as untrustworthy and under Rule 402 as irrelevant. 505 F.Supp. at 1168–71. They were also excluded under Rule 403. NUE and Zenith do not urge here that those documents should have been considered in ruling on the motion for summary judgment. Thus we do not consider whether they were properly excluded.

4. *Records and Findings of the Japanese Fair Trade Commission*

█ NUE and Zenith in the FPS tendered a group of documents originating with the Japanese Fair Trade Commission. One is a Recommendation Decision in a case brought against the Home Electric Appliance Market Stabilization Council, six of whose members[38] are defendants in our case, charging illegal price stabilization in Japan. App., vol. 11, at 4685–4720. This

---

**38.** Sanyo, Toshiba, Hayakawa (now Sharp), Hitachi, Matsushita and Mitsubishi.

case, commenced in 1957, involved an illegal agreement to stabilize the domestic market by establishing high prices and to enforce this agreement among the parties. The other documents were developed in a case brought in 1967 against MEI charging it with illegal efforts to require that its Japanese wholesalers maintain high resale prices. App., vol. 11, at 4541–4684.

Preliminarily to the consideration of admissibility of this group of documents, the trial court reviewed the affidavits of experts on Japanese law who described the Japanese Anti-Monopoly Act and the role of the Japanese Fair Trade Commission in its enforcement. 505 F.Supp. at 1173–76. The Commission is an independent government agency charged with the primary responsibility of enforcing the Anti-Monopoly Act. It is composed of a chairman and five members, and is supported by a staff organized into three divisions, including an investigation division. The staff includes hearing examiners. Proceedings commence with a preliminary investigation, during which, as described by the trial court,

the staff can move from a highly unstructured initial screening process to a slightly less informal one by invoking certain legal processes to obtain information, including compulsory process, spot inspections, the interrogation of witnesses, the taking of statements, and the use of expert testimony.

505 F.Supp. at 1174. At the close of the investigation the staff prepares a report for the Commission setting forth the claimed violation, the investigative process, a synopsis of the facts, applicable legal provisions, and the opinion of the investigator. If the Commission deems a violation likely to have occurred it issues to the respondent a Recommendation, setting forth the facts and law taken from the staff report and proposed measures for eliminating the violation. The respondent may either accept or reject the Recommendation. If it is accepted, the Commission issues a Recommendation Decision, without resorting to a hearing. Id. at 1175. The Recommendation Decision in the case against the Home Electric Appliance Market Stabilization Council

was the result of the process described thus far: an investigation, a staff report to the Commission, and a Recommendation accepted by the respondents.

Should a respondent reject the Commission's Recommendation, the Commission serves a Complaint, making the same allegations as in its Recommendation. The Complaint may result in a hearing conducted before a hearing examiner. At any time before the Commission renders a final decision the respondent may agree to the entry of a Consent Decision in which it admits the findings of fact and application of law in the Complaint and submits a proposed plan containing concrete measures to be taken to eliminate the violation. If no Consent Decision is entered the hearing examiner, following a hearing, submits a report containing a proposed decision which, with the record, is forwarded to the Commission. The Commission reviews the report and the record, and issues its own decision. It may adopt the hearing examiner's report, remand for further proceedings, or initiate its own hearing. Id. at 1175–76. The documents in the MEI case include a Recommendation which was rejected by MEI, a Complaint which is identical to the Recommendation, a draft decision by a hearing examiner recommending a finding that MEI had violated the Anti-Monopoly Act, a Consent Decision admitting the allegations in the Complaint, a proposal for compliance, and a subsequent report on measures taken pursuant to the Consent Decision. The hearing examiner's draft report was made after lengthy hearings in which testimony was taken, statements were filed, and exhibits were introduced. Id. at 1177–78.

The trial court held that certain documents connected with the MEI case were not findings within the meaning of Rule 803(8)(C). 505 F.Supp. at 1179. Because certain of these documents were authored by Matsushita rather than by a "public office or agency," we agree with the trial court that those documents cannot qualify for admission under Rule 803(8)(C). The court held that the remainder of the documents were findings within the meaning of

the rule. 505 F.Supp. at 1180. Since this ruling is not challenged on appeal, we will assume that it is correct for purposes of this appeal.

The trial court found that there was a timely investigation by a staff with the requisite skill and experience. Nevertheless the court held that none of the documents qualified for admission under Rule 803(8)(C), because all were untrustworthy. The investigation on which the Recommendation was based was deemed to be "simply too preliminary to be trustworthy within the meaning of 803(8)(C), and that the document relied upon as the distillation of the investigation, because it is accusatory in nature, cannot be deemed a trustworthy finding." 505 F.Supp. at 1180. The Complaint, in the court's view, added nothing to the Recommendation because it, too, was accusatory. Even the Consent Decision was deemed untrustworthy because it was based on the staff investigation, not on the facts developed in the hearing before a hearing examiner. *Id.* at 1181. The hearing examiner's draft decision in the MEI case was deemed unreliable because it was superseded by the Consent Decision. *Id.* The court reasoned that because the initial staff investigation did not require a hearing, the staff findings could be revised in later de novo proceedings, and because the report was accusatory, none of the documents could qualify as "factual findings resulting from an investigation made pursuant to authority granted by law." Fed.R.Evid. 803(8)(C).

Both the Home Electric Appliance Market Stabilization document and the MEI documents involve findings set forth after investigations made by the Japanese Fair Trade Commission staff pursuant to the provisions of the Anti-Monopoly Act. The court's reliance on the fact that they resulted from accusatory proceedings is misplaced, because Rule 803(8)(C) plainly includes findings in investigatory proceedings, accusatory or otherwise. There is nothing in the record casting any doubt upon the thoroughness of the investigation. Moreover, at least in this case, reliance on the preliminary nature of the investigation is misplaced. In the Home Electric Appliance Market Stabilization case the respondents' early acquiescence in the Recommendation is strong circumstantial evidence that the investigation was in fact thorough and its finding trustworthy. This acquiescence is clearly sufficient to dispel any doubts which might otherwise exist about trustworthiness based on factors such as the motivation of the investigators, on which the trial court relied. The trustworthiness determination was, therefore, an abuse of discretion.[39]

In the MEI case the respondent went through a hearing to the stage of a draft recommended decision and at that point agreed to a Consent Decree in the form of the original recommendation. The draft decision was the product of a formal hearing at which the respondent was afforded the right to be represented by counsel, to

---

**39.** Chief Judge Seitz agrees with the district court's alternative holding that the Recommendation Decision is inadmissible under Rule 408. The only document that plaintiffs offer from the Home Electric Appliance Market Stabilization case is the Recommendation Decision in which the Home Electric Appliance Market Council acquiesced.

Rule 408 excludes evidence of the compromise of a claim if that evidence is offered "to prove liability for or invalidity of the claim or its amount." Fed.R.Evid. 408. On the basis of expert testimony, the district court found that in a proceeding before the Japanese Fair Trade Commission, the purpose of permitting the accused to acquiesce in a Recommendation Decision "is to obtain early settlement of disputes." 505 F.Supp. at 1175. Chief Judge Seitz be-

lieves that it is the purpose of Rule 408 to encourage settlements by shielding the parties to a settlement from liability based on the fact of settlement or on statements made in settlement negotiations. *See* Notes of Advisory Committee on Proposed Rules: Notes of Committee on the Judiciary, Senate Report, *reprinted in Federal Rules* 206 (West 1982) (Note to Rule 408). Because the Recommendation Decision in the Home Electric Appliance Market Stabilization case is evidence of the settlement of a claim against the members of the Home Electric Appliance Council, it may not be admitted to prove that the defendant Council members were liable for the acts that the Recommendation Decision describes. *See* 23 C. Wright & K. Graham, Federal Practice and Procedure § 5308, at 240–45 (1980).

cross-examine witnesses, and to present a defense. That the recommended decision was superseded by the Consent Decree is irrelevant, since the Consent Decree in no sense rejects the findings in the recommended decision. The recommended decision unquestionably is sufficiently trustworthy for admission under Rule 803(8)(C). The congruence between the Recommendation, the draft recommended decision, and the Consent Decree is strong circumstantial evidence that the staff investigation was thorough.[40] There is no contrary evidence. As we noted in Part C. 1 above, there is a presumption that reports of governmental agency investigations are reliable. There is insufficient evidence in this record to overcome that presumption. Thus we conclude that the trial court abused its discretion in holding that the Recommendation, the Complaint, and the Draft of Decision from the MEI case failed to qualify for admission under Rule 803(8)(C).

The Recommendation Decision from the Home Electric Appliance Market Stabilization case contains this finding:

> Under the direct influence of the above mentioned discount sales in Nagoya and Tokyo the manufacturers involved who were affiliated with the Radio Industries Association or with the Electrical Manufacturers' Association prepared the "Nine Points of Implementation" as per Attachment One about early July of the same year for the purpose of promoting maintenance of the so-called list price and of rectifying various conditions which were responsible for the so-called underselling.

App., vol. 11, at 4696–97. The trial court excluded the attachment for lack of authentication.[41] 513 F.Supp. at 1224. The court also held it to be irrelevant to this case because it did not refer to export matters. *Id.* at 1225. Authenticity is in our view established by the quoted finding which is itself admissible. *See* Part V E 1 *infra.* The attachment is not offered for the truth of the matters asserted therein, but for the fact that, as the report of the investigation found, it was prepared by the manufacturers for the purpose of price maintenance. As such it is a part of the finding and admissible under Rule 803(8)(C). Its relevancy depends on its tendency to support the NUE-Zenith conspiracy theory.

The trial court considered as alternative grounds for excluding the Japanese Fair Trade Commission documents in evidence Fed.R.Evid. 408, prohibiting the use of offers in compromise to prove liability, Fed.R. Evid. 410(2), prohibiting use of nolo contendere pleas to prove liability, and the proviso to section 5(a) of the Clayton Act, 15 U.S.C. § 16(a) (1982), excluding consent judgments from the collateral estoppel effect of final judgments in federal government civil or criminal antitrust cases. 505 F.Supp. at 1181–84.

█ The trial court rejected the contention that section 5(a) of the Clayton Act applied. 505 F.Supp. at 1183 n. 67. We agree. Section 5(a) makes final judgments in favor of the United States under the antitrust laws of the United States prima facie evidence against the defendant in subsequent actions. The proviso to the section excludes consent decrees entered into before any testimony has been taken. Neither the section nor its proviso has any application to reports of an investigation made pursuant to the laws of Japan.

█ The trial court did rely on Rule 410, which provides that plea offers are not, "in any civil or criminal proceeding, admissible against the defendant who made the plea or was a participant in the plea discussions."

---

**40.** Chief Judge Seitz would hold that the Recommendation, the Complaint, and the Draft of Decision from the MEI case are sufficiently trustworthy as the products of a governmental investigation to warrant their admission under Rule 803(8)(C) without considering the content of the Consent Decision. Because the Consent Decree is evidence of the settlement claim, Chief Judge Seitz would hold the Consent Decree inadmissible under Rule 408. *See supra* note 39.

**41.** Because Chief Judge Seitz relies on Rule 408 to exclude the Recommendation Decision from the Home Electric Appliance Market Stabilization case, he would also exclude the attachment to the Recommendation Decision.

Fed.R.Evid. 410; *see* 505 F.Supp. at 1181–84. By its terms Rule 410 deals only with pleas and plea negotiations in criminal cases. There is nothing in the Advisory Committee Note or the Congressional Reports on the Evidence Rules indicating that Rule 410 was intended to apply to civil consent decrees. Thus the trial court erred in relying on that rule to exclude the findings in the recommended decision.

The trial court also appears to have relied on Rule 408 which provides that compromises or offers of compromise are "not admissible to prove liability for or invalidity of the claim or its amount." Fed.R.Evid. 408; *see* 505 F.Supp. at 1181–83. What is offered, however, is not the compromise with the Japanese Fair Trade Commission, but the findings in its investigation. It would be entirely proper, if the case is tried to a jury, to exclude from its attention or consideration the facts of entry into the Consent Decree and of acquiescence in the Recommended Decision. Thus the ultimate fact finder can consider the findings resulting from an investigation without making use of the Consent Decree to prove liability.

A more difficult question is presented, however, by our observations, *supra,* with respect to trustworthiness. We noted there that the fact of consent or acquiescence supports the inference that the investigation was thorough and its findings trustworthy. In making the trustworthiness determination the trial court is not limited to admissible evidence.[42] Fed.R.Evid. 104(a). Thus the fact that consent or acquiescence is inadmissible because of Rule 408 is not dispositive. Moreover Rule 408 is not a privilege, for by its terms it "does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution." As the Notes of the Advisory Committee explain:

The final sentence of the rule serves to point out some limitations upon its applicability. Since the rule excludes only when the purpose is proving the validity or invalidity of the claim or its amount, an offer for another purpose is not within the rule.

Entirely apart from Rule 104(a), therefore, consideration of the fact of compromise or acquiescence not as an admission of liability, but only for the purpose of determining the trustworthiness of findings made in an investigation conducted pursuant to authority granted pursuant to law, does not fall within Rule 408. The trial court erred, therefore, in relying on that rule to exclude the findings of the Japanese Fair Trade Commission.

The court reserved ruling on relevancy of the Japanese Fair Trade Commission documents until its discussion of the summary judgment motion. We do likewise. But for purposes of that motion we deem those documents admissible under Rule 803(8)(C) to the extent that they contain the reports of investigations conducted pursuant to law.

### 5. *Judge Higginbotham's Findings of Fact*

NUE and Zenith contended in the trial court that the findings of fact made by Judge Higginbotham in ruling on the defendants' motions to dismiss for lack of personal jurisdiction, improper venue, and insufficient service of process were admissible under Rule 803(8)(C). The court rejected that contention. 505 F.Supp. at 1184–86. It is not renewed in this court. We will not consider those findings in determining whether summary judgment was proper.

### D. *Rule 702 Expert Opinion Evidence*

A substantial part of the NUE-Zenith case set out in the FPS consisted of an offer of proof as to the testimony to be given by expert witnesses. These offers were made

---

**42.** Because he finds the documents in question sufficiently trustworthy as the result of a governmental investigation, *see supra* n. 41, Chief Judge Seitz would not reach the question of whether a court may rely on a consent decree in making a determination of trustworthiness. Because the parties have not raised the issue, he would also refrain from deciding whether Rule 408 creates a privilege that falls within the exception to Rule 104(a).

in the form of five expert reports: (1) Economic Study of the Japanese Television Industry, by Dr. Horace J. DePodwin and others of Horace J. DePodwin Associates, Inc., an economic consulting firm (the DePodwin Report, App., vol. 5, at 1583); (2) The Pervasive Use of Collusive and Company Group (*Keiretsu*) Activities in Achieving the Rapid Increase in Japanese Exports of Television Receivers to the United States, by Professor Kozo Yamamura, Chairman, Japan Studies Program and Professor of Economics and East Asian Studies at the University of Washington (the Yamamura Report, App., vol. 7, at 2661); (3) Economic Analysis of Evidence Relating to Japanese Electronic Products Antitrust Litigation, by Stanley Nehmer of Economic Consulting Services, Inc. (the Nehmer Report, App., vol. 6, at 2239); (4) The Impact of Japanese Financial and Employment Practices on Japanese Production, Marketing and Price Behavior, by Professor Gary R. Saxonhouse, Professor of Economics, University of Michigan (the Saxonhouse Report, App., vol. 7, at 2887); and (5) Vertical Restraints by Japanese Television Manufacturers: Anticompetitive Effects, by Professor John Owen Haley, Associate Professor of Law, University of Washington (the Haley Report, App., vol. 7, at 2921). In its ruling on the admissibility of opinions contained in these reports or of live testimony expressing the opinions contained therein, the trial court focused upon two separate issues: first, whether the opinions complied with the reasonable reliance requirement of Rule 703; and, second, whether they complied with the specialized knowledge and helpfulness requirements of Rule 702.

First, the trial court noted that under Rule 703 the facts or data on which an expert bases an opinion need not be admissible "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed.R.Evid. 703. The court held that it must make a factual determination under Rule 104(a) as to whether experts in the field rely on the type of data relied upon. Such a determination must be made when there is a factual dispute over such reliance.

The court held, however, that in making this determination "[w]e do not consider the affidavits submitted by plaintiffs' experts to the effect that the material upon which they relied in forming their opinions is of a type generally relied upon by experts in their respective fields as in any way determinative of the issue." 505 F.Supp. at 1325–26. The proper inquiry is not what the court deems reliable, but what experts in the relevant discipline deem it to be. *See, e.g., Wilder Enterprises v. Allied Artists Pictures,* 632 F.2d 1135, 1143–44 (4th Cir.1980); *Bauman v. Centex Corp.,* 611 F.2d 1115, 1120 (5th Cir.1980); *United States v. Genser,* 582 F.2d 292, 298 (3d Cir.1978), *cert. denied,* 444 U.S. 928, 100 S.Ct. 269, 62 L.Ed.2d 185 (1979). There are in the record unequivocal and uncontradicted affidavits from each of the experts that the data they relied on in forming their opinions were of a type reasonably relied upon by experts in their respective fields. Thus the court's ruling was that these affidavits, the only record evidence bearing on the reliance issue, would be disregarded. Instead the court developed its own set of standards for determining reasonable reliance, including:

1. The extent to which the opinion is pervaded or dominated by reliance on materials judicially determined to be inadmissible, on grounds of either relevance or trustworthiness;

2. The extent to which the opinion is dominated or pervaded by reliance upon other untrustworthy materials;

3. The extent to which the expert's assumptions have been shown to be unsupported, speculative, or demonstrably incorrect;

4. The extent to which the materials on which the expert relied are within his immediate sphere of expertise, are of a kind customarily relied upon by experts in his field in forming opinions or inferences on that subject, and are not used only for litigation purposes;

5. The extent to which the expert acknowledges the questionable reliability of the underlying information, thus indicat-

ing that he has taken that factor into consideration in forming his opinion;

6. The extent to which reliance on certain materials, even if otherwise reasonable, may be unreasonable in the peculiar circumstances of the case.

505 F.Supp. at 1330 (footnote omitted).

In substituting its own opinion as to what constitutes reasonable reliance for that of the experts in the relevant fields the trial court misinterpreted Rule 703. The court's approach involved fundamental legal error because, as a matter of law, the district court must make a factual inquiry and finding as to what data experts in the field find reliable. There is no discretion to forbear from making this inquiry and finding. Insofar as the district court substituted its own views of reasonable reliance for those of the experts, therefore, we review for legal error.[43]

The indice of reliability under Rule 703 is the fact that experts in the field in question rely on the type of data in forming their opinions. As Professor McCormick observed years ago:

It is reasonable to assume that an expert in a science is competent to judge the reliability of statements made to him by other investigators or technicians. He is just as competent indeed to do this as a judge and jury are to pass upon the credibility of an ordinary witness on the stand. If the statements, then, are attested by the expert as the basis for a judgment upon which he would act in the practice of his profession, it seems that they

should ordinarily be a sufficient basis even standing alone for his direct expression of professional opinion on the stand . . . .

C. McCormick, Evidence § 15, at 35–36 (2d ed. 1972) (footnote omitted). It was this view which the drafters incorporated in Rule 703. They did so over significant opposition.[44] What the trial court did in effect was to reject the decision of the Judicial Conference, the Supreme Court, and Congress and adhere to an unusually restrictive view as to the basis on which an expert's opinion may be laid. This court has recognized that the rule "broadens and liberalizes the basis for expert opinions" by focusing on what experts in the field deem reliable. *Seese v. Volkswagenwerk A.G.,* 648 F.2d 833, 844 (3d Cir.), *cert. denied,* 454 U.S. 867, 102 S.Ct. 330, 70 L.Ed.2d 168 (1981). The trial court's interpretation of the rule has in this respect been criticized by the leading commentator on the federal evidence rules. 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 703[03], at 703–17–22 (1982).

We do not disagree with the trial court's observation that "the assumptions which form the basis for the expert's opinion, as well as the conclusions drawn therefrom, are subject to rigorous examination." 505 F.Supp. at 1328. But once the court finds that the data relied on is such as experts in the field reasonably rely upon, the rigorous examination should be conducted in the cross-examination for which Rule 705 makes explicit provision.[45] In that setting

**43.** Chief Judge Seitz agrees with the result reached by the majority, but he believes that our review of the reasonable reliance determination under Rule 703 is for abuse of discretion rather than for error of law. In his view, improper application of the law is embraced within the abuse of discretion standard. *See Barris v. Bob's Drag Chutes & Safety Equip., Inc.,* 685 F.2d 94, 101 n. 10 (3d Cir.1982); *Seese v. Volkswagenwerk A.G.,* 648 F.2d 833, 844–45 (3d Cir.), *cert. denied,* 454 U.S. 867, 102 S.Ct. 330, 70 L.Ed.2d 168 (1981); *United States v. Genser,* 582 F.2d 292, 298 (3d Cir.1978), *cert. denied,* 444 U.S. 928, 100 S.Ct. 269, 62 L.Ed.2d 185 (1979). Chief Judge Seitz incorporates this footnote by reference to each of the majority's uses of the legal error standard when reviewing

the district court's exclusion of the DePodwin, Yamamura, Nehmer, Saxonhouse, and Haley reports under Rule 703.

**44.** *See, e.g.,* Committee on the Federal Courts of the New York County Lawyers Assoc. Report (April 1970).

**45.** Rule 705 provides:

The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

the fact-finder can be expected to determine the appropriate weight to be given to the testimony.[46] We hold, therefore, that on this record the trial court erred in excluding expert opinion evidence on the ground that it was based on materials not reasonably relied upon. Thus we will disregard such rulings in determining what evidence to consider for purposes of summary judgment. The defendants urge that expert opinion testimony cannot be considered for that purpose, but the law in this circuit is clearly otherwise. *Paton v. LaPrade*, 524 F.2d 862, 871 (3d Cir.1975).

■ The second issue on which the trial court focused in considering the admissibility of the tendered expert opinion evidence was the interrelationship between Rules 702 and 704. 505 F.Supp. at 1330. The former provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702. The latter provides:

Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

Fed.R.Evid. 704. Rule 704 settles, for the federal courts, the old dispute over whether expressions of expert opinion on the ultimate facts in issue somehow invade the province of the jury. They do not. Such expressions, if they will assist the trier of fact, are admissible. The court's role is to make the determination whether the proffered testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." Undoubtedly the court is clothed by Rule 702 with some degree of discretion in determining whether the opinion will be helpful, and we normally review only for abuse of that discretion. *Knight v. Otis Elevator Co.*, 596 F.2d 84, 87 (3d Cir. 1979). But that review must be more discriminating if we believe that the court's exercise of discretion proceeded under a misapprehension as to the meaning of the governing rules. The court's misinterpretation of the reasonable reliance requirement of Rule 703 is in this respect significant.

After reviewing the caselaw, much of it antedating the Federal Rules of Evidence, the trial court interpreted Rule 702 as embodying several basic principles governing the issue of assistance. First, "expert opinion must be approached on an expert by expert, or even opinion-by-opinion, basis." Second, "the court may—indeed must—carefully scrutinize the underlying assumptions, inferences drawn, and conclusions reached by the experts before reaching a decision on admissibility ...." Third, "opinions do not assist the jury when they are cumulative of evidence already before the jury, or when the expert has sifted through that evidence reaching a conclusion which in essence attempts to tell the jury how it should decide the case." Finally, "the expert must utilize specialized knowl-

**46.** Most of the cases relied upon by the trial court in developing its restrictive approach to admissibility under Rule 703 involved weight, not admissibility. *See Punnett v. Carter,* 621 F.2d 578, 583–86 (3d Cir.1980) (trial court properly denied preliminary injunction despite expert's opinion); *Drayton v. Jiffee Chemical Corp.,* 591 F.2d 352, 362–64 (6th Cir.1978) (trial court did not err in admitting economist's testimony, but gave it undue weight); *Merit Motors, Inc. v. Chrysler Corp.,* 569 F.2d 666, 672–73 (D.C.Cir.1977) (trial court did not err in giving expert's opinion little weight); *Scheel v. Conboy,* 551 F.2d 41, 43–44 (4th Cir.1977) (trial court did not err in giving no weight to economist's testimony on future economic loss). Of

the cases relied upon only *Berguido v. Eastern Airlines, Inc.,* 317 F.2d 628 (3d Cir.), *cert. denied,* 375 U.S. 895 (1963), addresses admissibility rather than weight. *Berguido* did embrace a restrictive approach to admissibility of expert opinion based on anything but personal observation or trial testimony. *Id.* at 632. It has in that respect been overruled by the codification of a different approach in Rule 703. *Pittsburgh Press Club v. United States,* 579 F.2d 751 (3d Cir.1978), on which the court also relied, is not apposite. It involved an expression of opinion based on a survey offered in evidence, and thus was not an interpretation of the second sentence of Rule 703. *Id.* at 760.

edge, not ordinarily possessed by the layman, to reach an opinion which truly aids the jury . . . ." 505 F.Supp. at 1333–34.

There are several serious problems with the trial court's formulation of standards for determining admissibility under Rule 702. First, the requirement for admissibility that expert testimony be "beyond the jury's sphere of knowledge" adopts a formulation which was rejected by the drafters of Rule 702. While that formulation applied prior to the adoption of evidence rules, it no longer applies.

> Such a test is incompatible with the standard of helpfulness expressed in Rule 702. First, it assumes wrongly that there is a bright line separating issues within the comprehension of jurors from those that are not. Secondly, even when jurors are well equipped to make judgments on the basis of their common knowledge and experience, experts may have specialized knowledge to bring to bear on the same issue which would be helpful.

3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 702[02], at 702–9–10 (1982) (footnotes omitted). Moreover the suggestion that the court must, in deciding on admissibility, carefully scrutinize the underlying assumptions, the inferences drawn, and the conclusions reached, if followed rigorously, would result in the trial court, as distinguished from the fact-finder, deciding the weight to be given to the testimony:

> [D]oubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclusions. The jury is intelligent enough, aided by counsel, to ignore what is unhelpful in its deliberations.

Id. ¶ 702[03], at 702–14–15 (footnotes omitted). The objection that an expert should not be permitted to sift through the evidence in reaching a conclusion is inconsistent with the language of Rule 703 permitting expert testimony based on "facts or data . . . made known to him at . . . the hearing," language which codifies the long-standing practice of the courts. Whether the experts used specialized knowledge in reaching their opinions presents a question of fact, which we review by the clearly erroneous standard. The question whether such an opinion will be helpful to the jury involves discretion, but that discretion must be exercised consistent with the presumption that expert testimony will be helpful. Finally, to the extent that the trial court's discussion suggests that expressions of opinion on the ultimate fact in issue somehow impermissibly invade the province of the jury, 505 F.Supp. at 1334, it is inconsistent with the clear mandate of Rule 704.

The trial court's general approach to admissibility of expert opinion evidence seems inconsistent with the case law in this circuit favoring admissibility under Rule 702. *See, e.g., United States v. Hill,* 655 F.2d 512, 514–16 (3d Cir.1981) (when entrapment is an issue psychiatrist can express opinion on susceptibility to persuasion); *Seese v. Volkswagenwerk A.G.,* 648 F.2d 833, 844–45 (3d Cir.), *cert. denied,* 454 U.S. 867, 102 S.Ct. 330, 70 L.Ed.2d 168 (1981) (engineer can testify that had window retaining system been installed in van plaintiffs would not have been injured); *Knight v. Otis Elevator Co.,* 596 F.2d 84, 86–88 (3d Cir.1979) (factfinder, not trial court, determines credibility of expert's opinion on design defect). We turn, therefore, to the proffered expert opinions.

### 1. *The DePodwin Report*

The three volume DePodwin Report is described by the trial court as "by far the most careful, scholarly, and disinterested of the reports submitted by the plaintiffs' expert witnesses." 505 F.Supp. at 1334 (footnote omitted). The critical materials are in Volume I, consisting of eleven parts and a conclusion.[47] Part I is an outline of the economic analysis. Part II contains background on television manufacturing in the United States and Japan. Part III de-

---

**47.** Volume II is a statistical appendix and Volume III is a compilation of damage calculations for NUE.

scribes the Japanese television industry, with statistical information on concentration, construction and export data, production capacity, investment, and facilities expansion for the industry as a whole and for individual defendants. With one limited exception the court assumed that these parts were admissible under Rule 702. 505 F.Supp. at 1336–37. The court also assumed admissibility of Part VII describing the nature of the market for television receivers in Japan as conducive to cartel arrangements. *Id.* at 1363. It did not address Parts VIII through XI dealing with issues of damage and injury. Part IV, in which the experts opine that there was a Japanese television industry cartel, and Part V, in which they describe the operation of that cartel, were entirely excluded. Part VI, a comparison of prices of Japanese television receivers in the United States and in Japan, was also excluded.

a. Parts IV & V

 Exclusion of Parts IV and V was predicated on two grounds: that the expert relied on materials which did not satisfy the reliability requirement of Rule 703; and that the expert's conclusions as to the existence of a conspiracy are impermissible expert testimony under Rule 702 because they would not be helpful to the factfinder. The first ground need not long detain us. In this Part V D we have already held that the trial judge misapplied Rule 703 in concluding that he, not the experts in the field, was the source of information about reasonable reliance. Thus we examine Parts IV and V of the DePodwin Report only to determine whether testimony such as is there proposed displayed specialized knowledge, or would be helpful to the trier of fact.

The trial court found that DePodwin did not use economic expertise in reaching the opinion that the defendants participated in a Japanese television cartel. 505 F.Supp. at 1342–46. We have examined the excluded portions of Parts IV and V in light of the admitted portions, and we conclude that this finding is clearly erroneous. As a result, the court also held the opinions to be

unhelpful to the factfinder. What the court in effect did was to eliminate all parts of the report in which the expert economist, after describing the conditions in the respective markets, the opportunities for collusion, the evidence pointing to collusion, the terms of certain undisputed agreements, and the market behavior, expressed the opinion that there was concert of action consistent with plaintiffs' conspiracy theory. Considering the complexity of the economic issues involved, it simply cannot be said that such an opinion would not help the trier of fact to understand the evidence or determine that fact in issue. Characterizing the expert as an "oath-help[er]," or a "conspiracyologist," *see, e.g.,* 505 F.Supp. at 1343, 1352, 1367, 1369, is no substitute for recognition of the rule of law embodied in Rule 702. Exclusion under that rule of an opinion clearly based on expert judgment as unhelpful to the factfinder was an abuse of discretion.

b. Part VI

 The court also excluded Part VI of the DePodwin Report, entitled "Japanese Television Prices in Japan and the United States." 505 F.Supp. at 1352–59. This part of the report purports to compare defendants' prices in the Japanese domestic market with their prices in the United States market. In deciding the motion for summary judgment, however, the court noted:

We ruled most of these [price comparison] materials inadmissible in our Expert Testimony Opinion. However, because of their pivotal role in plaintiffs' case, we shall assume arguendo their admissibility and thereupon consider them.

513 F.Supp. at 1235–36 (footnote omitted). Because of our disposition of the case we cannot assume admissibility arguendo, but must address defendants' objections to admissibility.

The report makes three comparative analyses of the prices charged by defendants in domestic sales in Japan and in export sales. The first sets forth a comparison of average domestic sales and export sales by screen size categories for each de-

fendant. The calculations of average prices are made in a report by the accounting firm of Morris R. Cohen & Co., which is in evidence without objection. This report calculated average prices from list prices furnished by the defendants in answers to interrogatories. The second price analysis compares prices of domestic models and export models found by Zenith's engineers to be technically comparable. List prices for such models were derived from the Cohen report, but the DePodwin organization also used wholesale prices which the Japanese defendants had submitted to the Japanese Ministry of Finance when they filed commodities·tax returns. The third analysis used figures for average prices by screen size developed in the Morris R. Cohen & Co. report, but adjusted those prices by the adjustments to prices which are specified in the Antidumping Act of 1916. From the three methodologies DePodwin drew the same general conclusion: that "these companies engaged in pervasive and systematic price discrimination over many years." App., vol. 5, at 1861. "Moreover," DePodwin concluded, "the magnitude of the differences in Japanese domestic and export prices was very often so substantial as to indicate that a serious distortion in the relationship between supply and demand in the United States market must necessarily have resulted from this discriminatory policy of the Japanese television cartel." *Id.* at 1865.

The trial court ruled that the first and third analyses, both of which used average screen size prices developed by Morris R. Cohen & Co., which were already in evidence, were inadmissible because these average price calculations were not the type of comparison on which an economist would reasonably rely. The analyses did not, for example, separately calculate average prices of monochrome and color receivers, 505 F.Supp. at 1353–54. The second analysis, using sets found by Zenith's engineers to be comparable, was held to be inadmissible under the reasonable reliance requirement of Rule 703 because the economist relied on list prices furnished by the defendants in answers to interrogatories, without

taking into account defendants' rebate structures. *Id.* at 1355.

In making these exclusionary rulings the trial judge made the same fundamental legal error which we noted earlier: he assumed that the determining factor under Rule 703 was his view of what data experts in a field ought to rely upon rather than making a factual inquiry and a finding as to what data experts, in this case economists, deem reliable. Moreover in the report, which is, after all, an offer of proof, Dr. DePodwin explains:

> The differences in average domestic and export prices for each manufacturer ... may to some extent reflect differences in the mix of models within each screen size category sold domestically and exported. The fundamental·differences in price for comparable models sold in Japan and exported to the United States are so large and consistent that any effect of differences in the mix of models cannot be significant.

App., vol. 5, at 1818. There is no record evidence suggesting that economists would not, given the range of differences observed, rely on average prices rather than actual model-by-model price comparisons. Thus the ruling excluding Part VI of the DePodwin report on the authority of Rule 703 also was error.

The trial court also excluded the first and third sets of comparisons under Rule 702. The court found that price comparisons calculated in such gross terms "[take] no account of highly significant variations among models" and thus held that these comparisons cannot "be helpful to the trier of fact." 505 F.Supp. at 1354. However, the court's finding that the "highly significant variations" impugn the probative value of the price comparisons is contradicted by the record. DePodwin explained that "[t]he fundamental differences in price for comparable models sold in Japan and exported to the United States are so large and consistent that any effect of differences in the mix of models cannot be significant." App., vol. 5, at 1818. In light of this expert evidence, we hold that the trial court's help-

fulness determination is not consistent with the sound exercise of its discretion.

The trial court also excluded Appendix B to Part VI. Appendix B is a mathematical cost construction offered to show that four defendants—MEI, MELCO, Hitachi, and Sanyo—sold television receivers in the United States at prices below cost while earning substantial profits in Japan. The trial court held that Appendix B was inadmissible under Rule 703 because it is "pervaded by reliance on untrustworthy sources of information: false or unsupported assumptions, and average prices calculated in gross terms." 505 F.Supp. at 1363. In so ruling, the trial court ignored DePodwin's uncontradicted affidavit that all data relied on in his report were of the type on which experts in his field would reasonably rely. Instead, the court substituted its own opinion of what constitutes reasonable reliance. As we have held above, exclusion of expert evidence on the basis of this misinterpretation of Rule 703 is error.

### c. Part VII

Although the trial court admitted most of Part VII of the DePodwin Report, it excluded several pages that are based solely on what is assumed to be a scholarly Japanese language article. 505 F.Supp. at 1364. The court held that because the opinions contained in these pages are based on material that has not been shown to be independently admissible under Fed.R.Evid. 803(18),[48] they may not qualify as expert opinions under Rule 702. The court assumed that the article relied on was the type of data on which experts in the field reasonably rely. Thus, the article itself need not be admissible in order for the opinions that DePodwin draws from it to qualify as admissible expert opinions. To the extent that the trial court ruled otherwise, it erred.

We will, therefore, in deciding whether summary judgment was proper, consider Parts I through VII of the DePodwin Report.

### 2. The Yamamura Report

The Yamamura Report is by an economist specializing in the Japanese economy. The trial court ruled that the first seventy-three pages detailing background information on the relationship between Japanese industry and government were admissible under Rule 702. 505 F.Supp. at 1366. The balance of the report was excluded essentially for the same reasons that most of the DePodwin Report was excluded. For the reasons set forth in our discussion of that report, exclusion on such grounds was improper.

 In addition the court took exception to the fact that the report quotes from a Japanese language journal, which the court assumed to be a scholarly article by a group of economists. The court held that this quoted material must be excluded because its admissibility was not independently established under Rule 803(18). 505 F.Supp. 1368. The court apparently assumed that Yamamura could reasonably rely on the quoted material as a basis for his own opinions, but found that he did more than rely on the quoted material; he adopted the opinions expressed therein as his own. This, the court held, was impermissible.

To the extent that Yamamura used his expertise to evaluate and credit the opinions contained in the quoted material, the court, for purposes of summary judgment, should have considered the credited materials as reflecting Yamamura's own expert opinion. Nothing in Rule 803(18) suggests otherwise. We note that for purposes of summary judgment, only the content of Yamamura's opinion and not its form is

---

**48.** Rule 803(18) provides:

> **Learned treatises.** To the extent called to the attention of an expert witness upon cross-examination or relied upon by him in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other

> science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice [are not excluded by the hearsay rule]. If admitted, the statements may be read into evidence but may not be received as exhibits.

relevant. How the article is to be handled in the event that Dr. Yamamura testifies is a matter we need not now decide. But certainly the reference in his report to what he apparently viewed as a learned treatise is no reason for ruling that he cannot express an opinion consistent with it.

We will, therefore, consider the Yamamura Report in deciding whether summary judgment should have been granted.

### 3. The Nehmer Report

The Nehmer Report, relying on materials from published sources and on materials obtained during discovery, makes an economic analysis which suggests that in the Japanese market there were barriers to entry by American firms, collusive efforts to stabilize domestic prices, concert of action with respect to sales at low prices in the United States, and additions to capacity far in excess of the needs of the Japanese domestic market. The most significant parts of the Nehmer Report were ruled inadmissible essentially for the same reason that most of the DePodwin report was excluded.[49] 505 F.Supp. at 1369–76. The ruling suffers from the same defects.

We will, therefore, consider the entire Nehmer Report in deciding whether summary judgment should have been granted.

### 4. The Saxonhouse Report

The Saxonhouse Report, relying on economic information which was not seriously challenged as unreliable, posits that Japanese firms in general and Japanese electrical equipment manufacturers in particular have higher fixed costs than do similar American firms. These higher fixed costs are the result of differences in the labor market and differences in financing practices. These higher fixed costs, the report concludes, create a climate in which vigorous price competition is unlikely and collusion to avoid it is desirable. The Report also concludes that it creates a climate in which dumping abroad is necessary in order to absorb excess capacity. Finally, the Saxonhouse Report finds that collusive

price stabilization in the home market enables Japanese firms to support sustained sales at low prices in the export market.

The trial court noted relevancy objections, 505 F.Supp. at 1377, but postponed ruling on them. Instead it ruled, without extended discussion, that the opinions expressed in the Saxonhouse Report were inadmissible, because "[n]either Rule 703, which excludes opinions based upon unreliable assumptions, nor Rule 702, which excludes opinion testimony not helpful to the trier of fact, condones the admission of such circular expert testimony." 505 F.Supp. at 1378. Even on the doubtful assumption that this conclusory statement qualifies as a finding that Dr. Saxonhouse relied, in forming his opinion as to the likelihood of collusion, on materials on which economists do not rely, it would be based on the erroneous interpretation of Rule 703 noted earlier. Thus as a Rule 703 ruling it is improper.

The trial court also excluded the Saxonhouse Report as not helpful under Rule 702 because it explicitly assumed a collusive decision by the defendants. 505 F.Supp. at 1378. The Report does assume that "a calculated collusive decision has been made by Japanese radio and television manufacturers to take a continually increasing share of the American market for their products .... " App., vol. 7, at 2893–94. The Report does not appear to rely on this assumption to reach its conclusion that conditions in the Japanese home market make collusion highly likely. Rather it relies upon the presence in that market of high fixed costs, high debt-equity ratios, and a social environment of low labor turnover, id. at 2889–90, all of which suggest a desire and motivation to collude in the manner alleged by NUE and Zenith. Insofar as the Saxonhouse Report assumes collusion, it does so to demonstrate that the assumed collusion would lead to price differentials between the American and Japanese markets. There is record evidence of such differentials. Saxonhouse's opinion would unquestionably be helpful to the trier of fact in

---

49. As with the DePodwin Report the trial court did not rule on admissibility of the sections of

the Nehmer Report dealing with injury and damage issues. 505 F.Supp. at 1376.

understanding the reason for those differentials. Exclusion under Rule 702 was inconsistent with the sound exercise of discretion. Neither Rule 703 nor Rule 702 justifies exclusion.

Because the trial court did not make a Rule 403 determination and the defendants have not urged exclusion under Rule 403 before this court, we have no occasion to consider whether exclusion of the Saxonhouse Report under that rule would be an abuse of discretion. We will therefore consider it as part of the summary judgment record.

### 5. The Haley Report

■ The Haley Report opines that in the relevant time period the defendants had the capacity effectively to police a price-fixing agreement related to sales of television receivers in Japan as a result of governmentally imposed barriers to entry by foreign manufacturers, the practice of major Japanese manufacturers marketing through manufacturer-controlled wholesale and retail outlets which thus could be supervised, and the use of the actual control over distribution to fix and maintain retail prices. The report is by a law professor specializing in Japanese antitrust law. The court held that Professor Haley's descriptions of Japanese barriers to entry and of the distribution arrangements of major manufacturers were admissible. His opinion that there was horizontal concert of action in price fixing in Japan was excluded on two grounds. First the court held that because the opinion was based in part on the Japanese Fair Trade Commission documents, which the trial court had excluded, it did not meet the reasonable reliance requirement of Rule 703. 505 F.Supp. at 1379. We have held above that the court misinterpreted Rule 703 by substituting its own view for that of experts in the field. Second, the court held that Haley's conclusion that there was horizontal concert of action among defendants in pricing practices in Japan did not follow from the materials on which he relied. *Id.* We do not believe, however, that the court's disagreement with the expert's opinion is a proper

ground for excluding evidence. In any event we have reviewed the Haley Report and conclude that the opinion that there was horizontal concert of action is logically related to the materials on which he relies, some of which we have held to be independently admissible. Thus the trial court's rulings excluding the report were improper.

Because the trial court did not make a Rule 403 determination and defendants have not urged exclusion under Rule 403 before this court we have no occasion to consider whether exclusion under Rule 403 would be an abuse of discretion. The Haley Report will, therefore, be considered as part of the summary judgment record.

### E. Rule 803(6) Materials

NUE and Zenith included in the FPS a number of documents seized by the Japanese Fair Trade Commission from the offices of the defendants in the course of its market stabilization investigation, additional materials produced in discovery from the defendants' files, relating to activities of the defendants in Japan, and materials obtained in discovery from defendants and American purchasers respecting certain import transactions. NUE and Zenith contend that all of these documents are admissible under Rule 803(6) as records of regularly conducted business activity. They also contend that many of them are admissible under the residual hearsay exception in Rule 803(24) or, in instances where the witnesses are unavailable, under Rules 804(b)(3) and (5). The defendants objected to almost all of these documents on grounds of authenticity, and because they did not qualify as records of regularly conducted business activity.

### 1. Authentication

Rule 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901(a). This standard is the same as that for the admission of conditionally relevant evidence under Rule 104(b). It differs from the general standard for admissibility expressed in

Rule 104(a) which requires that the court make findings on preliminary questions. All that is required is a foundation from which the fact-finder could legitimately infer that the evidence is what its proponent claims it to be. I believe that under Rule 901(a) this prima facie standard for authentication is a legal one, as to which our review is plenary. Chief Judge Seitz and Judge Meskill believe that we review Rule 901 determinations by the abuse of discretion standard. *See United States v. Clifford*, 704 F.2d 86, 91 (3d Cir.1983). On the record presented here any difference in scope of review is not dispositive.

█ The trial court held, and we agree, that the evidence required to establish a prima facie case that the evidence is what the proponent claims it to be must itself be admissible. This contrasts with Rule 104(a) rulings, which may be based on inadmissible evidence. The difference lies in the fact that if authenticity is disputed the dispute must be resolved by the jury or other fact-finder. 5 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 901(a)[01], at 901–16 (1983). We note that the court, citing *United States v. Goichman*, 547 F.2d 778, 784 (3d Cir.1976), referred to the necessity for "substantial" admissible evidence. 505 F.Supp. at 1219–20. The reference to "substantial" evidence in *Goichman,* however, as the context discloses, was not intended to require anything more than a prima facie showing that the evidence is what its proponent claims it to be. We do not understand the trial court to have imposed any stricter standard.

█ In one respect, however, we disapprove of the trial court's approach to authentication. The court observed:

> As a corollary to this holding [that admissible evidence is required], we acknowledge that some documents may be authenticated only as against certain parties, since the authenticating evidence for those documents may be admissible only against certain parties.

505 F.Supp. at 1220 n. 19. This ruling confuses questions of authenticity—that the evidence is what its proponent claims it to be—with questions of admissibility. The rules governing admissibility are aimed at preventing use against a party of materials that are as to it untrustworthy. Thus as to each party evidence must have some independent basis of admissibility. Less is required in establishing that evidence is what its proponent claims it to be. For example, if one party in an answer to interrogatories states that a given document is a record kept in the course of its regularly conducted business activity, that answer suffices to authenticate it, even though for other purposes the answers to interrogatories of one party may not be admissible against another. The evidence which suffices to establish authenticity should be evidence that is relevant on the limited question of genuineness: that is, evidence admissible against the party having such a relationship to the proffered materials that it is likely to know the facts as to genuineness. Once a prima facie case of genuineness against that party is established, the court should regard the materials as sufficiently authenticated against all parties, subject, of course, to the right of any party to offer evidence to the ultimate fact-finder disputing authenticity. The other parties are adequately protected, with respect to trustworthiness, by the requirement that the court must still rule on admissibility.

The trial court ruled that six sets of materials proffered under Rule 803(6) were authenticated as to all defendants: the Yajima Diaries, DSS 48–50, 505 F.Supp. at 1267–70; the Yamada Diary, DSS 51, 505 F.Supp. at 1277–79; the Yamamoto Diaries, DSS 52–54, 505 F.Supp. at 1280–82; the Shimizu Memorandum, DSS 95, 505 F.Supp. at 1297–98; the Toshiba Memoranda, DSS 96–98, 505 F.Supp. at 1299–1300; and the TV Export Council Meetings documents, DSS 1030–1034, 505 F.Supp. at 1310–12. The trial court also held to be prima facie authentic against all defendants two sets of materials offered as prior testimony under Rule 804(b)(1): testimony of seventeen witnesses before hearing examiners of the Japanese Fair Trade Commission in the market stabilization case, DSS 58–74, 505 F.Supp.

at 1286–88; and protocols, or records of statements given to the same commission by officers of several defendants, DDS 75–92, 505 F.Supp. at 1294–96. These findings are not challenged on appeal.

■ One exhibit, the Okuma Diary, DSS 55, was held to be authenticated only against MELCO. 505 F.Supp. at 1283–84. The diary was identified in MELCO's supplemental answers to interrogatories as that of its assistant to the manager of the Consumer Products Sales Department. It is mentioned by Okura in his protocol to the Japanese Fair Trade Commission as having been written in relevant part at a meeting of the Tenth Day Group. Okura also testified in the Commission proceedings that he attended the meeting. The diary was lawfully seized by the Commission at MELCO's premises. The protocol was admitted against MELCO, 505 F.Supp. at 1294–97, and the relevant testimony was admitted against all six defendants in the market stabilization case. 505 F.Supp. at 1293. The court ruled similarly with respect to the Tokizane Diary, DSS 56–57, holding that it was authenticated only against MEI. Id. at 1285–86. Mr. Tokizane was director of MEI's television division. The diary was an exhibit in the market stabilization case and is referred to in MEI's answers to interrogatories. Because there was sufficient evidence admissible against MELCO and MEI, respectively, to authenticate the two diaries, we hold that the evidence referred to suffices to support a finding, against all defendants, that the Okura and Tokizane diaries are authentic.

■ Two sets of Rule 803(6) materials were held to be unauthenticated. The first set is offered as minutes of the meetings of officers of the Electronic Industries Association of Japan. DSS 1027 refers to a meeting of February 16, 1963. DSS 1028 refers to a January 18, 1964 meeting. Both are typewritten but unsigned. The documents were obtained during the course of this litigation from the Association at its office in Japan. Various defendants in answers to interrogatories refer to the meetings of the officers taking place on these dates. The documents were produced in compliance with a direction by Judge Higginbotham that the defendants, who are directors of the Association, make a good faith effort to have the Association's records made available to NUE and Zenith. Counsel for MELCO was present when such production took place. The two exhibits were removed from a stack of similar minutes of meetings held monthly. We hold that from the totality of these circumstances a finding could be made that exhibits DSS 1027 and 1028 are what NUE and Zenith claim them to be: namely, minutes of the monthly meetings of the Electronic Industries Association of Japan. They have the appearance, content and substance typical of minutes. Fed. R.Evid. 901(b)(4). They were produced by the defendants pursuant to a discovery order in this proceeding. Fed.R.Evid. 901(b)(10). They come from a source where such minutes were likely to be kept, and the Association was a body which was likely to prepare such minutes. No more evidence was needed to establish a prima facie case of authenticity than the record contains.

■ The second Rule 803(6) document rejected as unauthenticated, 505 F.Supp. at 1303–08, is DSS 1029, an internal memorandum from the files of Japan Victor Company, not a party to this litigation, but a member of the Statistical Committee of the Electronic Industries Association of Japan. Although separately operated, Japan Victor is fifty-one percent owned by MEI. The memorandum refers to a December 26, 1966 meeting of the Statistics Committee of the Electronic Industries Association of Japan, and suggests that at that meeting the members of the committee agreed to modify their accounting practices so as to conceal from government agencies the extent of the disparity between export and domestic prices. The document, dated January 6, 1966, was produced from the files of Japan Victor Company pursuant to a subpoena accepted by MEI's counsel on behalf of Japan Victor, at Japan Victor's office in Tokyo. MEI's counsel was present when it was produced. According to the translation, which is not disputed, it is addressed to

the Chief, Plant Accountants' Section, and is from Sales Promotion. Two "chops" or signatures appear on it: those of Mr. Shiokawa and Mr. Oguri. The defendants admit that both are employed by Japan Victor. Answers to interrogatories by several defendants establish that Japan Victor is a member of the Statistics Committee, that a meeting of that committee took place on December 26, 1966, that Mr. Oguri was Japan Victor's representative at meetings of the Statistics Committee, and that there had been a discussion at that meeting of the general subject matter set forth in the memorandum. App., vol. 4, at 1438. The handwritten memorandum is on stationery bearing a Japan Victor Company Ltd. legend and is dated eleven days after the meeting it purports to describe. The trial court held that this document was not authenticated because "[w]e have no notion of who wrote the document, or where, or on what basis." 505 F.Supp. at 1306. The court noted that "while the plaintiffs might have taken the deposition of someone from Japan Victor when their counsel was in Tokyo to receive production of the document and thus shed some light on its origin and its genuineness, they elected not to do so." *Id.* The evidence, however, indicates that there was a meeting of the Statistical Committee on December 26, 1966, that Japan Victor was a member of that committee, that Mr. Oguri represented Japan Victor in meetings of that committee, that the general subject matter described in the memorandum was discussed at the meeting, that the document on its face is addressed from Sales Promotion to Accounting and discusses matters on which action by the accounting section would be expected, that its date is in close proximity to the date of the committee meeting, and that it was preserved in the files of Japan Victor. We conclude that a fact-finder could reasonably infer that the document is what NUE and Zenith claim it to be: Mr. Oguri's instruction to the accounting section to implement an agreement reached on December 26, 1966 at the committee meeting. Its admissibility must be separately considered, but prima facie it is authentic.

We have dealt thus far with all of the authenticity rulings made following the *in limine* hearing on admissibility. In addition the trial court made some evidentiary rulings on materials proffered under Rule 803(6) in its opinion granting summary judgment. 513 F.Supp. at 1211 n. 157, 1228, 1229, 1223–25. The documents in question include the MD group documents, DSS 101, 102, 103 and 104, and the Nine Essential Points of Implementation document which was an exhibit to the Recommended Decision in the market stabilization case before the Japanese Fair Trade Commission. The court excluded all of them, but it is not clear with respect to any of them that the ruling was based on lack of authenticity as well as inadmissibility under Rules 802, 803 and 804. In Part V E 2, *infra,* we hold that exhibits DSS 101, 103 and 104 do not qualify for admission as business records; in Part V H, *infra,* we conclude that no other hearsay exception supports their admission. Thus we need not examine the record for prima facie evidence of their authenticity. The finding in the recommended decision of the Fair Trade Commission is evidence from which a factfinder could conclude that the Nine Essential Points document is what NUE and Zenith claim it to be. The trial court's ruling on DSS 102, testimony of Mr. Saeki of MEI before the Japan Fair Trade Commission, is unclear. 513 F.Supp. at 1229. The testimony was sufficiently authenticated.

### 2. *Admissibility*

■■■■ Since, except for DSS 101, 103 and 104, all of the documentary evidence which NUE and Zenith tender as admissible under Rule 803(6) has been sufficiently authenticated in compliance with Rule 901, we turn to admissibility. The trial court held that the question whether a document qualifies as a record of regularly conducted activity for purposes of Rule 803(6) must be answered by the court under Rule 104(a), not by the ultimate fact-finder. It held, as well, that in answering that question the court is not bound by the Rules of Evidence. Finally, the court held that it must be satisfied by a preponderance of the evidence

that the preconditions for admission are satisfied. 505 F.Supp. at 1230. At least insofar as the rulings on preliminary questions involve factual issues, each of these rulings is correct. Moreover, our review of these factual determinations is by the clearly erroneous standard of Rule 52. To some extent, however, preliminary rulings about admission under Rule 803(6) involve the application to those facts of defined legal standards, and as to such applications our review is plenary.[50]

Business records are admissible under Rule 803(6) "if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness." Fed.R.Evid. 803(6). Despite the reference in the Rule to a qualified witness, the trial court held "that the testimony of the custodian or other qualified witness is not a sine qua non of admissibility in the occasional case where the requirements for qualification as a business record can be met by documentary evidence, affidavits, or admissions of the parties, *i.e.*, by circumstantial evidence, or by a combination of direct and circumstantial evidence." 505 F.Supp. at 1236. This interpretation of Rule 803(6) is not challenged here by the defendants. It seems, in any event, consistent with the spirit of the Rules. The ruling on admissibility is to be made by the court under Rule 104(a), and the court is not even confined, in making it, to admissible evidence. It would make little sense to require live witness testimony every time a business record is offered when, from the other materials open for the court's consid-

eration, it can make the required finding to its own satisfaction. The court held that in the absence of live witness testimony as to regularity of the activity and its recordation, the proponent "must show regularity of practice in some precise and explicit manner, either by external evidence or from the documents themselves plus surrounding circumstances." *Id.* Placing the burden of establishing regularity of practice on the proponent was also proper. Addressing the Rule 803(6) requirement that the record be made "by, or from information transmitted by, a person with knowledge," the court held that the proponent must show "either (1) that the author of the document had personal knowledge of the matters reported, or (2) that the information he reported was transmitted by another person who had personal knowledge, acting in the course of a regularly conducted activity, or (3) that it was the author's regular practice to record information transmitted by persons who had personal knowledge." 505 F.Supp. at 1237. Both the allocation of this burden and the methods by which it may be satisfied were correctly stated by the court. Finally, turning to the Rule 803(6) proviso excluding business records when "the source of information or the method or circumstances of preparation indicate lack of trustworthiness," the court held that the burden of showing such untrustworthiness was on the party opposing admission. *Id.* Placing this burden on the party opposing admission was correct.

The trial court held, however, that Rule 803(6) requires that the proponent of business records show that they were "created by routine practices where careful checking and habits of precision and regularity assure their accuracy." *E.g.,* 505

---

**50.** Chief Judge Seitz agrees that our review of the district court's preliminary determinations under Rule 803(6) is by the clearly erroneous standard. However, he believes that where the facts are not in dispute, our review in general is for abuse of discretion. *E.C. Ernst, Inc. v. Koppers Co.,* 626 F.2d 324, 331 (3d Cir.1980); *United States v. Bailey,* 581 F.2d 341, 346 (3d Cir.1978); *see also United States v. Flom,* 558

F.2d 1179, 1182–83 (5th Cir.1977). While he reaches the same conclusions on admissibility as business records as the majority, he would review the district court's rulings on the business record status of the documents discussed in section V E by an abuse of discretion standard wherever the majority uses a legal error or plenary standard.

F.Supp. at 1271. In adopting this stringent standard the trial court looked to caselaw antedating the Evidence Rules. Even the pre-rules caselaw does not uniformly support so stringent a standard. *Compare Standard Oil Company of California v. Moore,* 251 F.2d 188, 215 (9th Cir.1957), *cert. denied,* 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958) (requiring an established procedure "for the systematic or routine and timely making and preserving of company records") *with United States v. Hyde,* 448 F.2d 815, 846 (5th Cir.1971), *cert. denied,* 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972) (informal, regularly kept notes admissible). We do not believe that Rule 803(6) as drafted requires that the court independently analyze the procedures used by a business or its employees in making regularly kept records of regularly conducted business activity. The principal indice of reliability is that reliance on routine record keeping is essential to ongoing business activity. Deficiencies in the manner in which specific records are kept may be called to the court's attention in carrying the burden of showing that the "method or circumstances of preparation indicate lack of trustworthiness." Fed.R.Evid. 803(6). Given the separate treatment in Rule 803(6) of untrustworthiness, we think the regular practice requirement should be generously construed to favor admission. Thus, for example, it may well be that a record of a single meeting satisfied the regular practice requirement if the business in question routinely records other important meetings. Thus we agree with NUE and Zenith that the trial court generally imposed too stringent a burden of showing regularity of practice.

■ Our review of the trial court's factual conclusions as to business records under Rule 104(a) is by the clearly erroneous standard. Where the facts are not in dispute, whether a given document is a business record is a legal question. If the court has misconstrued the requirements of Rule 803(6), its conclusion that a given record is not a business record may be legal error.

With these general observations in mind, we turn to the specifics.

a. The Diaries

(1) The Yajima Diaries

■ Exhibits DSS 48, 49 and 50 are three notebooks which the Japanese Fair Trade Commission seized from Toshiba Corporation in the course of its investigation in the Market Stabilization case. App., vol. 12, at 5087–5266. As noted above, the diaries were held to be authentic: that is, genuine diaries of Mr. Seiechi Yajima, who during the period covered by them, 1965 and 1966, was employed by Toshiba. During that period, Yajima attended, on Toshiba's behalf, meetings of the Tenth Day and TS groups, at which meetings, according to NUE and Zenith, the Japanese defendants engaged in price fixing. The diaries are offered as evidence of what transpired at those meetings. The court held that diaries did not qualify for admission under Rule 803(6). 505 F.Supp. at 1270–73.

The court found that Mr. Yajima was a high management official with responsibility for production and sales planning whose attendance at the Tenth Day Group meetings was within the scope of the authority with which he had been entrusted by Toshiba, and that he reported to his superiors about what transpired at those meetings. 505 F.Supp. at 1270 n. 100. The diaries are referred to in the protocols (deposition testimony) in evidence, furnished by Mr. Yajima in the Japanese Fair Trade Commission case. The protocols establish that in 1966 Mr. Yajima attended meetings of the Tenth Day Group regularly (App., vol. 12, at 4925), that tentative decisions on price were arrived at (App., vol. 12, at 4916–17), but that although in attendance he had to consult with his superior in Toshiba before settling specific problems (App., vol. 12, at 4918). As translated, the diaries appear to be notes rather than complete transcripts of the meetings. The entries suggest the repetitive nature of Mr. Yajima's note taking. Moreover the contents of the notations are entirely consistent with notations of proposed business activity which would be

needed by someone without final decisional responsibility in order to inform his superiors and obtain such authority.

The trial court held that NUE and Zenith failed to establish regular practice. "In contrast to notions of regularity," the judge observed, "the diaries are erratic." 505 F.Supp. at 1271. The court's observations about their style are, for purposes of the Rule 803(6) regular practice requirement, simply irrelevant. The court observed that Yajima's notations "are, like most notes that one keeps for oneself, written in an irregular and shorthand manner which Yajima himself doubtless understood, but which no one else can. One cannot tell with any certainty where accounts begin and end. The diaries are laden with all kinds of arrows and symbols and code-like notations and references which are unintelligible." *Id.* Rule 803(6) focuses on the regularity of the record keeping process, not on its form. Business records unintelligible to the uninitiate because of the code in which they have been kept may nonetheless qualify under Rule 803(6), subject, of course, to a conditional relevancy determination under Rule 104(b). In the light of other evidence, business records which might otherwise be irrelevant because of unintelligibility may become clearly relevant because in whole or in part their meaning becomes intelligible. The court also observed that "we do not know when and where he got the information, including figures, which he recorded or when he recorded the entries." *Id.* This observation, too, is irrelevant to the regular practice requirement.

As to the personal knowledge requirement, the court observed, "Yajima's diaries contain double and triple hearsay, and because of the manner in which the entries were kept, it is impossible to sort out what is based upon Yajima's personal knowledge and what is based upon hearsay." 505 F.Supp. at 1273. The diaries are offered as business records reflecting what went on at the Tenth Day Group meetings. Undoubtedly what was said by others in attendance was hearsay as to the truth of what they said about events elsewhere. But the significance of the diaries is as a record of what transpired at the meeting. The record evidence is that Yajima regularly attended. Thus, he had personal knowledge of what was discussed, and it was this he recorded so as to be able to inform his superiors.

There is no question that Yajima had personal knowledge of what transpired in the meeting described in DSS 48, since he testified before the Japan Fair Trade Commission that he attended it. App., vol. 12, at 4928. DSS 50 describes meetings of the Tenth Day Group. Yajima testified that he attended the same meetings and if he did not attend, Mr. Kamakura, the Manager of the TV Sales Department, attended. App., vol. 12, at 4925. The entries in DSS 48 and DSS 50 suggest a regular practice of recording what went on at the meetings. Yajima testified that he made regular reports to his superiors of the meetings he attended. App., vol. 12, at 4918, 4926. From these circumstances the only reasonable inference which may be drawn is that the diary entries were made on the basis of Yajima's personal knowledge or from information transmitted by Kamakura. Thus the trial court's finding of lack of knowledge with respect to DSS 48 and 50 is clearly erroneous.

There is no evidence that Yajima attended the meetings described in DSS 49. With respect to the Palace Group meeting to which it refers, Yajima got his information from his immediate superior, Kono, who was director of the TV Business Department. App., vol. 12, at 4933. Kono's superior was Senior Manager Narita, who was a member of the Police Group. App., vol. 12, at 4918. While a permissible inference would be that Yajima's information came from Narita, who may have have personal knowledge, we cannot say that the trial court's finding of absence of personal knowledge is in this instance clearly erroneous. Thus we agree that DSS 49 is not admissible under Rule 803(6). We consider its admissibility under Rules 804(b)(3) and 804(b)(5) in Parts V F and H *infra.*

As to trustworthiness, the court observed that "we do not believe that [the] diaries possess the circumstantial guarantees of trustworthiness that the hearsay rules implicitly and 803(6) explicitly require." 505 F.Supp. at 1273. The circumstantial guaranty of trustworthiness for Rule 803(6) is regular recording of regular business activity. The trustworthiness proviso assumes that this guaranty is satisfied, and places on the opponent the burden of overcoming that badge of reliability by showing other reasons for untrustworthiness. The court reasoned that the diaries were untrustworthy because they were unintelligible, and thus might permit the jury to speculate as to their meaning. We believe that unintelligibility is a factor extraneous to the trustworthiness inquiry. Ambiguities in a business record, as with any evidence, may be argued to the jury. Exclusion of business records on the ground that their meaning might be arguable was an abuse of discretion.

We hold that Mr. Yajima's diaries, DSS 48 and 50, deal with meetings which were regularly conducted business activity, that these notebooks were kept as a regular practice, recording what transpired during that activity, that he had the requisite knowledge of what was recorded, and that no showing has been made that either the source of his information or the method or circumstances of the notebooks' preparation were untrustworthy. They are admissible under Rule 803(6).[51]

The Yajima diaries, DSS 48 and 50 will, therefore, be considered in considering the propriety of summary judgment.

### (2) The Yamada, Tokizane and Kozukue Diaries

DSS 51 is a notebook kept by Noboro Yamada, Department Manager of the Electric Appliance Department, Consumer Products Division of Hitachi Limited, from August to November 1965. App., vol. 13, at 5281–5303. The notebook, like Mr. Yajima's, was seized by the Japanese Fair Trade Commission. Hitachi produced it in discovery in response to a Fed.R.Civ.P. 34 request. The trial court held that it was not admissible as a business record, both because there was no evidence of regular practice and because it is unintelligible. While we disagree with the court on the relevancy of its unintelligibility, we agree that no showing of regular business practice has been made. 505 F.Supp. at 1279. In contrast with the Yajima notebooks there is no independent evidence that Yamada regularly attended the Tenth Day Group meetings, or that he reported about those meetings to his superiors. There is no evidence about the circumstances of recordation. NUE and Zenith point to the similarity of the entries in Yamada's notebook with those in DSS 48, 49, and 50. That is not enough.

DSS 56 and 57 consist of two pages of the notebook made by Hayata Tokizane, who when the entries were made was Director of the Television Division of MEI. App., vol. 13, at 5425–27. The offer is made to establish that two of the defendants conspired to fix prices, and the contents are suggestive in this respect. However, there is no evidence that Mr. Tokizane attended the meetings, no evidence about the source of his information, and no evidence about Mr. Tokizane's purpose in making the entries. We agree with the trial court that DSS 56 and 57 were not qualified as business records under Rule 803(6). 505 F.Supp. at 1286.

DSS 104 is a page from the diary of Mr. Kozukue of Sanyo, referring to a meeting of the 20th Day Group on May 20, 1965. The court excluded it. 513 F.Supp. at 1229. There is no evidence that Mr. Kozukue was a member of the 20th Day Group, or of the source of his information. We agree that it was not qualified as a business record under Rule 803(6).

Because we hold that the Yamada, Tokizane and Kozukue diaries were not qualified as business records, we must consider

---

**51.** Since they are admissible under Rule 803(6) we need not decide whether DSS 48 and 50 qualify under Rule 801(d)(2) or Rule 804.

the other grounds on which they were offered. We consider DSS 51, 56 and 57 in Parts V F, G, and H *infra,* and DSS 104 in Parts V G and H *infra.*

### (3) The Yamamoto Diary

██ DSS 52–54 consist of pages from the diary kept by Mamoru Yamamoto of Hitachi, Ltd. App., vol. 13, at 5305–5419. The diary was seized from the Yamamoto desk by the Japanese Fair Trade Commission in the course of its investigation. Returned to Hitachi, it was identified in Hitachi's answers to interrogatories. The diaries are offered to establish what transpired at Tenth Day and TS Group meetings. In his protocol to the Japanese Fair Trade Commission Yamamoto stated that he went to some Tenth Day Group meetings, that when he did not attend Mr. Adachi, another Hitachi employee, attended and within a week communicated back to him what transpired, and that Mr. Yamamoto would promptly record in his diary information relevant to his business responsibilities. App., Vol. 12, at 4995–96. DSS 52–54 were excluded for lack of showing of personal knowledge and regular practice, and as untrustworthy. 505 F.Supp. at 1282–83.

In contrast with the Yamada and Tokizane diaries, there are protocols and testimony showing that employees from Hitachi regularly attended the Tenth Day and TS Group meetings, and that Yamamoto recorded what transpired, insofar as was relevant to his responsibilities, either from personal knowledge or from what Mr. Adachi reported. Thus the entries were "by, or from information transmitted by, a person with knowledge." The trial court's contrary finding is clearly erroneous.

The trial court's regular-practice ruling with respect to the Yamamoto diary suffers from the same reliance on factors extraneous to Rule 803(6) which we noted earlier. There is evidence of regularity in entries and of reliance on the diary by Mr. Yamamoto in carrying out his duties at Hitachi. Exclusion for absence of regular practice was improper.

The trial court also excluded the diary as untrustworthy because it was unintelligible and ambiguous. As in the case of the Yajima diaries this ruling was an abuse of discretion.

The Yamamoto diary qualifies as a business record under Rule 803(6) and, to the extent that what transpired at the Tenth Day and TS Group meetings is material, will be considered in deciding whether summary judgment was proper.

### (4) The Okuma Diary

██ DSS 55 is a notebook in which Ushizo Okuma, formerly assistant manager of the radio and television section and later director of the sales department of MELCO, made entries. App., vol. 13, at 5421–23. The notebook was seized by the Japanese Fair Trade Commission, but later returned to MELCO which produced it in discovery. Both the notebook and Mr. Okuma are identified in MELCO's answers to interrogatories. In his protocol to the Japanese Fair Trade Commission Mr. Okuma stated that he attended meetings of the Tenth Day Group, and that the entry for February 16, to which the NUE and Zenith offer of proof refers, was made at that meeting. App., vol. 12, at 5017. The trial court excluded the diary because of "lack of evidence of systematic checking or of a regular continuous habit on Okuma's part in making entries in his notebooks relating to group meetings." 505 F.Supp. at 1284. The court also noted that the entries with respect to what transpired at the Group meeting did not explain who the speaker was, and that the entries were "cryptic" and "chart-like." *Id.* The cryptic style of entries in business records is irrelevant to the issue of regularity of the entries. The fact that the speakers are not identified is also irrelevant for that purpose, since for purposes of the business in question that information will often be known. At best the absence of identification of the speakers goes to evidentiary weight. There is ample evidence that the Tenth Day Group meetings were regularly conducted business activities attended by representatives of the defendants, that Okuma attended the meeting in question in the course of his business responsibilities for MELCO, that the notebook was kept by him

for business purposes, and that for the entries in question he had personal knowledge. The defendants rely on a nine-page gap between the two entries relied upon to establish untrustworthiness. They make no showing, however, that the untranslated contents of the pages between the first and second entries would, if translated, reflect on the trustworthiness of the entries offered by NUE and Zenith.

Although DSS 55 is based on personal knowledge, relates to regularly conducted business activity, and has not been shown to be otherwise untrustworthy, we are not aware of any additional evidence significantly probative of regular practice in making the entries.

Chief Judge Seitz and Judge Meskill conclude that NUE and Zenith have not adequately demonstrated a regular practice, but agree that because the trial court's standard for regular practice is too rigid a remand for reconsideration of admissibility of DSS 55 under Rule 803(6) is appropriate. I would hold that the factors referred to above suffice.

Because a majority of this court concludes that DSS 55 cannot be held to be admissible under Rule 803(6) we consider its admissibility under other Evidence Rules in Parts V F & H, *infra.*

b. Internal Memoranda

 NUE and Zenith offered five internal memoranda, DSS 95, obtained from Hitachi, DSS 96, 97 and 98, obtained from Toshiba, and DSS 1029 obtained from Japan Victor Company. They also offered DSS 101, a MEI memorandum.

DSS 95 is a handwritten document on Hitachi stationery dated December 29, 1965, captioned "The Second Meeting of Color TV Committee," of the Okura Group and stamped by Mr. Shimizu, a Hitachi employee. App., vol. 12, at 5055-62. It was seized from Hitachi by the Japanese Fair Trade Commission a year after its date. It is written on stationery bearing a Hitachi business logo. The memo identifies Mr. Shimizu as a participant in the meeting and shows that it was routed to Satoshi Ueno of Hitachi, in whose custody it was when seized. The court excluded it for several reasons.

The court observed that "[w]e do not know who wrote it" and "[t]here is no showing of who received the document or that it was relied upon. Neither do we know anything of the sources of information of the writer of the memo." 505 F.Supp. at 1298-99. These findings are clearly erroneous. Mr. Shimizu's signature on the document and the fact that he attended the meeting establish both authorship and personal knowledge. Receipt and reliance are shown, for on its face it shows a routing to Mr. Satoshi Ueno of Hitachi, in whose custody it was seized a year after it was written.

 The trial court also noted that "the memorandum is laden with internal hearsay . . . ." 505 F.Supp. at 1299. The memorandum is offered, however, not for the truth of what was said at that meeting to which it refers, but as evidence of what transpired at the meeting, which is the only significance the exhibit has for summary judgment purposes. The fact that a business record memorializes hearsay statements is not a relevant consideration under Rule 803(6) and does not justify exclusion.

The trial court also observed, "nor do we know anything of the method of its preparation, whether it was created by a process involving habits of precision or regularity and systematic checking, or otherwise." 505 F.Supp. at 1298-99. The depositions of Hitachi employees Adachi, App., vol. 12, at 4982-90, and Yamamoto, App., vol. 12, at 4992-98, while not referring to the memorandum, suggest that it was Hitachi's practice to have employees who attended group meetings report to other company officials what transpired. The parties to this appeal have not, however, referred us to any evidence of Mr. Shimizu's practice.

Considering the testimony of Adachi and Yamamoto, the contents, routing, letterhead, and retention by Hitachi of the exhibit, and taking into account that the trial court's standard for establishing regular

practice misconstrues Rule 803(6), I would hold that the court should have admitted exhibit DSS 95, and that it should be considered part of the summary judgment record. Chief Judge Seitz and Judge Meskill, recognizing that a substantial question exists as to whether the record establishes regular practice, prefer to have that question reconsidered by the trial court.

As with the other documents which we have not held admissible under Rule 803(6), we will consider other bases for admission of DSS 95 in Parts V F & H, *infra*.

■ DSS 96, 97 and 98 are internal Toshiba memoranda which were seized by the Japanese Fair Trade Commission and furnished by Toshiba in discovery. App., vol. 12, at 5063–86.

DSS 96 is a memo, dated April 11, 1966, from Mr. Kamuro to Mr. Narita of Toshiba. The trial court found with respect to it: "We are in the dark as to the method of preparation of the memo[]. We do not know if [its] preparation was attended by regularity or systematic checking. We know nothing of the writer's source of information." 505 F.Supp. at 1300.

The memo is identified in Kamuro's protocol as written by him on the basis of information received from Narita about an April 8, 1966 Palace Group meeting. App., vol. 12, at 4974–76. Narita in his protocol identified it as a Toshiba internal memorandum about the April 8, 1966 Palace Group meeting. App., vol. 12, at 4948. The protocol discloses that "[a]s to the Palace Group, in the case of Tokyo Shibaura Electric Co., Ltd [Toshiba], Vice-President Hiraga and me, or sometimes Director Sato, attend it. General issues of all electrical appliance matters are discussed at these meetings of Senior Managing Directors and Managing Directors of each company which are also members of the Okura Group." App., vol. 12, at 4947. It also discloses that "[a]t the meeting of the Palace Group on April 8th, somebody from Matsushita Electric Industrial Co., Ltd. proposed to increase the profit margin for color TV from 18% to 20% and everyone in attendance agreed that this practice should take effect as of September

21st." App., vol. 12, at 4948–49. As to the manner of preparation of the memorandum, Mr. Kamuro, who was employed in the TV Business Department of Toshiba when he prepared it, testified:

> I wrote the manuscript from what I heard from the Managing Director at that time, Mr. Narita, after the meeting of the Palace Group was over, and a girl clerk transcribed it. Mr. Narita came to my desk and told me more than what was written in this document, so, I took notes right there and wrote only the essential points in the manuscript.

App., vol. 12, at 4974–75. He also testified that "our company was the secretary of the Tenth-Day Group." *Id.* at 4974. Thus the Kamuro protocol discloses precisely how and why DSS 96 was prepared.

There is in the record somewhat ambiguous testimony about Mr. Narita's attendance at the specific April 8, 1966 meeting. Narita testified:

> I don't think I attended on April 8th because there was an All-Japan Business Conference held from the 7th to 9th and I gave a congratulatory address at the rally of the All-Japan Wholesalers' Union on April 8th. However, if there were 3 attendants on this day, I would have attended.

App., vol. 12, at 4948. Tadashi Kamakura of Toshiba testified that he, Mr. Kawara of Toshiba, and Mr. Narita of Toshiba attended the April 8, 1966 meeting. App., vol. 12, at 4971. This testimony establishes that there were three attendants on that day and that Narita was one of them. Thus while Mr. Narita's memory is unclear his testimony is consistent with that of Mr. Kamakura, and consistent with that of Mr. Kamuro. There is no other record evidence bearing on DSS 96. Like the Yajima, Yamamoto and Okura diaries, DSS 96 is a record of a regularly conducted business meeting, prepared to preserve the "essential points" of the meeting. It was prepared from information transmitted by a person with knowledge. Its preservation by Toshiba and Toshiba's role as Secretary of the Tenth Day Group verified the regularity of main-

taining such a record. Thus the trial court's findings, quoted above, are clearly erroneous. The court also objected that it contains internal hearsay 505 F.Supp. at 1300, but business records often do, and this one is being offered only to establish what transpired at the meeting. DSS 96 qualifies as a business record under Rule 803(6). Thus DSS 96 will be considered in deciding whether summary judgment was proper.

DSS 97 is a Toshiba memorandum from Mr. Kamakura, Director of the TV Business Division, to Mr. Iwata, Senior Managing Director, and Mr. Narita. Dated May 4, 1966, it refers to what transpired at Tenth Day Group meetings on April 4 and April 28 of that year. The trial court excluded it for the same reasons it excluded DSS 96. 505 F.Supp. at 1300.

The subject matter of DSS 97 is such as would necessarily fall under the responsibility of Iwata and Narita. Mr. Kamakura's protocols establish that beginning in January of 1966 he attended the Tenth Day Group meetings, which were held monthly. App., vol. 12, at 4960–61. DSS 97 discusses, among other things, the retail price maintenance of color TV sets. Mr. Kamakura's protocol also states that "[t]he time when the target price for table model color TVs was decided as 180,000 yen was shortly after I came to Tokyo, probably either at the March or April Tenth-Day Group meeting." App., vol. 12, at 4962. There is also Mr. Kamura's testimony that Toshiba served as Secretary of the Tenth Day Group. Thus although Mr. Kamakura did not specifically identify DSS 97 to the Japanese Fair Trade Commission there is evidence, and none to the contrary, that he attended the meeting in question and prepared the memorandum from personal knowledge for use of others in Toshiba who would be interested in what transpired. The very nature of the detailed subject matter of DSS 97 discloses that others in the business would have to rely on it in order to implement the specific steps said to have been agreed upon. Its preservation by Toshiba confirms as much. Thus the trial court's findings about DSS 97 are clearly erroneous. Its exclusion was error. It is a business record and will be con-

sidered in deciding whether summary judgment was proper.

DSS 98 is a Toshiba memorandum, dated October 26, 1966, written by Mr. Yajima, and forwarded to Mr. Narita by Mr. Kamakura. Mr. Yajima's protocol identifies DSS 98 as his report of a Tenth Day Group meeting on October 25. App., vol. 12, at 4933. The protocol explains the business purpose of this and similar reports:

I have been reporting to my superior on what has been discussed at the meetings of the Tenth-Day Group. In the case I attend alone, I report to the Sales Department Manager, Kamakura. With regard to important matters, I believe I have been reporting to the Senior Managing Director, Siego Narita, who is director in charge.

The matters referred here as important are the matters which affect our company's merchandise and sales planning and information pertaining to prices, etc.

Information pertaining to prices about which we discuss are the current prices and future prices including the actual selling prices and I report on them.

Though what I spoke at the Tenth-Day Group meeting was my view at that time, the view could ultimately become the company's, since I have been reporting to my superiors upon my return to the company. The same is true when Kamakura, Department Manager, attended and spoke at the Tenth-Day Group meeting.

App., vol. 12, at 4926. The trial court excluded DSS 98 for the same reasons it excluded DSS 96 and 97. 505 F.Supp. at 1300. However, the admissibility of DSS 98 as a business record under Rule 803(6) is, if anything, clearer. Indeed Yajima's protocol affords additional evidence that DSS 96 and DSS 97 were routine reports of regular business activity, contemporaneously made and regularly recorded for business purposes. The document is neither opaque nor suffused with internal hearsay. The trial court's findings about DSS 98 are clearly erroneous. DSS 98 will be considered in

deciding whether summary judgment was proper.

DSS 1029 is the Japan Victor document which we have already discussed in Part V E 1 above dealing with authenticity. App., vol. 4, at 1479–80. It is an internal memorandum from persons in sales promotion to the Chief, Plant Accountants' Section, about what transpired at a meeting of the Statistics Committee of the Electronic Industries Association of Japan. The trial court held that it was inadmissible, noting:

> [n]ot only do we know nothing of its author, but we know nothing of the circumstances of its preparation, of its source or origin or when it was prepared. Thus, we do not know if there was any habit of regularity or precision or systematic checking attendant to its preparation, or whether it was maintained in the ordinary course of business, nor do we know whether the author had first hand knowledge or received information from someone with such and with a duty to report.

505 F.Supp. at 1307 (footnote omitted).

As noted in our discussion of authenticity, however, we know that Japan Victor was a member of the Statistics Committee, that Mr. Oguri represented it at Statistics Committee Meetings, that there was a meeting of the Statistics Committee on December 26, 1966, and that the Statistics Committee was a regular business activity. We know from the face of the document that it was prepared either by Mr. Oguri or by Mr. Shiokawa, and it is readily inferable that if the latter prepared it Mr. Oguri, who attended the meeting, furnished the information. We know from the subject matter— prices reported to the government agencies—that the addressee, the Chief of the Plant Accountants' Section, would have to take action to implement the decisions on which it reports. We know from the face of the document that it was prepared shortly after the meeting. Finally we know it was preserved in Japan Victor's business files. Thus it is a report of what went on at a business meeting, by someone who attended on behalf of his employer, to a fellow employee who would logically have to take action as a result of what went on, and who preserved the memorandum in the company files. The trial court is clearly erroneous about lack of identification of the author or circumstances of identification.

We have noted that the trial court's approach to the regular practice requirement is inconsistent with Rule 803(6). Considering the subject matter, routing, and retention of DSS 1029, I would hold that it is a business record and should be considered as part of the summary judgment record. Chief Judge Seitz and Judge Meskill, recognizing that a substantial question exists as to whether the record establishes regular practice, prefer to have that question reconsidered by the trial court.

As with the other documents which we have not held admissible under Rule 803(6) we will consider other bases for admission of DSS 1029 in Parts V F & H, *infra*.

c. Minutes of Trade Group Meetings

 NUE and Zenith proffered DSS 1027 and 1028, minutes of the officers' meetings of the Electronic Industries Association of Japan, App., vol. 13, at 5605–08, and DSS 1030–34, minutes of the TV Export Council Meetings, App., vol. 14, at 6241–56. In Part V E 1 above we held that DSS 1027 and 1028 were sufficiently authenticated; the trial court assumed authentication as to 1030–34. 505 F.Supp. at 1312. Both sets of minutes were excluded by the trial court. 505 F.Supp. at 1303, 1312.

As we noted in discussing authenticity, the Officers' Meeting Minutes were produced during discovery at the office of the Association from a stack of typewritten minutes of monthly meetings, and have the appearance, contents, and substance typical of minutes. The Association obviously engages in regular business activities through its officers. Of all the records likely to be kept by an industry association, minutes of its meetings are the most likely. It is true that these are unsigned. However, they were deemed by the Association to be sufficiently probative as to be retained in its

files. Regular practice is established by the fact that the two minutes which are offered were kept in a stack of minutes recording monthly meetings. It is inconceivable that these would have been retained unless the recorder had been present or at least had obtained the information recorded from someone who was present and transmitted the information while acting in the regular course of business. A deposition of the unknown scrivener would have gilded the lily, but such gilding is not required for admissibility. Moreover, when an organization like the Electronic Industries Association of Japan keeps minutes of its own meetings it is acting in the course of a regularly conducted business activity. Nor are we impressed by the court's observation that "[t]here is no record of who said what to whom, nor do we know whether what is written is what someone said, or what the writer (or someone informing his judgment) thought." 505 F.Supp. at 1303. Minutes of meetings which do no more than record topics discussed by item and record votes are nevertheless business records of what they in fact record. There is no requirement in Rule 803(6) that the minutes of a business meeting, intended to preserve a record of what is needed for business purposes, be the equivalent of a stenographic transcription. The badge of authenticity is the regular recordation of so much that transpired as is needed for purposes of the business in question. The court's reasons for rejecting Exhibits DSS 1027 and 1028 as business records are legally insufficient. Since only one of the exhibits, DSS 1027, is reproduced in the appendix, it, but not DSS 1028, will be considered in deciding whether summary judgment was proper.

DSS 1030–34, App., vol. 14, at 6243, 6246, 6253, present a different problem. Like DSS 95, 96–98 and 1029, these are internal memoranda, in this instance of MEI, although at least one is entitled "Minutes of T.V. Export Council Meeting of November 17, 1969." They were produced in response to document requests and referred to in interrogatory answers. Unlike the other internal memoranda referred to, however, they are not referred to in protocols or in answers to interrogatories. The trial court ruled that the personal knowledge requirement had not been satisfied and "that neither the structure of the documents nor their sheer number nor their retention in MEI's files satisfies the 'regular practice' requirement as we have explicated it, *supra*." 505 F.Supp. at 1312. Since we believe the court's approach to admissibility under Rule 803(6) was generally too strict, we have independently examined the record.

NUE and Zenith complained in the trial court that the documents were produced only after discovery was closed, and thus they were prejudiced in their ability to produce foundation evidence. The trial court held that "[i]nsofar as plaintiffs argue that because of late production they were unable to lay foundation by taking depositions ... plaintiffs failed to avail themselves of that provision of P.T.O. 154 which permitted reopening of discovery for good cause shown." 505 F.Supp. at 1312. This ruling was not, in the circumstances, an abuse of discretion. Thus we must find support for admission in the record as it stands.

■ As to personal knowledge, we note that Interrogatory # 19 asked: "With respect to each meeting of the T.V. Export Council: (a) State whether any ... notes, minutes, [or] memoranda ... were prepared which refer or relate to such meeting ...." App., vol. 32, at 14855. Matsushita replied that no such documents were prepared, except that "from time to time, its attendants prepared notes or 'minutes' of TV Export Council Meetings.... To the extent such notes and 'minutes' were made ... they have been produced to plaintiffs." App., vol. 32, at 14856. Portions of one of the documents, DSS 1032, were redacted by Matsushita pursuant to a claim of attorney-client privilege. Thus the documents were unquestionably authored by employees of Matsushita. The interrogatory answer states that attendants at the meeting prepared notes or minutes. The internal contents of the exhibits indicate that the author was in attendance. Thus the trial

court's finding of lack of personal knowledge is clearly erroneous.

As to regular practice, there is no question but that attendance at the Television Export Council meetings was a regularly conducted business activity of Matsushita. The documents were prepared by Matsushita employees in the course of that business activity, and were retained in Matsushita's files. The contents suggest subject matter on which a business corporation would for some period need ongoing information, and thus suggest reliance. Indeed the answer states that "[p]rior to 1971, these notes, or 'minutes' were routinely disposed of shortly after the meetings to which they related due to their short-lived usefulness," *id.*, which suggests that those retained and furnished were relied on for business purposes. We have already noted that the district court's approach to the regular practice requirement was unduly severe. Moreover it seems likely that the court's ruling with respect to regular practice was the result of disregarding the record evidence to which we have referred. We conclude that the evidence referred to establishes regular practice. Thus DSS 1030–34 will be considered part of the summary judgment record.

Another group of minutes, those of the MD Group, were excluded by the trial court in its summary judgment opinion. 513 F.Supp. at 1211 n. 157. Similarly, the court excluded DSS 101, a memorandum from the files of MEI dated December 11, 1965, entitled "itemized minutes of the October 10 [1965] meeting of the presidents of sales companies from all over Japan." 513 F.Supp. at 1228. Finally DSS 103, a notice of meeting of the Market Stabilization Council on September 1, 1966 was excluded. 513 F.Supp. at 1229. We have been unable to find in the record evidence which would qualify these documents under Rule 803(6), and we know of no other basis for their admission. NUE and Zenith also note the exclusion of DSS 1173, but we have been unable to locate that document in the appendix and do not consider it. Thus we will not consider any of them in determining whether summary judgment was proper.

NUE and Zenith challenge the exclusion of DSS 1035. App., vol. 14, at 6255. That document, obtained in discovery from MELCO, is a memorandum from the Deputy to the Manager, Merchandise Export Department, to the Manager of that Department, routed via two other employees in that Department. It reports on attending the TV Council meeting of January 22, 1973. MELCO's answers to interrogatories state that "[t]his council was created pursuant to MITI's direction in order to implement the foreign trade policies established by the Japanese Government.... The general purpose of this Council was to prepare proposals regarding MITI-mandated minimum prices below which television receivers could not be sold in the Japanese domestic market for export to the United States." App., vol. 30, at 13526. The answer also states that MELCO had a representative who attended meetings from time to time. *Id.* at 13527. DSS 1035 is dated the same date as the meeting it describes and MELCO's answer to the interrogatory establishes that the Council was still functioning on that date. It is not disputed that while it operated the TV Council regularly conducted business activity. What is missing, however, in the record, to the extent we have been able to master it, is anything suggesting the regularity of MELCO's practices with regard to recording what transpired at the meetings of the Council. Thus we cannot hold that DSS 1035 should, as a business record, be considered part of the summary judgment record. As with other documents not found to be admissible under Rule 803(6), we will consider other bases for admission, *infra.*

Finally, NUE and Zenith urge that the trial court erroneously excluded DSS 1164, which appears to be a series of Sharp Corporation documents. We have been unable to find any place in the trial court's opinions where this exhibit was excluded. Since it does not appear material to summary judgment we have not examined it in detail.

### F. *Rule 804(b) Materials*

NUE and Zenith offered, under Rule 804(b)(1), the testimony of seventeen wit-

nesses, employees of the Japanese manufacturer defendants, who testified before the Japanese Fair Trade Commission in the Market Stabilization case. DSS 58–74, App., vol. 13, at 5429–5574. That rule permits admission of such prior testimony if the witness is unavailable and "if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Fed.R.Evid. 804(b)(1). Unavailability includes the proponent's inability to procure the witnesses' attendance by process or other reasonable means. Fed.R.Evid. 804(a)(5). The trial court held, and we agree, that the witnesses in question, including one deceased and the others resident in Japan, are unavailable. 505 F.Supp. at 1249–51, 1288. The court also held that against Sanyo, Toshiba, Sharp, Hitachi, Matsushita and MELCO, who defended the Market Stabilization case jointly, there was an opportunity and similar motive to develop the testimony, and thus that it was admissible in support of the NUE-Zenith claim that there was concert of action to maintain high prices in Japan. 505 F.Supp. at 1291. The court also held that the testimony was admissible against all defendants to authenticate, under Rule 901, the diaries, referred to above. These rulings are not challenged by the defendants.

In addition, the trial court held the employees' testimony inadmissible under Rule 804(b)(1) against any parties except the six defendants to the JFTC proceedings. 505 F.Supp. at 1292. The NUE and Zenith briefs do not specifically address that holding, and therefore the court does not review it. The admissibility of the testimony against other defendants under other evidentiary rules is considered elsewhere in this opinion.

The trial court also held that all references in DSS 58–74 to export matters would be excluded, because there was no allegation in the Market Stabilization case of an export conspiracy, and thus no motivation to develop testimony on that subject. *Id.* at 1291–92. The majority declines to review this holding, again because the *NUE* and *Zenith* briefs do not specifically address it.

I would hold that the limitation with respect to export matters was an error of law. The badge of trustworthiness for former testimony admissible under Rule 804(b)(1) is the fact that in the former proceeding the present opponent had an adequate motive for testing it on cross-examination. What was principally relevant in the Market Stabilization proceeding was the fact that officials met together for the purpose of acting in concert. There was a strong motive to develop the facts about what occurred at those meetings and to negate the suggestion that any steps were taken as a result of the meeting. The testimony is offered for the truth of matters asserted by the witnesses with personal knowledge.[52] If it happens that the witnesses' assertions are relevant to issues in this case which are broader than those in the Market Stabilization case, the testimony is nevertheless admissible on those issues. The test is not identity of issues between the two proceedings, but rather the relevancy of the testimony to the disposition of the first proceeding, and thus the opportunity and motive of the opponent to develop it. Once the latter is established, the testimony is admissible against the party to the first proceeding for all purposes.

NUE and Zenith also contend that DSS 58–74, as well as other evidence considered by the district court, is fully admissible against all defendants under Fed.R. Evid. 804(b)(3) as statements by the witnesses against pecuniary, proprietary, or criminal law interest. NUE and Zenith

---

**52.** In considering the former testimony for purposes of summary judgment we will, of course, take into account only so much as satisfies Rule 805, which provides:

Hearsay included within hearsay is not excluded under the hearsay rule if each part of

the combined statements conforms with an exception to the hearsay rule provided in these rules.

Fed.R.Evid. 805.

urge that "[a]ll of plaintiffs' evidence is ... admissible under ... [Rule] 804(b)(3)." Appellant's Brief at 124. The trial court found that "plaintiffs have made no showing from which we could infer that any of the declarants were conscious that the statements were against their personal interests; and because the testimony is generally consistent with the defense offered in the Six-Company [Market Stabilization] Case[,] [this testimony] is not even against the employers' interests." 505 F.Supp. at 1293. These findings are not clearly erroneous, and they preclude admission of the testimony against the remaining defendants under Rule 804(b)(3). Similarly, the district court was not clearly erroneous in excluding DSS 49, 51, 55–57, and 95 on the grounds that plaintiffs had failed to show a belief by the declarants that the diaries and other writings were against the declarants' interests.[53]

For similar reasons we will consider DSS 102, App., vol. 12, at 4909–12, an excerpt of the testimony of Mr. Saeki of MEI in the Japanese Fair Trade Commission Resale Price Maintenance case, to be admissible only against MEI.

### G. *Rule 801(d)(2) Materials*

■ NUE and Zenith offer, against all defendants, DSS 75–92, the protocols given by employees of the defendants in the Market Stabilization case. App., vol. 12, at 4915–5050. These protocols are statements given to investigators of the Japanese Fair Trade Commission. The trial court admitted all except DSS 90 as admissions of a party opponent because, under Rule 801(d)(2)(C) & (D), each is "a statement by a person authorized by him to make a state-ment concerning the subject, or ... a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship ...." Fed.R.Evid. 801(d)(2)(C), (D); *see* 505 F.Supp. at 1297. Those rulings are not challenged on appeal. However, DSS 90 was excluded because when the statement was made the declarant, Mr. Maekawa, was no longer employed by the defendant Sharp Corporation. 505 F.Supp. at 1296–97. We agree that NUE and Zenith have made an insufficient showing of authority in the case of DSS 90 for its admission under Rule 801(d)(2)(C) or (D). With that exception these documents will be considered as admissions by a party-opponent in deciding whether summary judgment was proper.

NUE and Zenith contend that a number of documents should have been admitted under Rule 801(d)(2)(A) or (B) as statements of a party or statements as to which a party has manifested adoption or belief in its truth. Appellants' Brief at 131. They point out that many of the documents in question were furnished by the defendants in answers to interrogatories pursuant to Fed.R.Civ.P. 33(c). That rule provides:

> Where the answer to an interrogatory may be derived or ascertained from the business records of the party upon whom the interrogatory has been served or from an examination, audit or inspection of such business records, including a compilation, abstract or summary thereof and the burden of deriving or ascertaining the answer is substantially the same for the party serving the interrogatory as for the party served, it is a sufficient answer to

---

**53.** Chief Judge Seitz would apply the abuse of discretion standard in reviewing the district court's decision to exclude the testimony under Rule 804(b)(3).

Chief Judge Seitz also observes that the district court's exclusion of this evidence under Rule 804(b)(3) was premised on its earlier holding that the rule requires a showing of the declarants' "*subjective* understanding of the danger to his interests." 505 F.Supp. at 1259–60 (emphasis in original). The court therefore rejected plaintiffs' argument that there is an objective or "reasonable person" test for as-sessing the declarants' beliefs. Chief Judge Seitz emphasizes that this court is not ruling on the validity of the district court's analysis, because the evidence offered by the plaintiffs would be inadmissible under either construction. The district court noted the extreme improbability of the declarants' prosecution for violations of Japanese antitrust laws based on statements contained within the diaries, and appellants do not challenge that finding on appeal. It would not be clearly erroneous to conclude that a "reasonable man" would not fear for his interests in such circumstances.

such interrogatory to specify the records from which the answer may be derived or ascertained and to afford to the party serving the interrogatory reasonable opportunity to examine, audit or inspect such records and to make copies, compilations, abstracts or summaries. A specification shall be in sufficient detail to permit the interrogating party to locate and to identify, as readily as can the party served, the records from which the answer may be ascertained.

The defendants do not contend that answers to interrogatories would be inadmissible under Rule 801(d)(2)(A) or (B). *See Mangual v. Prudential Lines, Inc.,* 53 F.R.D. 301, 302 (E.D.Pa.1971). They urge, however, that mere cross-reference does not amount to an adoption. The trial court noted the problem, and held that a Rule 33(c) submission is not an adoption unless so expressed. 505 F.Supp. at 1244–45.

■ Rule 33(c) does not permit an answering party to list documents and thereby avoid answering an interrogatory. "The responding party . . . has a 'duty to specify, by category and location' the records from which he knows the answers to the interrogatories can be found." 4A J. Moore, J. Lucas & D. Epstein, *Moore's Federal Practice* ¶ 33.25[5.5], at 33–149–50 (2d ed. 1983) (footnote omitted). The rule does not contemplate that the response be so couched as to avoid its obvious intent that a cross-reference to documents vouches that the response is contained in the documents. If the responding party does not know the answer to the interrogatory and cannot find the information, then he must so state explicitly under oath. In the absence of such an explicit statement the interrogating party is entitled to assume that a cross-reference to documents adopts the contents of the documents as answers to the interrogatory, and the answering party is estopped from claiming otherwise.

We have examined the Rule 33(c) references in the defendants' answers to interrogatories, and find that they do not contain statements under oath that the answering party does not know or cannot find

the information. Thus they have adopted the referenced documents as answers, and the documents are properly admissible under Rule 801(d)(2)(B).

While noting the problem, the trial court did not rule explicitly on admissibility under Rule 801(d)(2)(B) by virtue of a Rule 33(c) reference. Because the parties have not in the briefs before us focused on specific documents, not otherwise admissible, which might qualify for admission under Rule 801(d)(2)(B), and those documents are not outcome determinative for summary judgment purposes, we conclude that admissibility under that rule should be considered by the trial court on remand.

The Yamada, Tokizane and Kozukue diaries were also offered under Rule 801(d)(2) as admissions by representatives of their respective employers. *See* 505 F.Supp. at 1279, 1285–87; 513 F.Supp. at 1229. Subject to our observations about the interrelationship between Rule 33(c) and Rule 801(d)(2)(B), we hold that the trial court did not err in finding that the diaries were not statements of a party.

### H. *Rules 803(24), 804(b)(5) and 803(l)*

■ We have found no basis for admission against some or all defendants of DSS 49, 51, 55, 56–57, 58–74, 90, 95, 101–04, 1029, and 1035 in the rules considered thus far. Thus we must consider their admissibility under the residual exceptions in Rule 803(24) and Rule 804(b)(5), admitting statements not specifically covered by other rules "if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence."

The trial court held that NUE and Zenith failed to establish the second requirement of the rules, that the documents were more probative on the point for which they were offered than other evidence which the proponent could procure through reasonable

efforts. The court correctly placed this burden on the proponents. *Pittsburgh Press Club v. United States,* 579 F.2d 751, 758 (3d Cir.1978). We review the trial court's factual determinations by the clearly erroneous standard. *Copperweld Steel Co. v. Demag-Mannesmann-Bohler,* 578 F.2d 953, 964 (3d Cir.1981). We note, moreover, that those exceptions are intended to have a narrow focus. *United States v. Bailey,* 581 F.2d 341, 346 (3d Cir.1978). We have carefully examined the record and conclude that the trial court did not err in holding that NUE and Zenith failed to meet the burden imposed by the residual exceptions rules.[54]

■ This court is not able, however, to affirm the exclusion of the JFTC Testimony, DSS 58–74, and the protocol of Mr. Maekawa, DSS 90, under the residual exceptions. In deciding to exclude these documents, the district court apparently applied what it labeled the "Near Miss" theory. Because we reject that theory, we must remand for further consideration of their admissibility under the appropriate legal standard to meet the burden imposed by the residual exceptions rules with regard to DSS 49, 51, 55, 56–57, 95, 101–04, 1029, and 1035.

The Near Miss theory, according to the district court, states that a piece of hearsay evidence may only be offered under the exception that most nearly describes it. If it is excluded under that exception, it may not be offered under the residual exceptions. The district court endorsed this theory "in principle" but noted that many of the hearsay exceptions are so amorphous that strict adherence to the Near Miss theory would virtually eliminate the residual exceptions. The court therefore decided to apply the theory in cases where consideration of the evidence clearly seemed appropriate under a discrete and well-defined exception such as former testimony, Rule

804(b)(1). Otherwise the district court would ignore the theory.

The district court did not directly refer to the Near Miss theory in excluding the JFTC Testimony. The inference that the theory supports the exclusion, however, is not a difficult one.

The most obvious flaw in the theory is the one noted by the district court. We consider this flaw fatal. The residual exceptions cannot be explained by a theory that makes sense for only a few of the twenty-seven other exceptions. The fact that many documents may be considered under Rule 803(24) or Rule 804(b)(5) despite having failed the requirements of one of the other exceptions clearly suggests that the residual exceptions are not dependent on the other exceptions for their meaning.

This points to a more general difficulty with the Near Miss theory, namely that it conflicts with the general function of Rules 803(24) and 804(b)(5). Plainly stated, the theory puts the federal evidence rules back into the straightjacket from which the residual exceptions were intended to free them. *Cf.* J. Weinstein & M. Berger, Weinstein's Evidence ¶ 803(24)[01] (1981).

Finally, the theory appears to derive no support from the cases. The district court cites no authority for its position, and in fact the cases support rejection of the theory. *See, e.g., United States v. Hitsman,* 604 F.2d 443, 447 (5th Cir.1979); *Pittsburgh Press Club v. United States,* 579 F.2d 751, 757–58 (3d Cir.1978).

For these reasons, we reject the Near Miss theory. The appropriate limitations on the residual exceptions should be found in the rules themselves and in their legislative history. Without doubt the exceptions were not intended to have broad application. This does not warrant, however, the creation of some new theory of limitation

---

**54.** The district court emphasized that the availability of depositions is an important factor in determining whether the proffered hearsay is the most probative evidence on point. 505 F.Supp. at 1264–65. We do not understand the court to have imposed a requirement that depositions must be taken in all cases before hearsay can be considered under the residual exceptions. Clearly other factors are relevant, including the staleness of the deponent's memory and the cost of taking the deposition.

that seems more to complicate matters than to resolve them.

■ NUE and Zenith offered various documents under Fed.R.Evid. 803(1), "Present Sense Impressions." The district court refused to admit any of the documents under that hearsay exception. This court has admitted some of the documents, DSS 52–54 and 1027, under different exceptions. It is necessary, however, to consider the admissibility of the other documents. There can be no doubt that DSS 51 (the Yamada Diary) is inadmissible under Rule 803(1). As noted elsewhere in this opinion, there is no evidence that the author of that diary actually attended the relevant meetings. The admissibility of the remaining two documents, DSS 55 (the Okuma Diary) and DSS 1029 (the Japan Victor memorandum), is a closer question. There is evidence that both documents were created during or shortly after the relevant meetings. There is, however, no corroboration of the declarations contained within the documents. The exception for present sense impressions is founded on the notion that contemporaneity of observation and impression provide some guarantee against misrepresentation and defective memory. Apparently because this guarantee is not considered totally reliable, however, the rule is generally understood to require that, in addition to contemporaneity, there be some corroborating testimony. *See Houston Oxygen Co. v. Davis,* 139 Tex. 1, 5–7, 161 S.W.2d 474, 476–77 (1942); *cf.* J. Weinstein & M. Berger, Weinstein's Evidence ¶ 803(1)[01] (1981). In the present circumstances, there is reason to be skeptical of the documents, and we therefore refuse to admit them solely on the basis of contemporaneity.

Thus DSS 49, 51, 55, 56–57, 90, 95, 101, 103–104, 1029, and 1035 will not be considered part of the summary judgment record. DSS 58–74 and 102 will be considered against only those defendants as previously discussed.

### I. *Other Contentions*

NUE and Zenith urge that the court erred in excluding certain evidence prof-fered under Rule 803(5) as recorded recollections. Assuming, arguendo, that the recorded recollection rule applies in contexts other than witness testimony, NUE and Zenith have referred to no evidence that any witness "has insufficient recollection to enable him to testify fully and accurately ...." Fed.R.Evid. 803(5). In a related contention NUE and Zenith urge that the court erred in requiring testimony establishing a declarant's lack of memory for purposes of Rule 804(a)(3). However, the district court found no other evidence that established lack of memory, and we are aware of none.

### J. *Other Evidence*

We have discussed all of the court's contested evidentiary rulings. Other evidence was deemed to be admissible without objection, except for relevancy, and will be considered insofar as relevant in our ruling on summary judgment.

### VI. Liability Issues

We have in Part V above established the record that we must review. It includes the materials in the FPS that we hold were erroneously excluded, as well as materials that the trial court agreed should be taken into account. We must now consider separately for each claimed basis of liability and as to each moving defendant whether on every necessary element of their prima facie case there is any evidence from which a reasonable inference could be drawn in favor of NUE and Zenith. As noted in Part IV above, we do not approach that task with any assumption about burden of production or of persuasion. Rather we assume that the evidentiary materials in question are before the fact-finder and determine whether or not the inferences necessary to support the NUE and Zenith claims are as a matter of law logically permissible.

### A. *The Conspiracy*

1. *The Legal Standards for Sufficiency of Evidence of Conspiracy.*

■ Cases in which, as under section 1 of the Sherman Act and section 73 of the Wilson Tariff Act, liability depends upon

the existence of a conspiracy usually will require determining the permissible limits of inferences which may be drawn from circumstantial evidence. That is so because it rarely happens that conspirators in an illegal enterprise will provide direct evidence of agreement. Because the concert of action which violates the antitrust laws will so rarely be the subject of direct evidence, the Supreme Court has permitted broad latitude with respect to what inferences are permissible from the totality of the circumstances. *E.g., Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 223–28, 59 S.Ct. 467, 472–75, 83 L.Ed. 610 (1939). There are, however, limits beyond which reasonable inference-drawing degenerates into groundless speculation, limits having due process aspects.[55] Those limits are defined in each case by the laws of logic, which inform the court whether there is a reasonable probability that the asserted conclusion follows from the proven facts. It is not surprising therefore that the courts have had frequent occasion to address the minimum quantum of circumstantial evidence sufficient to support an inference of conspiracy.

This court has in a series of cases dealt with the problem of discerning those limits. The context in which that problem has been most frequently presented is in cases in which the court has been asked to draw an inference of concert of action from the circumstantial evidence of conscious parallel conduct by the defendants. Certainly such circumstantial evidence has some tendency to make the existence of concert of action more probable than it would be without such evidence. Fed.R.Evid. 401. That standard of admissibility, however, is not determinative of the question whether such evidence, standing alone, can as a matter of due process be relied upon to support such an inference. While conscious parallel conduct has some tendency suggestive of concert of action, the tendency is so slight that we have held that circumstance, standing alone, to be legally insufficient. *Tose v.*

*First Pennsylvania Bank, N.A.,* 648 F.2d 879, 890–91 (3d Cir.), *cert. denied,* 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981) (parallel refusals to lend); *Schoenkopf v. Brown & Williamson Tobacco Corp.,* 637 F.2d 205, 207–09 (3d Cir.1980) (parallel refusals to deal); *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 446 (3d Cir.1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978) (parallel lease terms); *Venzie Corp. v. United States Mineral Prod. Co., Inc.,* 521 F.2d 1309, 1314 (3d Cir.1975) (parallel refusals to deal); *Delaware Valley Marine Supply Co. v. American Tobacco Co.,* 297 F.2d 199, 202–07 (3d Cir.1961), *cert. denied,* 369 U.S. 839, 82 S.Ct. 867, 7 L.Ed.2d 843 (1962) (parallel terms of sale). These cases are merely illustrations of the more general proposition that there are legal limitations upon the inferences which may be drawn from circumstantial evidence, which must be determined in light of the ultimate fact in issue and the totality of relevant circumstantial evidence having any tendency to make the existence of that fact more probable.

When there is direct evidence of concert of action—a written agreement, or a memorandum of what transpired at a meeting, for example—the legal problem facing a court is different. Then it is not faced with the limitations of the inference-drawing process, for such direct evidence "tends to show the existence of a fact in question [concert of action], without the intervention of the proof of any other fact ...." Black's Law Dictionary 414 (5th ed. 1979). Rather, the court must simply determine whether, if the fact-finder were to credit the direct evidence of the fact in issue, the existence of that fact would have the legal significance urged by the proponent of the credited evidence. Would direct evidence of a horizontal agreement to fix resale prices in Japan, for example, have any legal significance in this action? Unlike most of the cases referred to in the preceding paragraph, this case presents a record in which

---

**55.** A judgment supported by no evidence on an essential element violates due process. *See, e.g., Vachon v. New Hampshire,* 414 U.S. 478, 94 S.Ct. 664, 38 L.Ed.2d 666 (1974) (per curiam); *Thompson v. Louisville,* 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960).

there is both direct evidence of certain kinds of concert of action and circumstantial evidence having some tendency to suggest that other kinds of concert of action may have occurred. Thus none of those conscious parallelism cases can be dispositive on the propriety of summary judgment in this case. They deal not with the substantive question of what is a violation of section 1 of the Sherman Act, but with the adjective question of how such a violation may be proved circumstantially. Here, direct evidence and circumstantial evidence may validly be considered to cumulate and reinforce with respect to the ultimate facts in issue. For example, direct evidence of some kinds of concert of action like price fixing in Japan may be circumstantial evidence of a broader conspiracy. A piece of circumstantial evidence like conscious parallel conduct, marginally relevant, but standing alone legally insufficient to support an inference of those ultimate facts, may nevertheless be taken into account along with such direct evidence, and such other circumstantial evidence, as the record contains.

This process of examining all of the admissible evidence, direct and circumstantial, in order to determine what legitimate inferences could be drawn as to the ultimate facts in issue is what the Supreme Court had in mind when in *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 698–99, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962), it warned against fragmentizing or compartmentalizing the evidence in an antitrust conspiracy case. *See American Motor Inns, Inc. v. Holiday Inns, Inc.,* 521 F.2d 1230, 1253 (3d Cir.1975). With that admonition in mind we turn to the conspiracy alleged by NUE and Zenith.

2. *The NUE-Zenith Theory of the Case*

As noted in Part I, *supra,* NUE and Zenith charge that the defendants conspired to fix and maintain artificially high prices for their products sold in Japan, while maintaining artificially low prices for those products in the United States, to the injury of American television manufacturers.

In ruling on the summary judgment motions the trial court assumed, correctly, that there is evidence in the record from which a fact-finder could conclude that the defendant Japanese manufacturers sold comparable television sets in the United States at prices significantly below the prices charged in the Japanese home market. Such a differential, even if regarded as consciously parallel business behavior, obviously would not establish a violation of section 1 of the Sherman Act or of the Wilson Tariff Act. NUE and Zenith therefore also charge that the Japanese manufacturers, who in the aggregate had manufacturing capacity in excess of what could be absorbed by the Japanese home market at a desirable price, entered into an agreement or understanding to stabilize prices in that market. While such an agreement or understanding was unlawful under Japanese law, standing alone it would normally be beyond the reach of American law. NUE and Zenith contend, however, that its necessary effect was to make it possible for the conspirators to sell at prices in the American market below the prices at which they could successfully compete.

The defendants urge that even if there was such a home market horizontal price-fixing agreement it would not be a violation of American law so long as their behavior in the American market was nonconspiratorial and pro-competitive. NUE and Zenith do not agree that a price-fixing conspiracy in Japan, having the effect of permitting each of its members to cut prices in the American market, is beyond the reach of American antitrust law. That question is not free from doubt. *See, e.g., Timberlane Lumber Co. v. Bank of America, N.T. & S.A.,* 549 F.2d 597, 608–15 (9th Cir.1976). NUE and Zenith urge, however, that the question is not presented here, because they also charge that the defendants entered into certain agreements respecting the export of consumer electronic products. One feature of these alleged agreements was that each manufacturer would confine itself to sales to five companies in the United States. Other features were secret rebates and sales at prices that produced losses. The effect of those agree-

ments, they urge, was to reduce, if not eliminate, competition among the Japanese manufacturers in the American market, and permit the full effect of the support derived from home market price stabilization to be concentrated upon competition with American manufacturers.

A horizontal allocation of customers in the American market would, of course, be a violation of section 1 of the Sherman Act. *United States v. Topco Associates, Inc.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). It would not ordinarily be one for which primary line competitors like NUE and Zenith could seek recovery under section 4 of the Clayton Act, however, since it would leave them free to compete for all customers, and tend to insulate them from competition. Thus it would not injure their business or property. When coupled with a home market price stabilization conspiracy in Japan, however, the effect on them would be different. Price stabilization in Japan coupled with customer allocation in the United States would tend to permit separate Japanese manufacturers to concentrate their predatory tactics on separate selected American mass merchandisers, insulated from price competition at home and from Japanese competition here. The full brunt of the support derived from home market price stabilization could thus be concentrated against the American manufacturers competing for sales to the retailers in question. We hold that if the evidence would permit a finding that there was a conspiracy having these features, it would support the conclusion that there were Sherman Act and Wilson Tariff Act violations for which NUE and Zenith may recover under section 4 of the Clayton Act.

In so holding we reject the contention, advanced principally by MELCO, that the NUE and Zenith complaints do not charge conduct which as a matter of customary international law is within the jurisdictional reach of American antitrust law. We have in this court adopted the test, first articulated in *United States v. Aluminum Co. of*

*America,* 148 F.2d 416, 443–45 (2d Cir.1945), that the Sherman Act reaches conduct abroad which is intended to and does have an impact on United States commerce. *See Mannington Mills, Inc. v. Congoleum Corp.,* 595 F.2d 1287, 1291–92 (3d Cir.1979). Even if we were to refine the *Mannington Mills* test so as to apply the Sherman Act only to conduct which has a *substantial* effect on United States commerce, the NUE and Zenith allegations would amply satisfy such a test. They charge foreign conduct which in conjunction with American conduct impinged severely on primary-line competition in consumer electronic products in the American market.[56]

### 3. Evidence Supporting the NUE-Zenith Conspiracy Theory

In Part V C, we reserved ruling on the relevancy of evidence we found otherwise admissible. To the extent that we refer to it hereafter, we hold that evidence to be relevant under Rule 402 and admissible under Rule 403.

#### a. Evidence Relating to the Japanese Home Market

■ It is undisputed that the Japanese television receiver manufacturing industry originated with the utilization by Japanese manufacturers of American technology, and that the encoding system adopted in Japan, that of the National Television Standards Committee, is compatible with that used in the United States. This encoding system differs from the Phase Alternating Line encoding system used in Germany, and the Sequential Color and Memory System used in France and the Soviet Union. 494 F.Supp. at 1204. There are technical differences, acknowledged in the opinion filed simultaneously herewith on the 1916 Antidumping Act claim. But, as that opinion makes clear, the similarities are more significant than the differences.

There is also evidence from which a factfinder could conclude that although American technology in television receivers is substantially compatible with Japanese broad-

---

**56.** In Part VI B, *infra,* we address the separate contention that the Act of State or Sovereign

Compulsion Doctrine warrants summary judgment.

cast standards, there are governmentally imposed barriers to competition by American or other non-Japanese manufacturers in the Japanese home market. That evidence is contained in the Nehmer, DePodwin, Yamamura and Haley Reports, discussed in Part V C, *supra.* The barriers include high tariff rates, discriminatory ocean freight rates, the Japanese commodity tax, import deposits, limitations on foreign investment in Japan, safety and design standards involving cumbersome inspection and testing procedures, and Japanese government procurement practices. 513 F.Supp. at 1183–84. Besides these governmentally erected barriers to entry, there is evidence of structural barriers to entry arising from the traditional methods of organization of Japanese businesses in *keiretsu,* which effectively control channels of distribution. 513 F.Supp. at 1185. The evidence respecting entry barriers to manufacturers whose products are technically compatible with Japanese broadcast standards would support an inference that a home-market horizontal price-fixing agreement among the Japanese manufacturers was a technically feasible project, because the parties to such an agreement would be protected from price competition from non-parties.

There is also evidence from which a fact-finder could conclude that Japanese manufacturers of consumer electronic products had relatively higher fixed costs than did their American counterparts, resulting from Japanese employment practices, and from Japanese financing practices. Japanese manufacturers are expected to maintain the permanence and stability of their workforce. They also customarily have higher debt-equity ratios, and thus greater fixed obligations. Saxonhouse Report, App., vol. 7, at 2891–92. A fact-finder could reasonably infer that higher fixed costs provide a strong incentive to utilize manufacturing capacity at the highest possible rate.

The evidence also would permit a finding that the manufacturer defendants, individually and in the aggregate, created plant capacity which exceeded what could reasonably be absorbed by the Japanese home market for consumer electronic products at a desirable price. DePodwin Report, App., vol. 5, Part III. A fact-finder could reasonably infer, from the existence of such excess capacity, that those manufacturers had strong incentives to dispose of the products of this excess capacity in a market outside Japan. Since, however, unlimited price competition in all markets in an industry characterized by excess capacity would be likely to produce losses, a reasonable inference could be drawn that if it were feasible to avoid price competition in one such market, efforts might be made to do so. Because the Japanese home market may be sheltered from outside competition by the entry barriers referred to above, it would not be unreasonable to believe that such collusion was possible.[57]

The evidence also would permit a finding that the Japanese consumer electronic industry was in the years in issue characterized by concentration in a small number of dominant manufacturers, and that those manufacturers belonged to industry trade associations which met at regular intervals and exchanged information about plant capacity, inventories and pricing. These included the Electronic Industries Association of Japan, the TV Export Council, the Market Stabilization Council, and others. Evidence of concentration among a small number of manufacturers, and of their common membership in industry trade associations which met regularly and exchanged information, would support the inference that there were opportunities for concert of action with respect to home market price stabilization. Such concert of action would

---

**57.** Chief Judge Seitz believes that appellants' evidence would support an inference that appellees had a motive to fix prices in Japan because of market conditions and high fixed costs. This inference, combined with the other evidence discussed in the court's opinion, is sufficient to reverse the grant of summary judgment. In his opinion, it is unnecessary to consider whether appellants' evidence supports an inference that exports were necessary to maintain this price-fixing conspiracy, or an inference that price-cutting in the United States was required in order "to absorb excess capacity."

make possible export sales at prices sufficiently low to absorb excess capacity.

To the foregoing can be added the evidence in Part VI of the DePodwin Report tending to show that fairly consistently each defendant sold comparable models in the Japanese market at prices higher than they were being sold in the United States. That parallel conduct over a long time permits an inference that each manufacturer was confident that it would be able to support low price sales in the export market by higher price sales at home.

The evidence relating to the Japanese home market to which we have referred thus far, while having some tendency to make the existence of a conspiracy to stabilize home market prices more probable than if there were no such evidence, is probably not, standing alone, sufficient to support a conspiracy finding. What it suggests is a set of economic circumstances providing a strong incentive for horizontal price stabilization, the feasibility of such a program, an opportunity to meet for the purpose of agreeing on it, and pricing activity in the export market consistent with the existence of such an agreement. Were this the only evidence, we would probably agree that a finding of conspiracy would be impermissibly speculative.

Besides the foregoing circumstantial evidence, however, we have considerable direct evidence that there was agreed-upon price stabilization in Japan. That evidence includes the findings of the Japanese Fair Trade Commission which in Part V C 4 above we have held to be admissible for the truth of the matters reported upon. The report in the Market Stabilization case finds that the six respondents in that case agreed to stabilize the domestic market by establishing high prices and enforcing that agreement among the parties. The report in the 1967 MEI case finds that MEI took steps to require that its Japanese wholesalers maintain high resale prices. Moreover the evidence of what transpired at certain meetings, which in Part V E we have held to be admissible, tends to show that the participation of the defendants in various trade groups led to agreements on price stabilization. There is, moreover, direct evidence of the exchange of production and inventory statistics which would be necessary for the functioning of a horizontal price stabilization agreement.

The trial court rejected the significance of such of the Japanese price-fixing evidence as was deemed admissible on the theory that it would at best reflect a policy of increasing the margins of wholesalers and retailers. 513 F.Supp. at 1208, 1214. Entirely apart from the fact that exchanges of inventory and production data suggest far more than this, what the court has done is to select one of several permissible inferences to the exclusion of other equally permissible inferences. The obvious first step in a home market price stabilization scheme would be retail and wholesale price stabilization, but a fact-finder could reasonably conclude that no manufacturer would be likely to participate in such a scheme except for the long-range purpose of protecting its own profit margins. Moreover horizontal resale price maintenance agreements may have redounded to the benefit of the Japanese manufacturers by permitting them to ensure quality and warranty control, to maintain brand image and consumer confidence, and to protect their credit with sales companies. App., vol. 11, at 4622. See L. Sullivan, Handbook of Antitrust Law §§ 134–35, at 380–87 (1977).

Liaison counsel for the defendants candidly conceded at oral argument that there was a two year period between 1964 and 1966 during which some discussions about bottom prices in Japan took place among some of the defendant companies. Transcript of argument, Oct. 22, 1982, at 71. The defendants contend, however, that evidence relevant to this period is legally insufficient to prevent the entry of summary judgment because it does not show that the conspiracy to stabilize prices in Japan began earlier or continued later. Id. We conclude, however, that the direct evidence of horizontal price-fixing in the periods referred to in the Japanese Fair Trade Commission proceedings, when coupled with the

circumstantial evidence to which we have referred, would permit an inference that the conspiracy operated over a longer period. Particularly significant are the circumstances that the trade groups on which the Japanese Fair Trade Commission focused its attention operated over a much longer period, and that, as suggested in the price comparisons which in Part V D 1 we held to be admissible, the higher Japanese home market prices continued over many years. There is direct evidence of a horizontal price-fixing conspiracy in the home market at some points in time, and circumstantial evidence that neither the economic conditions providing an incentive for horizontal price-fixing in the home market, nor the industry circumstances providing opportunity for and feasibility of such a program, nor the price differentials between the home market and the American market, changed. That circumstantial evidence includes exchange of production and inventory statistics, which would facilitate the implementation of a horizontal price stabilization agreement. *See* DePodwin Report, App., vol. 5, at 1616–17, 1673. While a fact-finder might well conclude that horizontal price-fixing in Japan began in 1964 and ended in 1966, a different conclusion is on this record a permissible one.

We hold, therefore, that on this record a fact-finder could reasonably infer the existence, among some Japanese manufacturers, of an agreement to stabilize prices in the Japanese home market, thereby deriving profits which would support sales at low prices in the United States. The direct and circumstantial evidence of a price stabilization conspiracy in the home market is reinforced by the conclusions of several of the NUE-Zenith economist experts, who, after studying the industry, opine that there was a price-fixing cartel in operation. *See* Nehmer Report; DePodwin Report.

Sony filed the affidavit of Mr. Akio Morita, its President, denying that Sony ever engaged in any price-fixing agreements in Japan. App., vol. 3, at 932. Sony was not a respondent in any Japanese Fair Trade Commission proceedings, and there is little direct evidence that it participated in specific meetings at which price-fixing in Japan was discussed.

Some of the circumstantial evidence respecting the Japanese market is, however, relevant to Sony. Like the six other manufacturing defendants, it could be found to have had higher fixed costs, and to have been protected from competition with American firms in Japan by entry barriers. Moreover there is direct evidence that Sony was a member of some trade groups which could be found to have engaged in price-fixing and was regularly represented at the meetings of those groups. Yajima Diary, App., vol. 12, at 5171–72, 5226. There is direct evidence that Sony was a member of the Japan Machinery Exporters' Association which enforced the five-company rule. Sony's retail prices in the American market were among the highest in the industry, but it could be found that there were significant price differentials between the American and Japanese markets. Although the evidence linking Sony to a home market price-fixing conspiracy is not strong, we conclude that there is sufficient independent evidence from which a fact-finder could find that it was a member of such a conspiracy.

That conclusion, however, is not applicable to all the defendants. There is no direct evidence that Sears Roebuck & Co. or Motorola, Inc. participated in any meetings at which price-fixing in Japan was discussed. The circumstantial evidence about economic conditions in Japan has no probative value against Sears or Motorola. In Part VB above, we hold that before coconspirator statements may be admitted against an alleged member there must be independently admissible evidence of its membership. We have carefully examined the record, and conclude that there is no independently admissible evidence connecting Sears Roebuck & Co. or Motorola, Inc. with any agreement respecting price stabilization in Japan. NUE and Zenith contend that because these defendants became participants in the export aspects of an overall conspiracy having both home market and export aspects, the home market evidence should be admitted

against them under Rule 801(d)(2)(E). We address that contention hereafter.

### b. Evidence Relating to Exports to the United States

We have already noted the Japanese manufacturers' high fixed costs, higher debt-equity ratios (Saxonhouse Report, App., vol. 7, at 2887), and more stable workforce. A fact-finder could reasonably infer that these conditions created an incentive to find a market for excess capacity. We have also noted that Japanese and American television standards are compatible. Thus, among the developed countries likely to be a market for excess capacity of the Japanese manufacturers, the United States was the market with the greatest potential. This evidence would permit a fact-finder to infer that the Japanese manufacturers had a strong incentive to find a market for excess capacity in the United States. Moreover, when considered in light of the evidence respecting price stabilization in the home market, it would permit a fact-finder to infer a motive to sell at prices low enough to eliminate competition in the United States market by American firms.[58] The trial court reasoned that "[n]o defendant, or any other businessman for that matter, would have any motivation for entering a conspiracy to sell at low prices." 513 F.Supp. at 1238. On this record a fact-finder could find such a motive. Moreover a fact-finder could find, from the evidence of price stabilization in Japan, that the Japanese manufacturers, if they acted in concert, had the ability to carry out a predatory export raid on the American market sustained by home market profits. There is record evidence that the Japanese Ministry of International Trade and Industry (MITI) plays an important role in the supervision of Japanese firms engaging in exports. The purpose of that supervision is to discourage the sale of Japanese products in other countries at prices which might result in charges of dumping, charges which might encourage the erection in those countries of trade barriers against Japanese products. With the apparent encouragement of MITI, the seven principal Japanese manufacturers of television receivers between 1963 and 1973 became signatories of formal written agreements which established minimum prices for television receivers sold for export to the United States. Similar agreements were made with respect to radio receivers and tape equipment. At the same time the seven manufacturers were members of the Japan Machinery Exporters' Association, an export trade association which required all its members to register the names of all customers who purchased television receivers for the United States market, and which, after 1967, limited the number of customers so registered to five. While the minimum price agreements appear to have been encouraged, if not mandated, by MITI, a fact-finder could conclude that the five-company rule was the result of non-governmental action.

Putting aside for the moment the role of the Japanese government, an agreement fixing minimum prices for the American market would ordinarily be a per se violation of section 1 of the Sherman Act. Thus the United States might sue to enjoin enforcement of such an agreement, or a purchaser might seek damages under section 4 of the Clayton Act. Since, however, the effect of a horizontal agreement among manufacturers to set minimum prices would in isolation protect non-party competitors like NUE and Zenith from competition, they could not, absent other circumstances, bring a section 4 suit, because they could not show the requisite injury to their business or property. *E.g., Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1571 n. 9, 23 L.Ed.2d 129 (1969); *Van Dyk Research Corp. v. Xerox Corp.,* 631 F.2d 251, 254–55 (3d Cir. 1980), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981). Likewise, a horizontal agreement to allocate customers in the American market would ordinarily be

---

**58.** As noted earlier at footnote 57, Chief Judge Seitz believes it is unnecessary to consider whether appellants' evidence supports an inference that exports of "excess capacity" were necessary to maintain appellees' price fixing conspiracy in Japan.

a per se violation of section 1. *United States v. Topco Associates, Inc.,* 405 U.S. 596, 606–12, 92 S.Ct. 1126, 1133–35, 31 L.Ed.2d 515 (1972). But again, such an agreement would not, absent other circumstances, produce an injury to the business or property of a non-party competitor.

There is record evidence, however, of other circumstances suggesting that NUE and Zenith may have been injured in their business or property from the existence of what they refer to as an export cartel. First, there is evidence from which a fact-finder might conclude that the minimum prices agreed upon were in fact dumping prices. That evidence includes the finding made in investigations under the Antidumping Act of 1921 (Part V C 2) and several expert opinions (Part V D). The collusive establishment of dumping prices could support an inference of collective predatory intention to harm American competitors. Next, there is substantial evidence that with the exception of Sony, the defendant manufacturers and their subsidiaries engaged in various schemes to rebate part of the sales price to a number of mass marketing retail customers in the United States. The evidence would permit a finding that efforts were made to conceal this activity both from MITI and from the United States Customs Service, and a finding that at least some of the manufacturers knew that others were engaged in rebating but did not report it to either government. There is expert opinion evidence that export sales generally were at prices which produced losses, often as high as twenty-five percent on sales. Long-term sales below cost are circumstantial evidence from which one can draw an inference of intentional predatory pricing. Finally, there is evidence that the five-company rule operated at a time when a fact-finder might conclude that there was a horizontal price-fixing agreement in Japan. Thus a fact-finder might reasonably infer that the allocation of customers in the United States, combined with price-fixing in Japan, was intended to permit concentration of the effects of dumping upon American competitors while eliminating competi-

tion among the Japanese manufacturers in either market.

The trial court questioned the probative value of the five-customer rule as illusory because a defendant could avoid its impact by creating a wholly-owned American sales subsidiary, and because agreements limiting customers normally tend to keep prices high. 513 F.Supp. at 1190. Neither reason is sufficient to exclude as a matter of law the inference that the five-customer rule was intended to prevent competition among the Japanese manufacturers in the American market so that all could concentrate their competition on American firms.

We hold that a finding of a conspiracy to sell at artificially high prices in Japan while at the same time selling at artificially low prices in the United States would support liability to NUE and Zenith under section 4 of the Clayton Act, assuming they could show that they were in fact damaged. The defendants do not on this appeal contend that the FPS is deficient with respect to plaintiffs' proof of damage.

As with the evidence relating to the Japanese home market, however, we must separately consider what independent evidence connects each defendant to a conspiracy having export aspects.

### (1) Motorola, Inc.

■ While Motorola, Inc. was an American competitor it was, if anything, a victim of the alleged conspiracy. In 1974 it sold its Consumer Products Division to the Matsushita interests. That transaction has no tendency to prove that Motorola joined in a conspiracy or even knew of its existence. Other evidence relied on by NUE and Zenith to connect Motorola to the conspiracy is evidence that in 1968 and 1969 it purchased from Sharp fourteen-inch color television receivers for resale. In the course of those transactions it became aware that six Japanese manufacturers were acting in concert, under the auspices of MITI, to establish minimum prices for that model. Motorola, a fact-finder could conclude, agreed with Sharp, Toshiba and Aiko that it would pay the MITI minimum price but would receive secret rebates.

This is, perhaps, circumstantial evidence having some tendency to connect Motorola to the alleged conspiracy. We hold it to be legally insufficient, however, because there is no evidence that Motorola had any knowledge of Japanese home market price stabilization, or of the five-company rule, or any knowledge that the suppliers with which it dealt were acting in concert with respect to evasion of the minimum prices agreed upon with MITI. *Cf. Albrecht v. Herald Co.,* 390 U.S. 145, 149–50, 88 S.Ct. 869, 871, 19 L.Ed.2d 998 (1968). At best the rebating evidence admissible against Motorola would support an inference that it conspired separately with several Japanese suppliers to conceal dumping.

NUE and Zenith also rely on the fact that in 1973 Motorola entered into an agreement with Awai Co., Ltd., a Japanese company controlled by Sony, to market Motorola's Quasar console color television in Japan, and that it aborted that agreement when it sold its Consumer Products Division to Matsushita. The abandonment of Motorola's effort to penetrate the Japanese home market is said to have advanced the purposes of the overall conspiracy by helping to insulate the conspirators from home market price competition. Granting that a fact-finder could legitimately so conclude, that fact does not support an inference that Motorola was a conspirator. Obviously it was subject to the entry barriers in the Japanese home market to which we have referred in Part VI A 3 a above, and was in the American market a target of the alleged conspiracy. Its decision to bail out by selling to Matsushita does not support an inference that it became a conspirator. *See generally Harold Friedman, Inc. v. Kroger Co.,* 581 F.2d 1068, 1072–73 (3d Cir.1978).

We conclude, therefore, that there is no independent evidence connecting Motorola to either the home market side or the export side of the alleged conspiracy.

(2) Sears Roebuck & Co.

Sears Roebuck & Co. was an owner of twenty-five percent of Warwick Electronics, Inc., a manufacturer of television receivers for private label retail customers.

It was also, in the years in question, one of the largest retailers of consumer electronic products in the American market. In 1976 Warwick, a failing enterprise, was acquired by a Sanyo Electric subsidiary in which Sears retained a twenty-five percent interest. As in the case of Motorola's sale of its Consumer Products Division to Matsushita, the Warwick-Sanyo transaction has no tendency to prove that Sears joined in a conspiracy or ever knew of its existence. There is evidence from which it could be found that Sears negotiated prices from Sanyo and Toshiba substantially lower than the minimum prices fixed in the MITI-sponsored minimum price agreement, and took steps, over a long period, to conceal these dumping prices from the Japanese government and the United States Customs Service. While that activity, if it occurred, may have been illegal, it was clearly consistent with Sears' economic interest as a retailer. There is no evidence that Sears was aware of retail price stabilization in Japan, or of the five-company rule, or that the suppliers with which it dealt were acting in concert with respect to the evasion of the minimum prices agreed upon with MITI.

It is true that Sears had an investment in Warwick Electronics, Inc., and thus that the solicitation of dumping prices from Japanese suppliers may be considered to have been inconsistent with its own economic interest as an investor. Uncontradicted record evidence establishes, however, that Sears' interest in Warwick was primarily as a supplier for its retail business, and that it attempted to keep Warwick alive for that purpose during a great part of the alleged conspiracy. When Warwick could not be kept alive Sears acted consistently with its economic interests by retaining an interest in the firm which purchased Warwick's television receiver business. Granting that Sears' solicitation of dumping prices may have been to some extent inconsistent with its economic interest as an investor in Warwick, that circumstance is so slightly probative of a motive to join a conspiracy as, on this record, to be valueless.

There is no evidence that Sears was aware of the five-customer rule. Zenith contends that Sears' refraining from selling television sets in the Japanese home market tended to insulate the defendants from price competition there. There is no evidence that Sears was aware of price stabilization efforts in Japan. There is uncontradicted evidence that Sears' consumer electronic products were not designed for operation in Japan.

We conclude, therefore, that there is no independent evidence connecting Sears to either the home market side or the export side of the alleged conspiracy.

### (3) Sony Corporation

As noted in Part VI A 3 a above, there is some independent evidence linking Sony Corporation with a Japanese market price stabilization conspiracy. It had the same incentive to utilize excess capacity as did the other Japanese manufacturers. Sony was a party to the MITI-sponsored minimum export price agreements. It was also a member of the Japan Machinery Exporters' Association, and could on that basis be found to be a party to the five-company rule. Sony contends that both the minimum export price agreements and the five-company rule were largely irrelevant to it, because unlike other manufacturers its sole export customer in the United States was its wholly-owned marketing subsidiary, Sony Corporation of America (Sonam). The record evidence establishes that Sony's efforts in the American market were concentrated at the upper range of television receiver prices. Moreover, there is no record evidence contradicting the affidavit of Mr. Akio Morita, Sony's Chief Executive Officer, to the effect that neither Sony nor Sonam ever gave any customer hidden discounts or rebates; that Sony was unaware of rebating practices by other manufacturers; that neither ever made sales to private label or original equipment manufacturer customers; that Sony never sold at dumping prices; and that Sony's American sales, representing forty-three percent of its total sales, were consistently profitable.

There is evidence of significant price differentials between Sony's home market and American market pricing. Although Sony sold to only one American distributor, its subsidiary Sonam, a fact-finder could conclude that it insulated other members of the conspiracy from direct competition by adhering to the five-company rule, and was in turn insulated from competition by them in that price segment of the market toward which its efforts were directed. Moreover a fact-finder could conclude that it was able to sell in the American market at prices significantly lower than its home market prices because it was protected from price competition in its price segment of the home market.

However, so far as the record disclosed, Sony never competed directly with NUE or Zenith because these plaintiffs concentrated their efforts at the lower end of the price scale for consumer electronic products, while Sony concentrated on high quality, high price products. If Sony was found to be part of an overall conspiracy it could be held liable for injury to NUE's and Zenith's business or property caused by the conspiracy, even though its own sales did not directly cause that injury. There is no requirement that a section 4 plaintiff show a separate causal relationship between its injury and the separate actions of each member of a conspiracy.

Admitting that the question is close, Chief Judge Seitz and Judge Meskill believe that the complete lack of evidence that Sony competed with NUE or Zenith establishes that it had no motive to join in the export side of the unitary conspiracy which is the theory of the plaintiffs' case. Absent some evidence suggesting such a motive, the remaining evidence is entirely too speculative to support a prima facie case against Sony. Thus the summary judgment in Sony's favor on the conspiracy charges will be affirmed.

I agree that there must be some evidence linking Sony to the American side of the conspiracy, but conclude that the evidence referred to, while admittedly not substan-

tial, suffices to satisfy the standards for summary judgment.

### (4) MELCO, Mitsubishi Corporation and Mitsubishi International Corporation

 MELCO is primarily a manufacturer of heavy electrical equipment, automotive electrical equipment, elevators, radar, computers, and aerospace equipment. Consumer electrical products exported for sale in the United States represent a tiny proportion of its total sales. Moreover, from 1965 to 1973 MELCO's share of the American market for Japanese-manufactured television receivers never exceeded 3.53 percent of monochrome and 5.52 percent of color receivers. During that same period its total sales of televisions for the American market never achieved as much as one percent of that market. Considering its tiny market share, its continued participation in this protracted proceeding must be disproportionately burdensome. But while that factor may make us sympathetic to MELCO's plight it does not relieve us of the burden of examining the record evidence in the light most favorable to NUE and Zenith in order to determine if MELCO was entitled to summary judgment.

MELCO was a respondent in the Market Stabilization case. A MELCO representative, Mr. Okuma, attended meetings of the Tenth Day Group. See DSS 89. Mr. Okuma gave a protocol in the Market Stabilization case. Id. There is in these documents, direct evidence of MELCO's participation in the price stabilization conspiracy in Japan. MELCO is a party to the MITI-sponsored minimum export price agreement. It is also a member of the Japan Machinery Exporters' Association. Thus it is a party to the five-company agreement.

 MELCO urges that it cannot have been a part of any export conspiracy because from April 1970 to October 1974 it sold its consumer electronics products to Mitsubishi Shoji Kaisha (MSK), an independent Japanese trading company, or its American subsidiary, Mitsubishi International Corporation (MIC). After October 1974 MELCO sold its consumer electronic products in Japan to its own wholly owned subsidiary, Melco Sales, Inc., which imported them to the United States for resale. MELCO contends that it cannot be held responsible for any activities of the Mitsubishi trading company, or even of its own wholly owned subsidiary. There is evidence of rebating to five customers for MELCO products.

The trial court did not grant summary judgment in MELCO's favor on the theory that it had successfully isolated itself from any predatory pricing of its products which may have occurred in the American market. Rather it elected "not to reach the question of the agency of MSI, the question whether there is a genuine issue of material fact as to Melco's involvement in the rebate scheme, or the question of the Melco-MC/MIC relationship and the 'Mitsubishi Group,' since at all events these issues of fact cannot be material." 513 F.Supp. at 1281. Under our analysis of the evidentiary issues and the evidence supporting the NUE-Zenith conspiracy theory, we think such issues of fact are material. If there is an agency relationship between MELCO and the sales organizations which marketed its products in the United States, the fact-finder could infer that actions taken by those organizations consistent with the objects of the conspiracy were done in furtherance of it. Thus we have examined the record to determine whether genuine fact issues exist as to the relationship between those organizations and MELCO. We conclude that summary judgment in favor either of MELCO or of Mitsubishi Corporation and Mitsubishi International Corporation is not possible. A fact-finder could reasonably conclude that MELCO was a part of the overall conspiracy and that the sales organizations knowingly joined MELCO in furthering its ends. A fortiori that is the case with respect to its subsidiary, Melco Sales, Inc.

### (5) The Remaining Defendants

There is independent evidence tending to connect each of the remaining defendants to both sides of the alleged conspiracy.

### 4. *Proof of Injury Arising From Violation of the Antitrust Laws*

Defendants claim that any damage which may have been sustained by NUE and Zenith could not have been caused by the conspiracy alleged. Their argument is that the minimum prices set in the MITI-sponsored manufacturers' export agreements would tend to insulate the plaintiffs from competition. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 484–89, 97 S.Ct. 690, 695–97, 50 L.Ed.2d 701 (1977); *Van Dyk Research Corp. v. Xerox Corp.,* 631 F.2d 251, 255 (3d Cir.1980), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981). Since, however, the MITI-sponsored agreements are relied on as evidence of a conspiracy to sell at predatory prices, we need not address this argument.

### 5. *The Defense of Sovereign Compulsion*

MELCO urges that all the Japanese manufacturer defendants are entitled to summary judgment because the activities of those defendants in Japan were undertaken at the direction of the Japanese Government, as an integral part of its trade policy toward the United States. MELCO's theory is that MITI mandated agreements fixing minimum export prices in order to accommodate United States concerns about dumping and to prevent the development of retaliatory trade barriers against Japanese products. We may assume, without deciding, that a government-mandated export cartel arrangement fixing minimum export prices would be outside the ambit of section 1 of the Sherman Act. *See, e.g., International Association of Machinists and Aerospace Workers v. Organization of Petroleum Exporting Countries,* 649 F.2d 1354, 1358–59 (9th Cir.1981), *cert. denied,* 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982). On this record, summary judgment on that ground is not possible for several reasons.

First, we note that NUE and Zenith rely on the minimum price agreements primarily as evidence of a low export price conspiracy. Moreover, it cannot be said with any degree of certainty that the minimum prices, claimed by the NUE and Zenith experts to be dumping prices, were in fact determined by the Japanese Government. It is possible to conclude that the government merely provided an umbrella under which the defendants gained an exemption from Japanese antitrust law, and fixed their own export prices. Second, there is abundant evidence suggesting that many defendants departed from the agreed-upon minimums and took steps to conceal their departure from MITI. Thirdly, there is no record evidence suggesting that the five-company rule originated with the Japanese Government. Finally the evidence about price stabilization in the Japanese home market suggests unequivocally that this activity violated the laws of Japan.

Clearly, therefore, a summary judgment in defendants' favor on the defense of sovereign compulsion would be improper.

### 6. *The* Illinois Brick *Defense*

Certain defendants, relying on *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), moved in the trial court for summary judgment against Zenith because Zenith sells all its consumer electronic products to wholesale distributors, all but four of which are independently owned, and not to retailers or consumers. Their theory was that if any injury occurred as a result of the alleged conspiracy, it was an injury to the business or property of the distributors, which could not be passed back to Zenith. According to the defendants, permitting Zenith to recover under section 4 of the Clayton Act would be inconsistent with the Supreme Court's rejection in *Illinois Brick* of the so-called pass-on defense. The trial court carefully analyzed the policies supporting the *Illinois Brick* interpretation of section 4, and held that none of them was implicated in this case. 494 F.Supp. at 1250–56. Because the parties have not briefed or argued the *Illinois Brick* defense on appeal as an alternate ground for affirmance of the summary judgment, we do not address it.

**316**

### 7. Conclusion as to the Conspiracy

We conclude that there was sufficient evidence to raise a genuine issue of material fact as to participation in the conspiracy alleged by NUE and Zenith by all of the defendants except Sony Corporation, Motorola, Inc., and Sears Roebuck & Co. Such a conspiracy would violate section 1 of the Sherman Act and the Wilson Tariff Act, and would be a basis for liability to NUE and Zenith under section 4 of the Clayton Act. Thus the summary judgment in favor of defendants must, except to the extent indicated, be reversed.

### B. The Attempt to Monopolize

■ In addition to their section 1 Sherman Act and Wilson Tariff Act claims, NUE and Zenith allege violations of section 2 of the Sherman Act. That section proscribes actual monopolization, attempts at monopolization, and combinations or conspiracies to monopolize. NUE and Zenith do not claim that any individual defendant achieved monopoly power or even a dangerous propensity to acquire such power in the manufacture or sale and distribution of consumer electronic products in the American market. Nor do they contend that individual defendants even attempted to achieve an individual monopoly in that market. Rather, their section 2 claim is predicated on *American Tobacco Co. v. United States,* 328 U.S. 781, 809, 66 S.Ct. 1125, 1138, 90 L.Ed. 1575 (1946), which affirmed a criminal conviction under section 2 of several separate tobacco companies who conspired to acquire or maintain the power to exclude competition from a market in which collectively they had monopoly power, and who intended to exercise it. The trial court recognized that a combination or conspiracy to acquire shared monopoly power and to exercise it would be a violation of section 2. 513 F.Supp. at 1319. NUE and Zenith relied upon the same evidence of conspiracy to support their section 2 charge as to support the section 1 charge. Since the trial court concluded that there was no evidence of conspiracy, the section 2 charge was also

dismissed. 513 F.Supp. at 1321–23. *See Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105, 118 (3d Cir.1980). Because we conclude that except as to Motorola, Inc., Sears Roebuck & Co. and Sony Corporation, there is evidence of a conspiracy and of the defendants' participation in that conspiracy, we hold that there are on this conspiracy to monopolize claim, as well, disputed issues of material fact.

In the trial court, as a separate ground for summary judgment on the section 2 claim the defendants urged that even with their aggregate share of the American market for television receivers they lacked the monopoly power required by that section. Their aggregate share of that market gradually increased for monochrome receivers from 21.8 percent in 1969 to 49.2 percent in 1977, and for color receivers from 12.2 percent in 1969 to 44.2 percent in 1977. Market share figures for other consumer electronic products are in the record, but it is unclear how the market for each separate product other than television receivers should be defined. Conceding that the NUE-Zenith showing with respect to market share is not an overwhelming demonstration of the existence of monopoly power in the aggregate, we conclude that there are material fact issues both as to the definition of the relevant market for separate product lines and as to the aggregate percentage of such market which would represent monopoly power, in light of the overall picture of the industry.

We hold, therefore, that except for Sony Corporation, Motorola, Inc. and Sears Roebuck & Co., the summary judgment on the section 2 charge in favor of the defendants must be reversed.

### C. The Robinson-Patman Claims

### 1. Discrimination Between Japanese and American Customers

■ NUE and Zenith both pleaded Robinson-Patman Act counts based on the fact that the defendants sold consumer electronic products in the Japanese home market at

prices significantly higher than those charged for products of like grade and quality in the United States. As noted in Part II A above, Judge Higginbotham dismissed these counts for failure to state a claim upon which relief could be granted. 402 F.Supp. at 246–51. Section 2(a) applies "where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States ...." 15 U.S.C. § 13(a) (1982). NUE and Zenith urged that only one sale of a commodity need be for use, consumption, or resale within the United States. After carefully analyzing the less than pellucid statutory language, and the available statutory history of section 2(a) and its predecessors, the trial court concluded that both sales must be for use within the United States. *Id.* at 248.

Essentially for the reasons set forth in Judge Higginbotham's opinion, we agree that Count V of the NUE and Count IV of the Zenith complaints were properly dismissed for failure to state a claim on which relief may be granted.

### 2. *Discrimination Among American Customers*

■ Zenith has separately charged that Matsushita Electric Corporation of America, Matsushita Electronics Corporation, Mitsubishi International Corporation, Melco Sales, Inc., Toshiba America, Inc., Hitachi Sales Corporation of America, Sanyo Electric, Inc. and Sharp Electronics Corporation each violated the Robinson-Patman Act by discriminating in price among American purchasers. Zenith contends, *see* 513 F.Supp. at 1323 nn. 389–90, that the other manufacturers should be held to be vicariously liable for such violations because of their participation in a conspiracy. *See Federal Trade Commission v. Cement Institute,* 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948); *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). The trial court granted summary judgment in defendants' favor because it

found Zenith's Robinson-Patman claim to be "entirely dependent upon its allegation that the defendants engaged in a low-price export conspiracy ...." 513 F.Supp. at 1325. Since the court found no evidence of such a conspiracy it held that Zenith lacked standing under sections 4 and 16 of the Clayton Act to complain about the alleged price discriminations. 513 F.Supp. at 1325, 1328.

Because, except as to Sony Corporation, Sears Roebuck & Co., and Motorola, Inc., the trial court's grant of summary judgment with respect to the alleged conspiracy was error, the reason relied upon for dismissing Zenith's separate Robinson-Patman Act claim is untenable. The court did not decide whether or not Zenith's FPS contains sufficient evidence from which a fact-finder could find the elements of a Robinson-Patman claim on behalf of a primary-line competitor. 513 F.Supp. at 1329. Since that issue has not been briefed here we conclude that we should not address it in the first instance. The summary judgment dismissing Zenith's Robinson-Patman claim is unsupportable for the reasons relied upon by the trial court. It should be vacated without prejudice to reconsideration of a summary judgment on other grounds. We note, however, that a primary line Robinson-Patman Act claim involves factually complex issues. *See generally O. Hommell Co. v. Ferro Corp.,* 659 F.2d 340 (3rd Cir. 1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1711, 72 L.Ed.2d 134 (1982).

### D. *Zenith's Clayton Act Section 7 Claim*

■ Zenith asserts that the acquisition by MEI in 1974 of Motorola's Consumer Products Division and its trademark "Quasar," and Sanyo's acquisition in 1976 of Warwick Electronics, Inc., violated section 7 of the Clayton Act. Other defendants are alleged to be vicariously liable for this section 7 violation. *See* 513 F.Supp. at 1329. That charge is independent of any conspiracy or intent, since section 7 prohibits acquisitions the effect of which may be substantially to lessen competition or create

monopoly in any line of commerce in any section of the country. In this case neither the relevant product market (television receivers) nor the geographic market (the United States) is in dispute. The defendants against whom the section 7 charge is made dispute three issues. The first is whether the FPS contains evidence from which it could be found that the acquisitions had the requisite tendency to lessen competition or create a monopoly. *See United States v. General Dynamics Corp.,* 415 U.S. 486, 494–506, 94 S.Ct. 1186, 1192–98, 39 L.Ed.2d 530 (1974); *United States v. Von's Grocery Co.,* 384 U.S. 270, 275–77, 86 S.Ct. 1478, 1480–82, 16 L.Ed.2d 555 (1966); *United States v. Philadelphia National Bank,* 374 U.S. 321, 372 n. 46, 83 S.Ct. 1715, 1746 n. 46, 10 L.Ed.2d 915 (1963); *Brown Shoe Co., Inc. v. United States,* 370 U.S. 294, 331–32, 82 S.Ct. 1502, 1527, 8 L.Ed.2d 510 (1962). The second is whether, in any event, the FPS establishes that Warwick was a failing enterprise and thus not a competitive force. *See United States v. Greater Buffalo Press, Inc.,* 402 U.S. 549, 555–56, 91 S.Ct. 1692, 1696, 29 L.Ed.2d 170 (1971); *Citizen Publishing Co. v. United States,* 394 U.S. 131, 136–39, 89 S.Ct. 927, 929–31, 22 L.Ed.2d 148 (1969); *International Shoe Co. v. Federal Trade Commission,* 280 U.S. 291, 299–303, 50 S.Ct. 89, 91–93, 74 L.Ed. 431 (1930). The third is whether, assuming a section 7 violation, it is one which would permit Zenith to obtain relief under section 4 or 16 of the Clayton Act.

The trial court did not resolve the first two issues. It held that as a matter of law NUE and Zenith lacked standing to obtain relief under those sections for any section 7 violation which may have occurred, because aside from the conspiracy, which of course is the subject of the section 1 and 2 Sherman Act claims, they have shown no injury from those violations. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 484–89, 97 S.Ct. 690, 695–97, 50 L.Ed.2d 701 (1977); Areeda, *Antitrust Violations Without Damage Recoveries,* 89 Harv.L.Rev. 1127, 1130–36 (1976).

In light of our holding that NUE and Zenith have adduced sufficient evidence to create a material issue concerning the alleged conspiracy, we must reverse the district court's dismissal of Zenith's section 7 claims as to all defendants except Sears, Motorola, and Sony. We express no opinion on the merits of defenses raised by defendants concerning whether the acquisitions in question had the requisite tendency to lessen competition or to create a monopoly, or whether the FPS establishes that Warwick was a failing enterprise. We also need not address the Clayton Act defenses raised in Motorola's separate brief.

*E. Clayton Act Injunctive Relief*

In addition to their prayer for damages under section 4 of the Clayton Act, NUE and Zenith seek injunctive relief under section 16 of that Act for defendants' alleged violations of the various antitrust provisions enumerated in their complaints. In the trial court's only mention of plaintiffs' request for an injunction, it held that plaintiffs' claim was moot since the manufacturers' agreements and Japan Machinery Exporters' Association rules are no longer in effect.

On appeal, the plaintiffs contend that the court erred in its determination that the plaintiffs' voluntary cessation of the aforementioned agreements alone rendered plaintiffs' claim for injunctive relief moot. We agree. In *Phillips v. Pennsylvania Higher Education Assistance Agency,* 657 F.2d 554 (3d Cir.1981), we held that voluntary cessation of allegedly illegal conduct does not by itself make a case moot. Instead, we said that a case becomes moot if (1) it can be said with assurance that there is no reasonable expectation that the alleged violation will reoccur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation. *Id.* at 569. Because the trial court relied solely on an improper factor, to the exclusion of proper factors, we believe it abused its discretion in dismissing plaintiffs' claim for injunctive relief. *Id.* at 570 (standard of review of district court's

grant or dismissal of claim for injunction is abuse of discretion). Therefore, we will vacate the court's dismissal of plaintiffs' claim for injunctive relief as to all defendants except Sears, Motorola, and Sony.

## VII. Conclusion

The summary judgment in favor of Sony Corporation, Motorola, Inc., and Sears Roebuck & Co. on the NUE and Zenith claims under sections 1 and 2 of the Sherman Act, under the Wilson Tariff Act, and under section 7 of the Clayton Act will be affirmed. The summary judgment dismissing Count V of the NUE complaint and Count IV of the Zenith complaint will be affirmed. The summary judgment in favor of the remaining defendants on the section 1 and 2 Sherman Act claims, the Wilson Tariff Act claim, the section 7 Clayton Act claim, the Robinson-Patman Act claim addressed to discriminatory sales to American customers, and the claim for injunctive relief under section 16 of the Clayton Act will be reversed. The author of this opinion would also reverse the summary judgment in favor of Sony Corporation.

Costs will be taxed in favor of Sony Corporation, Motorola, Inc., and Sears Roebuck & Co. against NUE and Zenith, and in favor of NUE and Zenith against the remaining defendants. Each party is directed to furnish to the Clerk of this Court within ten (10) days of the entry of judgment a brief written statement of its views as to allocation of costs among the parties. *See* Fed.R. App.P. 39(a).

In re JAPANESE ELECTRONIC PRODUCTS ANTITRUST LITIGATION (D.C.MDL No. 189).